# FILED

### IN THE UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

JAN 25 2024

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| **Zafar Sheikh** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **vs.** | ) | **Case No.** |
| | ) | |
| **Bashir Chaudry, Bushra Naseer** | ) | 1:24-cv-00658 |
| **Ambreen Qadir, Mahin Chaudry,** | ) | Judge Martha M. Pacold |
| **Ali Chaudry, Rabia Chaudry** | ) | Magistrate Judge Sunil R. Harjani |
| **minor children of Bashir** | ) | RANDOM / Cat. 2 |
| **and Qadir, Fadi Rafati, Sadia** | ) | |
| **Aslam 75th Bldg Inc., Sadia Aslam,** | ) | |
| **Loc Gas Inc., Chicago 59th Inc.,** | ) | |
| **Yakub Chaus & Yakub Chaus &** | ) | |
| **Co., Syed Jahantab, Hasan** | ) | |
| **Safiuddin, South Chicago One Inc.** | ) | |
| **& Shmaila Rafiq, Amjad** | ) | |
| **Chaudry, BCA investments Inc.** | ) | |
| **Junaid Ahmad, Congress Pulaski** | ) | |
| **Real Estate LLC** | ) | |

## VERIFIED COMPLAINT FOR FRAUDULENT
## TRANSFERS, CIVIL CONSPIRACY FOR FRAUD,
## AIDING & ABETTING OF FRAUDULENT TRANSFERS

i

## TABLE OF CONTENTS

**Page**

Facts common to all counts ....................................................... 1

Venue ................................................................................. 2

Parties ............................................................................... 2

Plaintiff ............................................................................. 2

Defendants .......................................................................... 3

Background .......................................................................... 6

Default by Defendants & filing of lawsuit ................................. 7

Debtor's assets prior to Judgment ........................................... 9

Current Status ..................................................................... 26

Illinois Fraudulent Transfer Act ............................................ 27

Causes of Action ................................................................. 28

Count 1 & II Against Bashir for Fraudulent Transfer ............... 28

Count III & IV Against Naseer for Fraudulent Transfer .......... 30

Count V & VI Against Qadir for Fraudulent Transfer ............ 31

Count VII & VIII Against Mahin for Fraudulent Transfer .......... 33

Count IX & X Against Safiuddin for Fraudulent Transfer ....... 35

Count XI & XII Against Abdelkader & 75th Bldg. Inc., ……….. 36

For Fraudulent Transfers ……………………………………… 36

Count XIII & XIV Against Aslam, Loc Gas & Chicago 59th Inc., . 39

For Fraudulent Transfers …………………………………….. 39

County XV & XVI Against Jahantab for Fraudulent Transfers 40

Count XVII Against Rafati for Aiding & Abetting Fraudulent 42

Transfer …………………………………………………….. 42

Count XVIII & XIV Against Rafiq for Fraudulent Transfer … 44

Count XX & XXI Against Qadir's LLC, Ali & Rabia, ………….. 47

Bashir's Minor Children for Fraudulent Transfers ……………… 47

Fraudulent Transfer ……………………………………………. 47

Count XXII Against Chaus for Aiding & Abetting Fraudulent …. 48

Transfers ……………………………………………………. 48

Count XXIII Against Chaoudhri, Chaus and Rafiq ……………… 50

For Civil Conspiracy to Commit Fraud …………………………. 50

Count XXIV Against Chaus, Choudhri & Rafiq for Aiding ……. 51

And Abetting Fraudulent Transfers ………………………………. 51

Count XXIV & XXIV Against Amjad, Bashir & BCA for ……… 52

**Actual and Constructive fraud** …………………………………… **53**

**Signature Page** …………………………………………………… **55**

**Verification by the Plaintiff** ………………………………….. **56**

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **Zafar Sheikh** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **vs.** | ) | **Case No.** |
| | ) | |
| **Bashir Chaudry, Bushra Naseer** | ) | |
| **Ambreen Qadir, Mahin Chaudry,** | ) | |
| **Ali Chaudry, Rabia Chaudry** | ) | |
| **Fadi Rafati, Soufian Abdelkader** | ) | |
| **75th St. Building Inc., Sadia Aslam,** | ) | |
| **Loc Gas Inc., Chicago 59th Inc.,** | ) | |
| **Yakub Chaus & Yakub Chaus &** | ) | |
| **Co., Syed Jahantab, Hasan** | ) | |
| **Safiuddin, South Chicago One Inc.** | ) | |
| **& Shmaila Rafiq, Amjad Chaudry** | ) | |
| **Bca Investments Inc., Congress & Pulaski** | ) | |
| **Real Estate LLC., Nusrat** | ) | |
| **Chaudry, Junaid Ahmad** | ) | |

## VERIFIED COMPLAINT FOR FRAUDULENT TRANSFERS & CIVIL CONSPIRACY

**NOW COMES THE PLAINTIFF ZAFAR SHEIKH and Complains of the**

**Defendants as Follows:**

### FACTS COMMON TO ALL COUNTS

1.  In this fraudulent transfer suit, the Debtors Bashir Chaudry (Bashir), and Bushra Naseer
    (Naseer), who owned and controlled assets of way over $10,000,000.00 (Ten Million dollars)
    with the knowledge and substantial assistance of a number of Defendants named herein,
    engaged in a complicated scheme to hide, transfer and otherwise shield their assets from the
    claims of the Plaintiff. And while Bashir and Naseer were implementing their fraudulent

transfer schemes, they selectively transferred their assets worth millions of dollars to their friends, partners, their children including some minor children, relatives and a select group of purchasers in a calibrated and strategic deliberate defaults, all in violation of state laws, Court citations, and liens which prohibited the debtors from transferring their assets.

2- While the case against Bashir and Naseer was being prosecuted in State Court, both schemed with their attorneys, accountants and close friends and transferred their assets in derogation of the rights of the Plaintiff and in violation of the state court directives. This is an action to void the debtors fraudulent transfers pursuant to the provisions of the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 et seq. (the "IUFTA"), and to recover damages from those who conspired with Bashir and Naseer in designing, implementing and executing their fraudulent transfer schemes. Plaintiff also wants the civil co-conspirators and schemers to be held liable for their malfeasance, illegal intrigues and civil conspiracies in aiding and abetting this racket.

## VENUE

3- Venue is proper as this action is brought under 28 U.S.C. §1332 as this Court has diversity jurisdiction because (a) this action is between citizens of different States with the amount in controversy exceeding $75,000.

4- In addition Venue is also appropriate in this Court pursuant to 28 U.S.C. §1391(b)(2), because a substantial portion of the events giving rise to the claims asserted herein occurred in this Judicial District.

## PARTIES

5- **Plaintiff**

Plaintiff Zafar Sheikh is a citizen of the State of Texas, who had lived in Illinois, prior to seeking retirement in Texas. Plaintiff while conducting business in Illinois had met the debtors and entered into different contracts, business transactions and promissory notes on which the

2

debtors reneged and defaulted.

6-      **Defendants**

**Bashir Chaudry aka Chaudry Bashir: (Bashir)**

Bashir is a resident of Lincolnwood, Illinois who entered into multiple agreements and contracts with the Plaintiff on which he defaulted. Bashir heads and directs other members of his family, organizes and incorporates different corporate entities, instructs his accountant to file corporate returns for himself and those in his family, hires attorneys for himself and other members of his family some of whom have been identified below. Bashir can be described as someone who controls, directs, manipulates, steers, guides and orchestrates all schemes, which other defendants within his family rehearse, and can rightly be conceived as nothing more than pawns. A Court in law division of the Cook County granted a judgment in favor of the Plaintiff Sheikh and against Bashir for $1,535,000.00 in April 2022. (Exhibit A).

**Bushra Naseer: (Naseer)**

Bushra Naseer is the sister in law of Bashir and wife of his brother, and resides in Lincolnwood, Illinois. A Court in law division of the Cook County granted a judgment in favor of the Plaintiff Sheikh and against Naseer for $257,000.00 in April 2022. (Exhibit A).

**Ambreen Chaudry aka Ambreen Qadir: (Qadir)**

Qadir is the wife of Bashir and resides in Lincolnwood, Illinois. Bashir has created different entities and assigned beneficial interests in these entities to Qadir's favor. Qadir also maintains numerous bank accounts in her name for the benefit of Bashir.

**Mahin Chaudry: (Mahin)**

Mahin is the daughter of Bashir, lives along with her parents in Lincolnwood and is a full time student at a local college. During litigation with this Plaintiff, Bashir started assigning and transferring assets to Mahin, when she was a teenager. Needless to say Mahin is under direct

3

control of Bashir and acts in accordance with Bashir's instructions.

**Ali Chaudry: Ali**

Ali is son of Bashir and lives with his parents in Lincolnwood, Illinois. Ali conforms with Bashir's wishes and Bashir has assigned and transferred businesses and numerous other assets to Ali's name.

**Rabia Chaudry: Rabia**

Rabia is daughter of Bashir and lives with her parents in Lincolnwood, Illinois. Rabia does as instructed by his father Bashir, who has transferred and parked assets in Rabia's name.

**SADIA ASLAM: (SADIA)**

Aslam is a resident of Morton Grove, Illinois and has been a partner, associate and close friends with Bashir for over ten years.

**Loc Gas Inc., (Loc Gas)**

Loc Gas is an Illinois Corporation, which is owned and controlled by both Aslam and Bashir. Loc Gas had been and still is the owner of a gas station located at 1224 West 59th Street in Chicago, Illinois.

**Chicago 59th Inc., (Chicago 59th)**

Chicago 59th is an Illinois corporation which is owned by Aslam and purchased the 59th Street gas station in a bogus carefully crafted strategic & deliberate default.

**Soufian Abdelkader (Abdelkader)**

Abdelkader is a resident of Cook County, owns 75th St., building Inc., Abdelkader owns numerous gas stations and purchased the Note from the Hinsdale Bank in a short sale.

**75th St. Building Inc., (75th St.)**

75th St. is an Illinois corporation which is being managed by Soufian Abdelkader who purchased the gas station located at 415 S. Pulaski Avenue, Chicago, in a strategic & deliberate

4

default from Bashir in a short sale disguised as a Note purchase.

**Junaid Ahmed (Ahmad)**

Ahmad is a resident of Cook County, owns Congress & Pulaski Real Estate Inc. Ahmad owns

numerous gas stations and has purchased the Gas station Note from Abdelkader.

**Congress & Pulaski Real Estate Inc., (Congress & Pulaski)**

Congress & Pulaski Real Estate Inc., is an Illinois corporation which is owned by Ahmad, and

in whose name Ahmad has purchased the Note from AbdelKader.

**Nusrat Chaudhri: (Chaudhri)**

Chaudhri is a resident of Inverness, Illinois, and a close friend and relative of Bahir. Both

Chaudhri and Bashir have been business partners since at least 2005 in one form or another.

Chaudhri is conspiring with Bashir in actively helping him conceal and shield his assets.

**Shamaila Rafiq: (Rafiq)**

Rafiq is a resident of Downers Grove, Illinois, and is 50% owner with Bashir in the gas station

at 7283 South Chicago Avenue in Chicago. The business is run under the corporate name of

South Chicago One Inc.

**South Chicago One Inc.,**

South Chicago One Inc., is an Illinois corporation which is jointly owned by Bashir and

Shamaila Rafiq. Gas station at 7283 South Chicago Avenue, Chicago is owned and run under

this corporate entity.

**Syed Jahantab (Syed)**

Syed is a resident of Morton Grove, Illinois, and is son of Bashir's friend Sha Jee. Jahantab is a

business partner of Bashir, who has transferred and parked couple of liquor stores in Jahantab's

name.

**Hasan Soufiuddin: (Safiuddin)**

5

Safiuddin is a resident of Aurora, Illinois. Bashir sold him a gas station business (not land) which is located at 415 S. Pulaski Avenue, in Chicago.

**Fadi Rafati: (Rafati)**

Rafati is a resident of Cook County, Illinois, and is certified as an attorney. Rafati owns Rafati & Ward / Rafati Law group, and was the attorney of record for Bashir and Naseer in litigation involving Plaintiff Sheikh at the Cook County trial (17-L-07194). Rafati has actively aided and abetted Bashir and Naseer to sell and hide their assets.

**Yakub Chaus dba Yakub Chaus & Co., (Chaus)**

Chaus is a resident of Cook County and maintains his office on Peterson Avenue in Chicago. Chaus is a certified public accountant who has actively helped Bashir make numerous shell companies with an intent to park Bashir's assets in the name of those companies in an effort to hide the true ownership of the Companies.

**Amjad Chaudry (Amjad)**

Amjad Chaudry is a partner of Bashir and is a resident of Cook County. Bashir has parked a recently acquired liquor store located in Wheaton, Illinois in Amjad's name.

**BCA INVESTMENTS (BCA)**

BCA is an Illinois corporation, was formed by Chaus for Bashir and Amjad and is registered in the State of Illinois. Business run by Bashir in Wheaton has been parked in BCA' name.

## BACKGROUND

7-     In April 2008 Plaintiff Zafar Sheikh (Sheikh) sold a gas station to Bashir (Bashir) located at 1224 West 59th Street in Chicago. (59th Street gas station). The price of the gas station was set at $1,500,000.00, out of which $300,000.00 was credited to Bashir for improvements by Bashir and the rest $1,200,000.00 was financed by Sheikh. Bashir signed a Note and a mortgage for this amount (Exhibit B).

6

8-   Few years later, in early 2012 Bashir was able to refinance and obtain a loan from Hanmi bank for $775,000.00 which he paid Sheikh towards the $1,200,000.00 note. That still left a balance of over $425,000.00 payable to Sheikh.

9-   Other than that Sheikh had advanced an additional $100,000.00 to Bashir to help purchase the inventory of the gas station, and also made few other cash advances to Bashir for numerous equipment purchases at the gas station, totaling over $125,000.00. (Exhibit C).

     Upon getting partial payments towards the purchase of the gas station, in 2012 both Bashir and Sheikh finalized the accounting for the balance owed to Sheikh by Bashir, upon which Bashir signed a Promissory Note for $650,000.00 in favor of Sheikh, agreeing to pay the balance owed to Sheikh no later than 2014. (Exhibit D).

10-  In early February 2012, Bashir sold 50% share in the 59th Street gas station to Aslam. Aslam was notified upon purchasing the gas station that Bashir owed Sheikh a balance of $650,000.00 and that Bashir had signed a Promissory Note to pay Sheikh all amounts still owed on the gas station by 2014.  Aslam promised to make sure that those sums were paid to Sheikh on time, so the Gas Station could be owned and run free and clear of all liens.

11-  Apart from the $650,000.00, as mentioned above, Bashir and his sister in law Naseer obtained another $200,000.00 from Sheikh and promised to pay that sum upon the sale of the gas station both owned at 415 South Pulaski Avenue in Chicago. (Exhibit E).

## CHAUDRY & NASEEER'S DEFAULT PROMPTED A LAWSUIT

## AGAINST THE BORROWERS

12-  Bashir failed to pay Sheikh  by 2014 as agreed in the Promissory Note, causing a default on the obligations under the Note. Pulaski gas station was also sold by Bashir and Naseer and despite its sale failed to pay monies owed to Sheikh. Both Bashir and Naseer had violated the terms of their Notes and were in default on making payments on over $850,000.00 in loans.

13- Sheikh made numerous attempts to collect and both Bashir and Naseer made promises to pay the amounts they owed, but never kept the promises.

14- Sheikh having failed to receive any payments finally filed a Complaint in Cook county Law division in 2017. (17-L-07194).

15- The lawsuit was finally adjudicated in April 2022. The Court granted a judgment in favor of Sheikh and against Bashir for $1,525,000.00 and in favor of Sheikh and against Naseer for $257,000.00 respectively. (Exhibit A).

16- Bashir and Naseer have since absconded and have failed to pay any money towards satisfying the judgments entered against them.

17- During the pendency of the lawsuit, (17-L-07194) and prior to its adjudication, Sheikh learned in 2019 that Bashir and Naseer were trying to sell the 59th Street and 415 Pulaski gas stations as well as some other assets that they had owned in anticipation of any judgment that the Court may enter against them. Sheikh filed a Motion on 5/6/2019, and notified the Court that Bashir and Naseer had fraudulently transferred the gas stations and/or were actively contemplating selling other assets that they owned. (Exhibit F). Sheikh asked the Court to avoid those transfers or issue an order which would prohibit them from disposing off their assets.

18- At the hearings, Fadi Rafati, Counsel of Bashir and Naseer denied that their clients were trying to sell any of the assets and assured the Court that he will advise his clients not to sell anything during the pendency of the lawsuit. Court denied Sheikh's Motion without prejudice (Exhibit F: last page), and stated that the Court will not entertain any Motion to set aside fraudulent transfers or issue any other order to block the sale of Bashir or Naseer's assets till Sheikh prevails on his lawsuit and is able to secure a judgment in his favor.

19- Despite Rafati's representations to the Court that he nor his clients were selling or contemplating Fraudulent Transfers, in reality Rafati was scouting for buyers for his clients and

after finding the buyers, cemented multiple deals to sell Bashir and Naseer's assets.

20-    Rafati also prepared all closing documents including Real Estate Purchase Agreements, accepting $100,000.00 as escrowee for the 59th Street gas station. Attached are Real estate agreements and $100,000.00 in Cashier Checks wired by Rafati as down payment and copies of escrow agreements. (Exhibit G). Likewise Rafati also prepared agreements to sell the business (not the property) at the 415 Pulaski gas station.

21-    Earlier upon filing the lawsuit in 2017, Sheikh had recorded lis pendens Notices with the Cook County Recorder of Deeds against Bashir & Naseer properties. The purpose of recording the lis pendens was to notify the public of the pending lawsuit in Cook County. (Exhibit H).

## PRIOR TO FILING THE LAWSUIT, BASHIR AND  NASEER'S ASSETS, AND THEIR MACHINATIONS TO HIDE  OR TRANSFER THEIR ASSETS

22-    At the filing of the lawsuit by Sheikh in Cook County, Bashir and Naseer had considerable holdings which were conservatively estimated to be around $8,000.000.00 to $10,000,000.00. (Eight to ten million dollars). Some of those assets were disposed off by Bashir in **Strategic deliberate defaults,** while others were sold off in fire sales to avoid paying the Plaintiff. From the monies received from those sales, Naseer and Bashir purchased additional assets and businesses which they parked in names of their spouses, children and close family friends. Some of the assets that Bashir and Naseer owned at the signing of the Promissory Notes and at the filing of the lawsuit and during its pendency appear underneath. Plaintiff would like to point out that there may even be more assets out there which are not in this Plaintiff's knowledge and which may get known in due course of time, and in discovery.

**Gas Station at 1224 W. 59th Street, Chicago**

23- Plaintiff Sheikh sold this gas station to Bashir in 2008 for $1,500,000.00. Out of which $1,200,000.00 was financed by Sheikh. Bashir sold 50% shares in the gas station to Jahanzaib and his wife Aslam for $350,000.00, and all three operated the gas station under Loc Gas Inc., The PIN Numbers of this property are: 20-17-131-018 to 024.

24- Sometime in 2016 Bashir and Aslam decided to go in *strategic deliberate default*, so the gas station could be foreclosed by the Bank. Purpose of this deliberate default was to wipe out all liens on the gas station, including the amounts owed to Sheikh, and then re-purchase the gas station in foreclosure sale, free and clear of all liens.

25- Bashir and Aslam also worked out a deal with the lender Hanmi Bank, prior to the foreclosure, which was negotiated by their attorney Rafati, which assured Hanmi Bank, that once foreclosed, the property will have a ready buyer, namely his client Mohammed Abdallah. Meantime Bashir and Aslam also assured the bank that they will not shut down the gas station during the foreclosure process and will continue to operate it.

26- Rafati negotiated the price of the re-purchase of the property with the lender Hanmi bank and it was agreed between the parties that the Hanmi bank will re-sell the gas station to Rafati's client Abdallah for $700,000.00 after foreclosure.

27- Mohammed Abdallah, Rafati's client was not the end buyer and was merely to act as a proxy, under whose name Rafati arranged to re-purchase the gas station. Since this loan was an SBA loan, their regulations prohibited re-selling the assets back to the original owners who defaulted. As such a third party to act as a proxy was needed to hide the transaction from SBA and Banking regulators.

28- In 2020 Mohammed Abdallah, as agreed with Rafati working as proxy for this transaction purchased the gas station from the bank for $700,000.00. Abdallah used 59th Property LLC to acquire the title of the gas station.

29-    On the same day Abdallah who had acquired the title under 59th Property, llc., re-sold the gas
       station back to Aslam and Bashir. In 2020 at its closing the gas station was estimated to be
       worth at least two million dollars, but Aslam and Bashir managed to buy it back from Abdallah
       for $1.2 million dollars, which is a 40% discount of its then existing market value.

30-    Aslam and Bashir financed the purchase of the gas station by obtaining a mortgage worth
       $1,200,000.00 from the Millinium Bank (Exhibit I). Aslam acted as the mortgagor.

31-    All four of them which included Abdallah, Bashir, Aslam and Rafati shared the excess proceeds
       over $700,000.00 which they had paid Hanmi bank to purchase the gas station in foreclosure
       and funneled the balance of $500,000.00, the difference between what they paid the Hanmi
       bank and the $1,200,000.00 loan (Exhibit I: Closing Statement) that they obtained from the
       Millinium bank back to themselves.

32-    This deliberate strategic foreclosure, in the scheme of things, served two purposes for Aslam
       and Bashir. One they figured that foreclosure would wipe out all liens, and deprive the Plaintiff
       from recouping on his debt, and secondly it put additional cash in their pockets estimated to be
       over $125,000.00 for themselves and for other conspirators.

33-    This Fraudulent transfer in a carefully calibrated deliberate default deprived the Plaintiff
       of an asset which could have been used to satisfy his debt and was equally useful in going
       around the lis pendens notices Sheikh had filed against the properties.

34-    The gas station was sold for $700,000.00 whereas its true market value is at least
       $2,000,000.00. In other words conspirators paid merely 1/3rd of the true value of the property,
       when the gas station was sold to Abdallah who acted as the proxy.

35-    This fraudulent Transfer made the debtor Bashir insolvent which prevented him from satisfying
       his debts to the Plaintiff.

36-    This Fraudulent Transfer was made by Bashir with actual intent to defraud the Plaintiff.

11

37- As a matter of fact nothing changed either before, during the pendency of the foreclosure proceedings or after foreclosure. Bashir and his partner Aslam retained the business and the possession of the gas station during foreclosure proceedings and continued to retain the control of the gas station after foreclosure by re-purchasing the business in a deliberate strategic default.

38- The transaction was concealed and different entities and individuals were used by Bashir and Aslam to hide this transaction. Both had substantial help from Accountant Chaus who made additional companies and corporations to hide the transaction. Chaus also deceptively helped Aslam and Bashir to triple the sales of the gas station, which he filed on their behalf with the Illinois department of Revenue and the Internal Revenue Service prior to these individuals applying the loan from the Millinium bank, which helped secure the loan.

39- This transaction was contrived by Bashir and Aslam when a lawsuit was pending in the Cook County law division seeking judgment against Bashir for monies owed to the Plaintiff.

40- The transfer of the gas station on record was to an insider, a close associate and partner of Bashir.

41- The transfer of this asset was substantial and comprised a major portion of Bashir's assets.

42- The value of the consideration received by the debtor Bashir was way lower than the market value of the asset and was not reasonably equivalent to the value of the asset transferred or the amount received for this fabricated transaction.

**Gas Station at 415 South Pulaski Avenue, Chicago:**

43- Naseer and Bashir owned this gas station at 415 South Pulaski Avenue which they purchased in 2015 for $2,2000,000.00. Fearing the judgment in the pending litigation could be entered against them, Bashir and Naseer sometime in early 2019 tried to sell the property. Since a lis pendens had been placed on the property by Sheikh, the property could not be sold as Banks shied away from writing a loan for a property in litigation. The PIN Number of the property is:

16-14-112-037-0000

44-  To go around this hurdle, Bashir and Naseer decided to sell the business only, (without real property), in which purchasers usually do not search title deficiencies.

45-  Hasan Safiuddin who was an old acquaintance of Bashir was offered the gas station business at a discount. The business alone was worth $800,000.00 but was offered at a steep discount to Safiuddin. Safiuddin purchased the gas station for $450,000.00 in cash.

46-  The sale of the gas station business was concealed by Bashir and Naseer as the business is still being run under MDDS Inc., a corporation which is owned by Bashir and Naseer, potentially giving them de-facto control of the property.

47-  Few months later Bashir and Naseer also went into strategic deliberate default on this property as well and stopped making any mortgage payments to the Bank.

48-  During this period, when Chaudry had stopped making mortgage payment to the lender Hinsdale Bank, he was introduced by a friend to One Soufian Abdelkader, who also owns and operates multiple gas stations in and around Chicago. Both Chaudry and Abdelkader concocted a plan, approached the Bank and worked out a 'short sale' arrangement of the gas station in which the bank agreed to sell the Note to Abdelkader for slightly over $000,000.00. (Redacted: Cook County Court Protective Order).

49-  Bashir owned another property under Naseer's name at 3635 West Armitage Avenue in Chicago, and both this property and the gas station were on the same loan and with the same lender, (Hinsdale Bank) were purchased by Abdelkader in a so called 'short sale' camouflaged as a 'Note Purchase' for a sum cited earlier for slightly over $000,000.00. (Exhibit J). (Protective Order).

50-  The gas station was purchased by Chaudry and Naseer in 2015 for $2,200,000.00. It is estimated that the property now is worth at least $2,500,000.00. As such the gas station which

was sold for $000,000.00 in a deliberate and strategic default was sold at a substantial discount compared to its true market value.

Sheikh has recently learned that Abdel Kader has turned around and sold his 'Note' to another company known as Congress & Pulaski Real Estate LLC for $500,000.00 over and above what Abdelkader paid Hinsdale Bank.

51- These fraudulent Transfers have made Bashir and Naseer insolvent, making them unable to satisfy the judgments against them.

52- These Fraudulent Transfer were made by Bashir and Naseer with actual intent to defraud the Plaintiff.

53- The transaction was deliberately concealed and different entities, individuals and methods were used by Bashir and Naseer to hide this transaction with the help of their accountant Chaus. Chaus prepared all sales figures of the gas station and invented an additional corporation which he named Awad Inc. to facilitate this transaction.

54- These transaction were contrived by Bashir and Naseer when a lawsuit was pending or a judgment had been entered against them in the Cook County law division.

55- The transfer of the gas station business was made to an old friend and acquaintance of Bashir and Naseer.

56- The transfer of this asset, comprised a major portion of Bashir's assets. Sale of this asset made Naseer and Bashir insolvent and unable to pay the debt and judgment which they owed the Plaintiff.

57- The value of the consideration received by the debtors Bashir and Naseer was way lower than the market value of the assets and was not reasonably equivalent to the market value of the asset transferred or the amount received for this transaction.

**Liquor Store at 3635 W. Armitage Avenue, Chicago.**

58- In 2001 Plaintiff Sheikh sold a liquor store located at 3635 West Armitage Avenue in Chicago to Bashir. The transaction included the real property as well and the sales price was set at $399,000.00 (Exhibit R). Bashir borrowed and assumed a mortgage for $350,000.00 from a local bank. The PIN Number of the property is: 13-35-305-047.

59- In 2012 Bashir went into a deliberate default on this property and stopped making mortgage payments to the Bank. It left the Bank with a choice to either file foreclosure proceedings in the Court, which would have resulted in substantial legal fees, and eighteen months or more of receiving no payments on its loan or as an alternative, sell the property.

60- Having cornered the Bank, Bashir pushed the Bank into agreeing to a 'short sale' and repurchased the property in his brother and sister-in-law Naseer's name. Naseer paid the Bank $206,000.00 (Exhibit S). Through this strategic and deliberate default, Bashir shaved off almost $140,000.00 from the price he paid on original mortgage.

61- Bashir continued to make payments thru his brother and sister in law on the $206,000.00 mortgage at which it had re-purchased the property till the end of 2021 and then went into another deliberate default and stopped making further payments to the Bank on his mortgage.

62- It was learned recently by Sheikh that few months ago Bashir has transferred the liquor store business to his son Ali. Since Ali is yet to receive his liquor license, he is using the liquor license of his mother Qadir, which Bashir had obtained few years earlier in his wife's name. Bashir's accountant Chaus played a significant part in perpetrating this transaction by creating different entities in an effort to hide the transaction from Sheikh.

63- The total amount Bashir received for concocting this deliberate "short sale" of Armitage liquor store and the gas station as outlined above at 415 S. Pulaski Avenue was $600,000.00. Apart from pocketing 00,000.00, Bashir also managed to take these properties out of reach for Sheikh, which Sheikh could have sold after getting the judgment to recoup on his judgment. As noted

earlier, Note obtained in short sale by Abdelkader from Hinsdale Bank has been re-sold to another company 'Congress & Pulaski Real Estate LLC' which is owned by Junaid Ahmed. Congress & Pulaski LLC owns and operates numerous gas stations, and has no history, like Abdelkader of purchasing Notes from banks. This so called purchasing of "Note" was a back door attempt to purchase the gas station and liquor store which these two companies could not have purchased because of Sheikh's lis pendens placed on the properties as well as the 'Memorandum of Judgment' which was recorded by Sheikh against the properties after the Court in Cook County entered the judgment in Sheikh's favor..

64- The combined value of 3635 Armitage liquor store and 415 S. Pulaski gas station is estimated to be around $2,800,000.00, which was sold to Abdelkader in a "short sale" for far less than its true market value for a paltry sum of $000,000.00 (Price withheld: Protective Order of Cook County Court). See Note below.

65- This fraudulent Transfer made Bashir and Naseer insolvent, making them unable to satisfy the judgments against them.

66- This Fraudulent Transfer was made by Bashir and Naseer with actual intent to defraud the Plaintiff.

67- The transaction was deliberately concealed and different entities and individuals were used by Bashir and Naseer to hide this transaction.

68- This transaction was contrived by Bashir and Naseer when a lawsuit was pending in the Cook County law division seeking judgment against Bashir and Naseer, and/or a judgment had been either entered or was about to be entered by the Court against these individuals.

69- The transfer of the liquor store property was made to an old friend and acquaintance of Bashir and Naseer.

*(1): Price paid for these assets is so low that Abdlekader before providing documents in Response to Sheikh's Subpoena, insisted that Sheikh sign a non-disclosure agreement.*

70- The transfer of this asset was substantial and comprised a major portion of Bashir's assets on which the debts owed to the Plaintiff could have been satisfied. This transfer has made Bashir insolvent and unable to satisfy Sheikh's judgment.

71- The value of the consideration received by the debtors Bashir and Naseer, as well as Abdelkader and Congress Pulaski Real Estate Inc., or the transfer of liquor store by Bashir to his son, believed to have been made for no consideration at all was way lower than the market value of the assets and was not reasonably equivalent to the market value of the asset transferred or the amount received for this transaction. The transfer was made to a close family member, in this case to Bashir's son Ali.

Sheikh would like to point out that Bashir has successfully used the strategic and deliberate defaults on multiple occasions on numerous other properties. Just few of the properties which fell victim to his deliberate and strategic defaults are listed below:

-Gas station at 3700 West 111th Street, Chicago.

- Strip Center at 6119-6131 S. Ashland Avenue, Chicago.

-Priceless Groceries, 501 W. Fairchild Road, Danville, Illinois.

-Strip Center at 5049 West Madison, Chicago, Illinois.

**Grocery Store at 951 S. Lewis Avenue, in Waukegan.**

72- In 2015 Bashir and Naseer purchased the grocery store at 951 South Lewis Avenue in Waukegan, Illinois, a far northern municipality situated close to Wisconsin. The property is located in Lake County and bears the PIN Number of 08-29-400-029-0000.

73- Naseer paid $417,000.00 for the real property and another $350,000.00 was paid for the business and fixtures of the property.

74- After the initiation of the lawsuit by the Plaintiff (17 L 07194), and in anticipation of a judgment being entered against Naseer, who had the property title parked under Sandal Inc.

transferred the corporation to her sister-in-law, Qadir, who happens to be the wife of the debtor Bashir. Chaus arranged to create new corporation in which Bashir shifted his newly transferred business for the sole purpose of hiding Bashir and Naseer's assets from this Plaintiff.

75- This Fraudulent Transfer has divested Naseer and Bashir of another asset that could have been utilized by the Plaintiff towards executing and partially satisfying his judgment.

76- The grocery store was transferred by Naseer to her sister-in-law Qadir, wife of debtor Bashir for very little or no consideration at all.

77- This fraudulent Transfer has made Naseer and Bashir insolvent, making them unable to satisfy the judgments against them.

78- This Fraudulent Transfer was made by Naseer and Bashir with actual intent to defraud the Plaintiff.

79- The transaction was deliberately concealed and different entities and individuals were used by the debtors to hide this transaction.

80- This Fraudulent Transfer was contrived by Naseer and Bashir when a lawsuit was pending in the Cook County law division seeking judgments against Bashir and Naseer.

81- This Fraudulent Transfer of the grocery store was made by Naseer and Bashir to an insider and a close relative of theirs, in this case to Bashir's wife Qadir.

82- The transfer of this asset was substantial and comprised a major portion of debtor's assets.

83- The value of the consideration received by the debtor Naseer and Bashir was insignificant and way lower than the market value of the asset and was not reasonably equivalent to the market value of the asset transferred or the amount received for this transaction.

**Grocery Store at 1401 14th Street, Waukegan.**

84- Being flush with money by concocting multiple 'short sales' and 'strategic deliberate defaults' and holding a sizeable cash, Bashir over the next few months purchased numerous businesses.

One of the businesses that Bashir purchased was a grocery store located at 1401 14th Street, in Waukegan, Illinois. Bashir paid over $100,000.00 in cash to purchase this business.

85- In an effort to hide the true ownership of the store, Bashir put the business in his daughter Mahin's name. Bashir also had all business licenses issued in Mahin's name as well.

86- Bashir also applied for a liquor license in Mahin's name, and had a liquor license issued for the business. The business is fully run, operated and managed by Bashir and his daughter is merely a figurehead, who attended a local college when he purchased the store. Bashir always had been and remains the main beneficiary of all profits and proceeds of this business. Chaus made bogus and dummy companies to hide the ownership of the business.

87- This fraudulent Transfer of $100,000.00 cash to purchase the business on his daughter's name made Bashir insolvent, making him unable to satisfy the judgments against them.

88- This Fraudulent Transfer was made by Bashir with actual intent to hide, hinder, delay and defraud the Plaintiff.

89- The transaction was deliberately concealed and different entities and individuals were used by Bashir to hide this transaction.

90- This transaction was consumed by Bashir when a lawsuit was pending in the Cook County law division seeking judgment against Bashir for debts he owed the Plaintiff.

91- The transfer of $100,000.00 cash to Mahin and the purchase of business was made to an insider who happened to be the daughter of the debtor Bashir.

92- The transfer of this asset was substantial and comprised a major portion of Bashir's assets which made Bashir insolvent and unable to satisfy his debts to the Plaintiff.

**Liquor Store at 4200 West Armitage Avenue, Chicago.**

93- With so much cash in hand, Bashir also decided to purchase a liquor store located at 4200 West Armitage Avenue in Chicago. For this business Bashir paid One named Aziz over $130,000.00

in cash. The price included business, goodwill and inventory.

94-    As usual fearing a judgment in the lawsuit that was filed by the Plaintiff to recover the sums Bashir owed him, Bashir put the business in Syed Jahantab's name. Jahantab is the son of Mr. Shah Jee, now deceased, who was a close friend of Bashir. The fictitious chain of ownership and the legal entities made to hide the transaction were made by Chaus.

95-    All licenses and leases of this liquor store are in Jahantab or on his entities name, but Bashir remains the true owner and maintains total control over the operation and management of the business. Bashir also remains the beneficiary of the profits and the proceeds of the business.

96-    This fraudulent Transfer of $130,000.00 cash to Jahantab and to purchase the business on his close friend's name made Bashir insolvent, making him unable to satisfy the judgments against him.

97-    This Fraudulent Transfer was made by Bashir with actual intent to hide cash from his creditors, and defraud the Plaintiff.

98-    The transaction was deliberately concealed and different entities and individuals were used by Bashir to hide this transaction.

99-    This Fraudulent Transfer was perpetrated by Bashir when a lawsuit was pending in the Cook County law division seeking judgment against Bashir for debts he owed the Plaintiff.

100-    The transfer of $130,000.00 cash and the purchase of business was made to an insider who happened to be the son of his close friend Shah Jee.

101-    The transfer of this asset was substantial and comprised a major portion of Bashir's assets. It also made Bashir insolvent and unable to pay his debts to the Plaintiff.

**Liquor Store at 4234 W. Fullerton, Chicago**

102-    Apart from investing on Jahantab's name on the 4200 West Armitage business, Bashir also

invested over $80,000.00 on a business that Jahantab had been operating since 2005. This business was run by his father Shah Jee, but upon his death was taken over by Jahantab, Shah Jee's son.

103- Bashir invested this money to upgrade the store, purchase additional inventory as he converted the store to a liquor store, which previously didn't have a liquor license.

104- This fraudulent Transfer of $80,000.00 in cash to purchase the 50% share in the liquor store business with Jahantab made Bashir insolvent, making him unable to satisfy the judgments against him.

105- This Fraudulent Transfer was made by Bashir with actual intent to hide the cash from his creditors and defraud the Plaintiff.

106- The transaction was deliberately concealed and different entities and individuals were used by Bashir to hide this transaction.

107- This transaction was contrived by Bashir when a lawsuit was pending in the Cook County law division seeking judgment against Bashir for debts he owed the Plaintiff.

108- The transfer of $80,000.00 in cash and the purchase of business was made to an insider who happened to be the son of his family friend.

109- The transfer of this asset was substantial and comprised a major portion of Bashir's assets.

**Gas Station at 7283-87 South Chicago Avenue, Chicago.**

110- In 2005 Bashir purchased a gas station located at 7283-87 S. Chicago Avenue in Chicago, in which Nusrat Choudhri was his partner. Both financed the purchase thru a loan from Allegiance Community bank (Exhibit K). The property consisted of gas station land as well as the business which sold fuels and additives. Both Bashir and Chaudhri managed, owned and operated the gas station. Bashir and Chaudhri are not only related but also close friends.

111- According to an unverified "transfer document" which is not authenticated, notarized or certified, Choudhri claims that Bashir sold him his 50% share of the land on which the gas station/building was located for a symbolic sum of $10.00 (Exhibit L).

112- It was learned that the real amount for which Bashir sold his 50% interest in the gas station was $800,000.00, as the total market value of the property 15 years ago was estimated to be $2,000,000.00.. This sum was financed by Bashir over a twenty five year period under which Chaudhri is paying this amount to Bashir in equal monthly installments. Under the agreement and in return, Choudhri relinquished the business operation of the fuel station exclusively to Bashir, whereas the land which included the building and the structure itself was deeded and was to be retained by Chaudhri. After acquiring the business Bashir turned around and sold 50% of the gas station operation to one Shmaila Rafiq for $200,000.00.

The partnership between Bashir and Rafiq is proven by certain documents which filed with the Cook County Recorder of Deeds in 2018 by Gas Depot Inc., which supplies fuel and related additives to the gas stations. Additional documents related to this transaction including a 'Right of First refusal' were also recorded by Byline Bank, signed both by Bashir and Rafiq. These documents gave Gas Depot right of first refusal to either purchase or decline to purchase the gas station property in case the property was ever sold. (Exhibit M). This 'Right of first refusal' document conveys the impression that Bashir may have re-purchased the real estate or partially purchased the real estate back from Chaoudhri, since only an individual having ownership interest in a property can grant the right of first refusal to a third party. Apart from the above, in 2023 in response to a Citation issued to Chaoudhri in supplemental proceedings in Cook County, Chaudhri's filed a detailed response in which he acknowledged that the gas station business indeed is owned by Bashir and Rafiq. (Exhibit N: Pages 3,4).

113- The gas station (business and building) is estimated in 2024 to have a combined value of over

$2,500,000.00 (two million five hundred thousand dollars), whereas the business alone which is owned by Bashir and Rafiq is conservatively estimated to be worth $700,000.00. This gas station is one of the largest gas stations on South Chicago Avenue and co-incidentally one of the busiest.

114- Choudhri and Bashir are related to each other apart from being close friends. A character letter written by Mahin, Bashir's daughter to U.S. District Court Judge Kennelly asking him to show leniency in sentencing Choudhri after the conclusion of a criminal trial, shows that Choudhri is "like a second father' to Bashir's children. (Exhibit O). Truly a close relationship.

115- Both Choudhri and Bashir are trying to workout an arrangement in which Rafiq is being pressurized to claim that she has purchased the shares of Bashir and has become the sole owner of the gas station, thus making her liable for facilitating this fraudulent transfer and any financial liability which could be fairly assessed at or over $350,000.00 as being the fair market value of the proceeds that she could have received from Bashir in a fraudulent transfer.

116- It is believed that Bashir and Chaoudhri are coercing Rafiq to make false statements as Rafiq feels threatened that if she doesn't follow the script, Chaoudhri who owns the building and is the landlord could cancel Raafiq's month to month lease or take other actions which could force her out of the business, resulting in Rafiq loosing her equity and investments.

117- This fraudulent Transfer of the 50% of the business shares of Bashir, to Rafiq made Bashir insolvent, making him unable to satisfy the judgments against him. Chaus made all corporations and legal entities in whose name Chaoudhri and Bashir could switch their assets back and forth. Chaus created South Chicago Once Inc., in whose name this gas station is being parked by Bashir and Rafiq.

118- This Fraudulent Transfer was made by Bashir to Rafiq with actual intent to hide his assets from his creditors and defraud the Plaintiff.

119-    The transaction was deliberately concealed and different entities and individuals were used by
        Bashir and Rafiq to hide this transaction with active help from Chaus.

120-    This transaction was contrived by Bashir when a lawsuit was pending, or a judgment was about
        to be entered against him in a court of law in Cook County. The transaction was concealed and
        was meant to hide it from being known to Bashir's creditors including the Plaintiff.

121-    The transfer of this asset was substantial and comprised a major portion of Bashir's assets
        which made Bashir insolvent and unable to pay his creditors.

**Purchase of a luxury Single Family House in Lincolnwood**

122-    Having sold the gas station at 415 Pulaski Avenue, the liquor store at 3635 Armitage Avenue
        and the 59th Street gas station, Bashir was awash and loaded with substantial amounts of cash.
        Bashir knew that having that much cash after a judgment that had been entered against him, or
        was to be entered against him in a short order was risky. As such Bashir decided invest this cash
        in a way that it could not be easily traced. To perpetrate this scheme, Bashir decided to park this
        cash in real estate and purchased a luxury single family home in Lincolnwood, Illinois.

123-    Since Bashir Could not purchase the house under his or his wife's name, he asked Chaus for
        help. Chaus advised Bashir not to purchase the house under his own name and instead form a
        brand name LLC, which will be unknown to the Plaintiff Sheikh, and advised him to put the
        house into the newly minted LLC, which Chaus named Qadir's LLC (Exhibit P).

124-    Chaus invented and structured the LLC in a way in which Bashir's two minor children Ali and
        Rabia were to be the members of the LLC. Since the children were minor and could not manage
        the LLC, Bashir was to act as a guardian and manage the affairs of the LLC.

125-    Chaus knew that the new LLC was being formed to hide and shield the assets of Bashir from
        the Plaintiff. The purchase of the house was totally handled by Bashir in which Bashir located
        the house, made an offer to purchase the house, negotiated the sales price, hired Attorney Sheraz

Darr for closing, went to the closing of this house and paid $470,000.00 in cash to purchase the house (Exhibit Q). Bashir remains the owner of the house, but to defraud his creditors, Bashir parked the house in the name of the newly minted Qadir's LLC., which shows his minor children Ali and Rabia as being beneficial owners.

126- This transaction was kept hidden by Bashir and perpetrated in complete secrecy.

127- This Fraudulent Transfer was made by Bashir with actual intent to hide the cash from his creditors and defraud the Plaintiff.

128- The transaction was deliberately concealed and different entities and individuals were used by Bashir to hide this transaction. The disposition of almost half a million dollars of cash made Bashir insolvent and unable to pay his debts to the Plaintiff.

129- This transaction was contrived by Bashir when a lawsuit was pending in the Cook County law division seeking judgment against Bashir for debts he owed the Plaintiff or judgment was about to be entered against Bashir.

130- The transfer of $470,000.00 in cash to close relatives, in this instance to his minor children for the sole purpose of purchasing this luxury house in Lincolnwood was made to insiders with the intent to defraud the Creditors including this Plaintiff.

131- The transfer and disposition of $470,000.00 in cash is a substantial sum by any standard and comprised a major portion of Bashir's assets.

132- The disposition of such a large sum of cash has made Bashir insolvent and unable to pay his debts, including the debt of the Plaintiff.

**Bashir invests in an Additional $125,000.00 in a Grocery Store in Wheaton**

133- Plaintiff has just recently unearthed another investment by Bashir in which Bashir has invested over $125,000.00 in cash and purchased a grocery store located at 326 West Liberty Road in Wheaton.

134-    In this transaction Bashir paid $125,000.00 cash to a close associate Amjad Chaudry. Both invested and own this business on a 50/50 basis,, but to hide this asset, Chaus invented a brand new corporation he named BCA Investment, which shows Amjad Chaudry as being the sole owner of this business. Debtor Bashir's name is not even on the record.

135-    Bashir invested this money with Amjad to hide and conceal his assets and to defraud and deceive the Plaintiff.

136-    This disposition of over $125,000.00 in cash has made Bashir insolvent and unable to pay his debts and liabilities too his creditors including to this Plaintiff.

### CURRENT STATUS

137-    Current status of Plaintiff's investigations in this matter are ongoing, and Plaintiff is attempting to reconstruct the universe of Fraudulent Transfers between and amongst the debtors Bashir, Naseer and their relatives and friends. So far Plaintiff has relied on some records filed with the Cook County Recorder of Deeds but true scope and extent of debtors conversions and transfers still remains under wrap. There is a strong possibility that out there are assets which are owned by Bashir and Naseer, are hidden or concealed under layers of corporate or personal machinations. For example the purchase of the luxury estate uncovered just weeks ago by Sheikh was so well concealed by Bashir with help from a professional accountant and CPA Chaus, that to unearth or disentomb this transaction was practically an impossible task.

### CHAUDRY & NASEER CANNOT SATISFY THE JUDGMENTS
### WITH THEIR REMAINING ASSETS

138-    Bashir and Naseer have represented that they have no assets with which to satisfy the Judgments, entered by Court in favor of Sheikh and against them . The house which is owned by Bashir at 6655 N. Monticello Avenue in Lincolnwood and the house owned by Naseer at 3673 West Northshore Avenue in Lincolnwood have multiple judgments listed against them,

and those judgments which were placed on their properties before Sheikh's judgment are superior and have priority over the Plaintiff's judgment.

## ILLINOIS FRAUDULENT TRANSFER ACT AFFORDS RELIEF

## TO THE PLAINTIFF SHEIKH

139-      **740 ILCS 160/6(A) states:**

(a)  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation.

140-      **740 ILCS 160/5 states in pertinent part:**

(a)    A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
 (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
 (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.
 (b) In determining actual intent under paragraph (1) of subsection (a), consideration may be given, among other factors, to whether:
(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
 (3) the transfer or obligation was disclosed or concealed;
 (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
 (6) the debtor absconded;
 (7) the debtor removed or concealed assets;
 (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
 (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
 (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

141-     **740 ILCS 160/8 states in pertinent part:**

(a) In an action for relief against a transfer or obligation under this Act, a creditor, subject to the limitations in Section 9, may obtain:

(1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

(2) an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by the Code of Civil Procedure;

(3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure,

(A) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(B) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

(C) any other relief the circumstances may require.

(b) If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.

### Causes of Action

#### Count I: Against Bashir for Avoidance of Actually Fraudulent Transfers

For Count I of its verified Complaint, Sheikh incorporates the allegations contained in the preceding paragraphs 1 through 136 as if part and parcel of this Count, and further states as follows:

142-    Bashir perpetrated each of the Fraudulent Transfers as noted above by disposing off gas stations on 59th Street, another gas station at 415 South Pulaski Avenue, liquor store property at 3635 Armitage Avenue, grocery store at 951 S. Lewis Avenue in Waukegan, liquor store at 4200 W. Armitage Avenue, another liquor store at 4234 West Fullerton Avenue, luxury single family house at 7001 North Keeler Avenue in Lincolnwood and transferred them to his family friends, Spouse, son, daughters and other close friends and associates.

143-    These Transfers were made with the actual intent to hinder, delay or defraud Plaintiff.

144-    These transfers made Bashir insolvent and unable to pay his debts.

145-    Transfers were made when Plaintiff had filed or about to be filed, judgment rendered or about to be rendered and Bashir intended to put his assets out of reach for the Plaintiff.

146-    The transfers were concealed and were kept a close secret by Bashir.

147-    **WHEREFORE,** Plaintiff prays that this Court enter a judgment in favor of the Plaintiff and against Bashir, thus:

A.    avoiding all the Transfers as itemized above,

B.    preserving the avoided Transfers for the benefit of the Plaintiff;

C.    awarding Plaintiff a money judgment against Bashir or/and his transferees, and

D.    granting all other relief which this Court deems is just and proper in the premises.

### Count II: Against Bashir for Avoidance of Constructively Fraudulent Transfers

148-    For Count II of its Verified Complaint, Plaintiff incorporates the allegations contained in the preceding paragraphs 1 through 136, and further states as follows:

149-    Bashir made each of the Constructively Fraudulent Transfers including 415 Pulaski gas station, 1224 W. 59th Street, Chicago, 951 S. Lewis Avenue, Waukegan, 4200 W. Armitage Avenue, Chicago, 3635 W. Armitage Avenue, Chicago and 4234 W. Fullerton Avenue in Chicago and 7001 North Keeler Avenue in Lincolnwood.

151-    Each of the Constructively Fraudulent Transfers was made without the transferor receiving a reasonably equivalent value in exchange while the transferor was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to its business or the transaction.

151-    Each of the Constructively Fraudulent Transfers was made without the transferor receiving a reasonably equivalent value in exchange and the transferor intended to incur, or reasonably should have believed, that the transferor would incur debts beyond the transferor's ability to pay as the debts became due.

152-    **WHEREFORE,** Plaintiff prays that this Court enter a judgment in his favor and against Bashir thus:

A.     avoiding all Constructively Fraudulent Transfers Bashir made as itemized above;

B.     preserving the avoided Constructively Fraudulent Transfers for Plaintiff's benefit;

       C. awarding Plaintiff a money judgment against Bashir in the amount of the Constructively

       Fraudulent Transfers, plus post-judgment interest, and costs of the proceedings;

D.     and granting all other relief which this Court deems is just and proper in the premises.

       **Count III: Against Naseer for Avoidance of Actually Fraudulent Transfers**

       For Count III of its Verified Complaint, Sheikh incorporates the allegations contained in the

       preceding paragraphs 1 through 136 as if part and parcel of this Count, and further states as

       follows:

153-   Naseer perpetrated each of the Fraudulent Transfers as noted above by disposing off gas

       stations at 415 South Pulaski Avenue, Liquor store at 3635 Armitage Avenue, grocery store at

       951 S. Lewis Avenue in Waukegan,  and transferred them to her family friends, sister-in-law and

       other close associates.

154-   These Fraudulent Transfers were made with the actual intent to hinder, delay or defraud

       Plaintiff.

155-   These transfers made Naseer insolvent and unable to pay her debts. 156-          Transfers

       were made when Plaintiff had filed or was about to file a lawsuit against Naseer and Naseer

       intended to put her assets out of reach to the Plaintiff.

157-   The transfers were concealed and were kept a close secret by Naseer.

158-   **WHEREFORE,** Plaintiff prays that this Court enter a judgment in favor of the Plaintiff and

       against Naseer, thus:

A.     avoiding all Transfers as itemized above,

B.     preserving the avoided Fraudulent Transfers for the benefit of the Plaintiff;

C.     awarding Plaintiff a money judgment against Naseer or/and her transferees, and

D.     granting all other relief which this Court deems is just and proper in the premises.

### Count IV: Against Naseer for Avoidance of Constructively Fraudulent Transfers

159- For Count IV of its Verified Complaint, Plaintiff incorporates the allegations contained in the preceding paragraphs 1 through 136, and further states as follows:

160- Naseer made each of the Constructively Fraudulent Transfers including 415 Pulaski gas station, 3635 W. Armitage Chicago, and 951 Lewis Avenue, Waukegan.

161- Each of the Constructively Fraudulent Transfers was made without the transferor receiving a reasonably equivalent value in exchange while the transferor was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to its business or the transaction.

162- Each of the Constructively Fraudulent Transfers was made without the transferor receiving a reasonably equivalent value in exchange for what the transferor intended to incur, or reasonably should have believed, that the transferor would incur debts beyond the transferor's ability to pay as the debts became due.

163- **WHEREFORE,** Plaintiff prays that this Court enter a judgment in his favor and against Naseer, thus:

A. avoiding the Constructively Fraudulent Transfers Naseer made as itemized above,

B. preserving the avoided Constructively Fraudulent Transfers for Plaintiff's benefit;

C. awarding Plaintiff a money judgment against Naseer in the amount of the Constructively Fraudulent Transfers, plus post-judgment interest, and costs of the proceeding;

D. and granting all other relief which this Court deems is just and proper in the premises.

### Count V: Against Qadir for Avoidance of Actually Fraudulent Transfers

For Count V of its Verified Complaint, Sheikh reincorporates the allegations contained in the preceding paragraphs 1 through 136 as if part and parcel of this Count, and further states as follows:

164-    Qadir perpetrated each of the Fraudulent Transfers as noted above by fraudulently
        accepting the gas stations at 415 South Pulaski Avenue, 3635 W. Armitage Avenue, and grocery
        store at 951 S. Lewis Avenue in Waukegan.

165-    These Fraudulent Transfers were made with the actual intent to hinder, delay or defraud
        Plaintiff.

166-    These transfers have made the debtors Chaudry and Qadir's sister-in-law Naseer
        insolvent and unable to pay theird debts.

167-    Transfers were made when Plaintiff had filed or was about to file a lawsuit against the debtors
        which they intended to put their assets out of reach to the Plaintiff.

168-    The transfers were concealed and were kept a close secret by Qadir.

169-    Qadir was a mere proxy, while her husband controlled the businesses,

170-    **WHEREFORE,** Plaintiff prays that this Court enter a judgment in favor of the Plaintiff
        and against Qadir, thus:

A.      avoiding all Fraudulent Transfers as itemized above,

B.      preserving the avoided Fraudulent Transfers for the benefit of the Plaintiff;

C.      awarding Plaintiff a money judgment against Qadir or her transferees, and

D.      granting all other relief which this Court deems is just and proper in the premises.

**Count VI: Against Qadir for Avoidance of Constructively Fraudulent Transfers**

171-    For Count VI of its Verified Complaint, Plaintiff reincorporates the allegations    contained in
        the preceding paragraphs 1 through 136, and further states as follows:

172-    Qadir made each of the Constructively Fraudulent Transfers as outlined earlier including
        415 Pulaski Gas Station, 3635 W. Armitage Avenue and 951 S. Lewis Avenue, Waukegan.

173-    Each of the Constructively Fraudulent Transfers were made without the transferor receiving a

reasonably equivalent value in exchange while the transferor was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to its business or the transaction.

174- Each of the Constructively Fraudulent Transfers was made without the transferor receiving a reasonably equivalent value in exchange and the transferor intended to incur, or reasonably should have believed, that the transferor would incur debts beyond the transferor's ability to pay as the debts became due.

175- **WHEREFORE**, Plaintiff prays that this Court enter a judgment in his favor and against Qadir, thus:

A. avoiding the Constructively Fraudulent Transfers made and itemized above,

B. preserving the avoided Constructively Fraudulent Transfers for Plaintiff's benefit;

C. awarding Plaintiff a money judgment against Qadir in the amount of the Constructively Fraudulent Transfers, plus pre-judgment interest, and costs of the proceeding;

D. and granting all other relief which this Court deems is just and proper in the premises.

**Count VII: Against Mahin for Avoidance of Actually Fraudulent Transfers**

For Count VII of its Verified Complaint, Sheikh reincorporates the allegations contained in the preceding paragraphs 1 through 136 as if part and parcel of this Count, and further states as follows:

176- Mahin participated in and perpetrated each of the Fraudulent Transfers as noted above by fraudulently accepting the grocery store in her name, located at 1401 14th Street in Waukegan, and the grocery store at 4200 W. Armitage Avenue, knowing that she was doing so at the instructions of his father, and was to act as a proxy and nominal owner for such purpose,

177- The Fraudulent Transfer was made with the actual intent to hinder, delay or defraud Plaintiff.

178- These transfers have made the debtors including his father Bashir insolvent and

unable to pay the debts he owed.

179- Transfers were made when Plaintiff had filed or was about to file a lawsuit against the debtors which the debtors intended to put their assets out of reach to the Plaintiff.

180- The transfers were concealed and were kept a close secret by Mahin.

181- Mahin was acting as a proxy, whereas her father Bashir controlled the business,

182- **WHEREFORE,** Plaintiff prays that this Court enter a judgment in favor of the Plaintiff and against Mahin thus:

A. avoiding the Fraudulent Transfers,

B. preserving the avoided Fraudulent Transfers for the benefit of the Plaintiff;

C. awarding Plaintiff a money judgment against Mahin or her transferees, and

D. granting all other relief which this Court deems is just and proper in the premises.

**Count VIII: Against Mahin for Avoidance of Constructively Fraudulent Transfers**

183- For Count VIII of its Verified Complaint, Plaintiff incorporates the allegations contained in the preceding paragraphs 1 through 136, and further states as follows:

184- Mahin made each of the Constructively Fraudulent Transfers and included 1401 14th Street liquor store in Waukegan, Illinois.

185- Each of the Constructively Fraudulent Transfers were made without the transferor receiving a reasonably equivalent value in exchange while the transferor was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to its business or the transaction.

186- Each of the Constructively Fraudulent Transfers was made without the transferor receiving a reasonably equivalent value in exchange and the transferor intended to incur, or reasonably should have believed, that the transferor would incur debts beyond the transferor's ability to pay as the debts became due.

187- **WHEREFORE,** Plaintiff prays that this Court enter a judgment in his favor and against Mahin, thus:

A. avoiding the Constructively Fraudulent Transfers so made for the liquor store located at 1401 14th Street in Waukegan, Illinois.

B. preserving the avoided Constructively Fraudulent Transfers for Plaintiff's benefit;

C. awarding Plaintiff a money judgment against Mahin in the amount of the Constructively Fraudulent Transfers, plus pre-judgment interest, costs of the proceeding;

D. and granting all other relief which this Court deems is just and proper in the premises.

**Count IX: Against Safiuddin for Avoidance of Actually Fraudulent Transfers**

For Count IX of its Verified Complaint, Sheikh incorporates the allegations contained in the preceding paragraphs 1 through 136 as if part and parcel of this Count, and further states as follows:

188- Safiuddin participated in and perpetrated each of the Fraudulent Transfers as noted above by fraudulently accepting the gas station at 415 South Pulaski Avenue in

Chicago, knowing that he was doing so to make that asset unreachable to the Plaintiff.

189- The Fraudulent Transfer was made with the actual intent to hinder, delay or defraud Plaintiff.

190- These transfers made the debtors including the transferor Bashir insolvent and unable to pay the debts he owed. Transfers were made to a close friend of Bashir.

191- Transfer was made when Plaintiff had filed or was about to file a lawsuit against the debtors and the debtors intended to put their assets out of reach to the Plaintiff.

192- The transfers were concealed and were kept a close secret by Safiuddin.

193- **WHEREFORE,** Plaintiff prays that this Court enter a judgment in favor of the Plaintiff and against Safiuddin thus:

A: avoiding the Fraudulent Transfers,

B. preserving the avoided Fraudulent Transfers for the benefit of the Plaintiff;

35

C.      awarding Plaintiff a money judgment against Safiuddin, and

D.      granting all other relief which this Court deems is just and proper in the premises.

**Count X: Against Safiuddin for Avoidance of Constructively Fraudulent Transfers**

194-    For Count X of its verified Complaint, Plaintiff incorporates the allegations contained in the
        preceding paragraphs 1 through 136, and further states as follows:

195-    Safiuddin made each of the Constructively Fraudulent Transfers and transferred an asset to his
        name namely the 415 Pulaski gas station in Chicago.

196-    Each of the Constructively Fraudulent Transfers were made without the transferor receiving a
        reasonably equivalent value in exchange while the transferor was engaged or was about to
        engage in a business or transaction for which its remaining assets were unreasonably small in
        relation to its business or the transaction.

197-    Each of the Constructively Fraudulent Transfers was made without the transferor receiving a
        reasonably equivalent value in exchange and the transferor intended to incur, or reasonably
        should have believed, that the transferor would incur debts beyond the transferor's ability to pay
        as the debts became due.

198-    **WHEREFORE,** Plaintiff prays that this Court enter a judgment in his favor and against
        Safiuddin, thus:

A.      avoiding the Constructively Fraudulent Transfers so made;

B.      preserving the avoided Constructively Fraudulent Transfers for Plaintiff's benefit;

C.      awarding Plaintiff a money judgment against Safiuddin in the amount of the Constructively
        Fraudulent Transfers, plus pre-judgment interest, and costs of the proceeding;

D.      and granting all other relief which this Court deems is just and proper in the premises.

**Count XI: Against Abdelkader and 75th St. Building Inc., Junaid Ahmad and Congress
Pulaski Real Estate Inc., for Avoidance of Actually Fraudulent Transfers**

For Count XI of its Amended Complaint, Sheikh incorporates the allegations contained in the preceding paragraphs 1 through 118 as if part and parcel of this Count, and further states as follows:

199-    Abdelkader and his fully owned corporation 75th St. Building Inc., Junaid Ahmad and his fully owned Congress & Pulaski RE Inc., participated in and perpetrated each of the Fraudulent Transfers as noted above by fraudulently accepting the gas station at 415 South Pulaski Avenue in Chicago, as well as liquor store located at 3635 W. Armitage Avenue, in Chicago, knowing that he was doing so to make that asset unreachable to the Plaintiff. Purchase was disguised as purchasing the Note on which Bashir deliberately defaulted.

200-    The Fraudulent Transfer was made with the actual intent to hinder, delay or defraud the Plaintiff.

201-    These transfers made the debtors including the transferor Bashir insolvent and unable to pay the debts he owed, and transfers were made to a close friend or associate, and was made at prices way lower at what those assets would have been sold in the open market.

202-    Transfer was made when Plaintiff had filed or was about to file a lawsuit against the debtors and the debtors intended to put their assets out of reach to the Plaintiff.

203-    The transfers were concealed and were kept a close secret by Abdelkader, and Junaid.

204-    **WHEREFORE,** Plaintiff prays that this Court enter a judgment in favor of the Plaintiff and against Abdelkader and 75th St., Building Inc., as well as Junaid Ahmad and Congress & Pulaski RE Inc., thus:

A.    avoiding the Fraudulent Transfers,

B.    preserving the avoided Fraudulent Transfers for the benefit of the Plaintiff;

C.    awarding Plaintiff a money judgment against Abdelkader and his wholly owned corporation 75th St. Building Inc., and against Junaid Ahmad and his wholly owned Congress & Pulaski Inc.,

D.    granting all other relief which this Court deems is just and proper in the premises.

**Count XII: Against Abdelkader, 75th St. Building Inc., Junaid Ahmad and Congress & Pulaski for Avoidance of Constructively Fraudulent Transfers**

205-  For Count XII of its verified Complaint, Plaintiff incorporates the allegations contained in the preceding paragraphs 1 through 118, and further states as follows:

206-  Abdelkader ,75th St. Building Inc., Junaid Ahmad and Congress & Pulaski Inc., made each of the Constructively Fraudulent Transfers which included the 415 Pulaski gas station as well as the Liquor store at 3635 W. Armitage Avenue in Chicago.

207-  Each of the Constructively Fraudulent Transfers were made without the transferor receiving a reasonably equivalent value in exchange while the transferor was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to its business or the transaction.

208-  Each of the Constructively Fraudulent Transfers was made without the transferor receiving a reasonably equivalent value in exchange and the transferor intended to incur, or reasonably should have believed, that the transferor would incur debts beyond the transferor's ability to pay as the debts became due. Transfer was disguised as a Note purchase.

209-  **WHEREFORE,** Plaintiff prays that this Court enter a judgment in his favor and against Abdelkader and his wholly owned corporation 75th St. Building Inc., Junaid Ahmad and his wholly owned Congress & Pulaski RE Inc., thus:

A.  avoiding the Constructively Fraudulent Transfers so made;

B.  preserving the avoided Constructively Fraudulent Transfers for Plaintiff's benefit;

C.  awarding Plaintiff a money judgment against Abdelkader and 75th St. building Inc., and Junaid Ahmad and his wholly owned Congress & Pulaski Inc., in the amount of the Constructively Fraudulent Transfers, plus pre-judgment interest, and costs of the proceeding;

D.  and granting all other relief which this Court deems is just and proper in the premises.

**Count XIII: Against Aslam, Loc Gas Inc., and Chicago 59th Inc., for Avoidance of Actually Fraudulent Transfers**

For Count XIII of its verified Complaint, Sheikh incorporates the allegations contained in the preceding paragraphs 1 through 136 as if part and parcel of this Count, and further states as follows:

210- Aslam, Loc Gas Inc., and Chicago 59th Inc., participated in and perpetrated each of the Fraudulent Transfers as noted above by fraudulently accepting the gas station at 1224 West 59th Street in Chicago, knowing that she was doing so to make that asset unreachable to the Plaintiff.

211- The Fraudulent Transfer was made with the actual intent to hinder, delay or defraud Plaintiff.

212- These transfers made the debtors including the transferor Bashir insolvent and unable to pay the debts he owed.

213- Transfer was made when Plaintiff had filed or was about to file a lawsuit against the debtors and the debtors intended to put their assets out of reach to the Plaintiff.

214- The transfers were concealed and were kept a close secret by Aslam.

215- **WHEREFORE,** Plaintiff prays that this Court enter a judgment in favor of the Plaintiff and against Aslam, LOc Gas Inc., and Chicago 59th Inc., thus:

A: avoiding the Fraudulent Transfers as outlined above of 1224 W. 59th Street gas station.

B. preserving the avoided Fraudulent Transfers for the benefit of the Plaintiff;

C. awarding Plaintiff a money judgment against Aslam, Loc Gas Inc., and Chicago 59th Inc., and

D. granting all other relief which this Court deems is just and proper in the premises.

**Count XIV: Against Aslam, Loc Gas Inc., and Chicago 59th Inc., for Avoidance of Constructively Fraudulent Transfers**

216- For Count XIV of its verified Complaint, Plaintiff incorporates the allegations contained in the

preceding paragraphs 1 through 136, and further states as follows:

217-    Aslam and Chicago 59th Inc., made each of the Constructively Fraudulent Transfers of 1224 West 59th Street gas station in Chicago.

218-    Each of the Constructively Fraudulent Transfers were made without the transferor receiving a reasonably equivalent value in exchange while the transferor was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to its business or the transaction.  Transfers were made to close friends.

219-    Each of the Constructively Fraudulent Transfers was made without the transferor receiving a reasonably equivalent value in exchange and the transferor intended to incur, or reasonably should have believed, that the transferor would incur debts beyond the transferor's ability to pay as the debts became due.

220-    **WHEREFORE,** Plaintiff prays that this Court enter a judgment in his favor and against Aslam, Loc Gas Inc., and Chicago 59th Inc., thus:

A.    avoiding the Constructively Fraudulent Transfers so made;

B.    preserving the avoided Constructively Fraudulent Transfers for Plaintiff's benefit;

C.    awarding Plaintiff a money judgment against Aslam, Loc Gas Inc., and Chicago 59th Inc., in the amount of the Constructively Fraudulent Transfers, plus pre-judgment interest, and costs of the proceeding;

D.    and granting all other relief which this Court deems is just and proper in the premises.

**Count XV: Against  Jahantab for Avoidance of Actually Fraudulent Transfers of liquor stores at 4200 West Armitage Avenue & liquor store at 4234 W. Fullerton Avenue.**

For Count XV of its verified Complaint, Sheikh incorporates the allegations contained in the preceding paragraphs 1 through 136 as if part and parcel of this Count, and further states as follows:

221- Jahantab participated in and perpetrated each of the Fraudulent Transfers as noted above by fraudulently accepting the liquor stores located at 4200 West Armitage Avenue in Chicago, and an additional liquor store located at 4234 West Fullerton Avenue in Chicago, knowing that he was doing so to make that asset unreachable to the Plaintiff.

222- The Fraudulent Transfer was made with the actual intent to hinder, delay or defraud Plaintiff and were made to Jahantab, who is the son of Bashir's close friend Shahjee.

223- These transfers made the debtors including the transferor Bashir insolvent and unable to pay the debts he owed.

224- Transfer was made when Plaintiff had filed or was about to file a lawsuit against the debtors and the debtors intended to put their assets out of reach to the Plaintiff.

225- The transfers were concealed and were kept a close secret by Jahantab,

226- Jahantab acted as a proxy whereas Bashir controlled the businesses,

227- **WHEREFORE,** Plaintiff prays that this Court enter a judgment in favor of the Plaintiff and against Jahantab thus:

A. avoiding the Fraudulent Transfers of the liquor/grocery store located at 4200 West Armitage Avenue, and another liquor store at 4234 W. Fullerton Avenue, in Chicago.

B. preserving the avoided Fraudulent Transfers for the benefit of the Plaintiff;

C. awarding Plaintiff a money judgment against Jahantab and,

D. granting all other relief which this Court deems is just and proper in the premises.

**Count XVI: Against Jahantab for Avoidance of Constructively Fraudulent Transfers for Liquor stores at 4200 W. Armitage & 4234 W. Fullerton, Chicago.**

228- For Count XVI of its verified Complaint, Plaintiff incorporates the allegations contained in the preceding paragraphs 1 through 136, and further states as follows:

229- Jahantab made each of the Constructively Fraudulent Transfer of the Liquor/grocery store

41

located at 4200 West Armitage Avenue in Chicago, and another liquor store at 4234 W. Fullerton Avenue, Chicago.

230- Each of the Constructively Fraudulent Transfers were made without the transferor receiving a reasonably equivalent value in exchange while the transferor was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to its business or the transaction.

231- Each of the Constructively Fraudulent Transfer was made without the transferor receiving a reasonably equivalent value in exchange and the transferor intended to incur, or reasonably should have believed, that the transferor would incur debts beyond the transferor's ability to pay as the debts became due. Transfers were made to the son of a close friend.

232- **WHEREFORE,** Plaintiff prays that this Court enter a judgment in his favor and against Jahantab, thus:

A: avoiding the Constructively Fraudulent Transfers so made of the liquor store located at 4200 West Armitage Avenue and another located at 4234 W. Fullerton in Chicago.

B. preserving the avoided Constructively Fraudulent Transfers for Plaintiff's benefit;

C. awarding Plaintiff a money judgment against Jahantab, in the amount of the Constructively Fraudulent Transfers, plus pre-judgment interest, and costs of the proceeding;

D. and granting all other relief which this Court deems is just and proper in the premises.

**Count XVII: Against Rafati for aiding and abetting Fraudulent Transfers, making false representations in Court:**

233- For Count XVII Plaintiff reincorporates the allegations contained in the preceding paragraphs 1 to 136 and states further:

234- Rafati appeared at the Court hearing on Plaintiff's Motion for avoiding the fraudulent transfers during litigation (17-L-07194) and represented in open court that his client Bashir and Naseer have not sold nor they are trying to sell any property. Rafati further represented in open

court that he has advised Chaudry and Naseer not to sell any property which is perceived to be part of the litigation on which Plaintiff is asserting that monies are owed to him.

235- While assuring the Court of one thing, in reality Rafati was actively engaged in finding buyers for those properties, preparing agreements, acting as an escrow agent to hold funds for the closing of those properties, preparing agreements for sale of those properties and preparing closing documents for those properties.

236- Simultaneously Rafati made every effort to delay the proceedings in 17-L-07194 by asking for continuances on frivolous grounds, so to delay the resolution of the case and the judgment of the Court. Those delays were to buy time so Chaudry and Naseer could sell their properties before the Court could enter its judgment.

237- Restatement (Second) of Torts § 876 is determinative as Rafati, Chaudry and Naseer's actions were concerted and establishe a legal relationship between a tortfeasor who acted in concert with his clients.

238- Additionally Rafati (a) committed a tortious act in concert with Bashir and Naseer pursuant to a common design, or (b) knew that his clients conduct constituted a breach of duty and gave substantial assistance or encouragement to Bashir and Naseer as to their fraudulent transfers, or (c) gave substantial assistance to the debtors in accomplishing a tortious result after establishing a legal relationship with the tortfeasors.

239- That by virtue of this relationship, Rafati provided substantial assistance and encouragement and established a joint enterprise and a mutual agency and provided substantial assistance to Chaudry and Naseer to sell their assets.

240- Rafati's conduct was not restricted by failing to act or advise Chaudry and Naseer not to violate the Fraudulent Transfer Act, but in reality assisted Chaudry and Naseer to violate Fraudulent Transfer Act so they could dispose off their properties before court enter a judgment, which could enable the Plaintiff to execute the judgment against those properties that Rafati sold.

241- Liability under §§ 876(b) and (c) 2 (Re-statement of torts) "is not based on common design or agreement, but on substantial assistance." Rafati did not merely fail to act, but also assisted Bashir and Naseer to dispose off their asseets.

242- Rafati actively participated and helped in perpetrating each of the Fraudulent Transfers as noted above by actively aiding and abetting their transfers.

243- Rafati knew his help to Bashir and Naseer was meant with an actual intent to hinder, delay or defraud Plaintiff, as these transfers were made during the Course of litigation.

244- Rafati knew that his providing assistance to Bashir and Naseer to sell and transfer their assets will make both Bashir and Naseer insolvent and unable to pay the debts they owed the Plaintiff.

245- Rafati knew that he was assisting the fraudulent transfers as a lawsuit against Bashir and Naseer was pending. Not only that Rafati had constructive notice of the issues in the case but had actual knowledge of the underlying issues, as he himself was representing Bashir and Naseer in the pending litigation.

246- **WHEREFORE,** Plaintiff prays that this Court enter a judgment in his favor and against Rafati, Rafati law group and Rafati & Ward.

A.    Spread the full amount of Judgments against Rafati, Rafati law group and Rafati & Ward,  that the Court entered in the prior litigation (17-L-07194) against Chadury and Naseer for $1,535,0000.00 and $257,000.00 respectively.

D.    Grant all other relief which this Court deems is just and proper in the premises.

### Count XVIII: Against Rafiq for Avoidance of Actually Fraudulent Transfers

For Count XVIII of its verified Complaint, Sheikh incorporates the allegations contained in the preceding paragraphs 1 through 136 as if part and parcel of this Count, and further states as follows:

247- Rafiq perpetrated each of the fraudulent transfers as identified herein this complaint by trying to conceal the ownership of the gas station located at 7283-87 S. Chicago Avenue.

248-    These Transfers were made with the actual intent to hinder, delay or defraud Plaintiff.

249-    These transfers made Bashir insolvent and unable to pay his debts.

250-    Transfers were made when Plaintiff had filed or was about to file a lawsuit against him, or a judgment was soon to be entered against Bashir. The main goal and purpose of Rafiq was to put his or Bashir's assets out of reach to the Plaintiff.

251-    The transfers were contemplated and concealed and were kept a close secret by Rafiq.

252-    **WHEREFORE,** Plaintiff prays that this Court enter a judgment in favor of the Plaintiff and against Rafiq, thus:

A.    avoiding all fraudulent Transfers as itemized above.

B.    preserving the avoided Transfers for the benefit of the Plaintiff;

C.    awarding Plaintiff a money judgment against Rafiq or his transferees, and

D.    granting all other relief which this Court deems is just and proper in the premises.

### Count XIX: Against Rafiq for Avoidance of Constructively Fraudulent Transfers

253-    For Count XVIIII of its verified Complaint, Plaintiff incorporates the allegations contained in the preceding paragraphs 1 through 136, and further states as follows:

254-    Rafiq participated and engaged in making each of the Constructively Fraudulent Transfers identified herein above.

255-    Each of the Constructively Fraudulent Transfers was made without the transferor receiving a reasonably equivalent value in exchange while the transferor was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to its business or the transaction.

256-    Each of the Constructively Fraudulent Transfers was made without the transferor receiving a reasonably equivalent value in exchange and the transferor intended to incur, or reasonably should have believed, that the transferor would incur debts beyond the transferor's ability to pay as the debts became due.

257- **WHEREFORE,** Plaintiff prays that this Court enter a judgment in his favor and against Rafiq by:

A.    avoiding all Constructively Fraudulent Transfers Rafiq made as itemized above;

B.    preserving the avoided Constructively Fraudulent Transfers for Plaintiff's benefit;

C.    awarding Plaintiff a money judgment against Rafiq in the amount of the Constructively Fraudulent Transfers, plus pre-judgment interest, and costs of these proceeding;

D.    and granting all other relief which this Court deems is just and proper in the premises.

**Count XX: Against Qadir's LLC, Ali and Rabia for Avoidance of Actually Fraudulent Transfers of the Luxury House at 7001 N. Keeler, Lincolnwood.**

For Count XX of its verified Complaint, Sheikh incorporates the allegations contained in the preceding paragraphs 1 through 136 as if part and parcel of this Count, and further states as follows:

258-    Ali, Rabia and Qadir's LLC participated in and perpetrated each of the Fraudulent Transfers as noted above by accepting $470,000.00 in cash and investing that money to purchase the luxury house in Lincolnwood, Illinois, knowing that this activity was fraudulent and money being transferred by Bashir to his minor children Ali and daughter Rabia and newly minted LLC by Chaus was an attempt to fraudulently transfer their assets, and in doing so was to make that asset unreachable to the Plaintiff.

259-    Fraudulent Transfer was made with the actual intent to hinder, delay or defraud Plaintiff.

260-    These transfers made the debtors including the transferor Bashir insolvent and unable to pay the debts he owed.

261-    Transfer was made when Plaintiff had filed a lawsuit against Bashir and a Court decision was expected or had been entered against the debtors and the debtors intended to put their assets out of reach to the Plaintiff.

262- The transfers were concealed and were kept a close secret by Bashir, Chaus, Ali, Rabia and the limited liability Company newly minted for this fraudulent purpose,

263- Ali, Rabi and Qadir's LLC acted as a proxy of Bashir whereas Bashir controls his minor children and the Qadir's LLC.,

264- **WHEREFORE,** Plaintiff prays that this Court enter a judgment in favor of the Plaintiff and against Ali, Rabia and Qadir's LLC by:

A. avoiding the Fraudulent Transfer of the single family luxury house located at 7001 North Keeler Avenue in Lincolnwood, Illinois.

B. preserving the avoided Fraudulent Transfers for the benefit of the Plaintiff;

C. awarding Plaintiff a money judgment against Ali, Rabia and Qadir's LLC., and,

D. granting all other relief which this Court deems is just and proper in the premises.

**Count XXI: Against Rabia, Ali and Qadir's LLC for Avoidance of Constructively Fraudulent Transfers**

265- For Count XXI of its verified Complaint, Plaintiff incorporates the allegations contained in the preceding paragraphs 1 through 118, and further states as follows:

266- Qadir's LLC, Bashir's minor children Ali and Rabia made each of the Constructively Fraudulent Transfer of receiving $470,000.00 in cash and for the purpose of hiding, purchased a single family house in Lincolnwood, Illinois.

267- The Constructively Fraudulent Transfer of cash and purchasing the house were made without the transferor receiving a reasonably equivalent value in exchange while the transferor was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to its business or the transaction.

268- Each of the Constructively Fraudulent Transfer was made without the transferor receiving a

47

reasonably equivalent value in exchange and the transferor intended to incur, or reasonably should have believed, that the transferor would incur debts beyond the transferor's ability to pay as the debts became due. Transfers were made by debtor to his hildren.

269- **WHEREFORE,** Plaintiff prays that this Court enter a judgment in his favor and against Qadir's LLC, and Bashir's minor children Ali and Rabia, thus:

A. avoiding the Constructively Fraudulent Transfers of making $470,000.00 in cash to purchase the house at 7001 North Keeler Avenue, in Lincolnwood, Illinois.

B. preserving the avoided Constructively Fraudulent Transfers for Plaintiff's benefit;

C. awarding Plaintiff a money judgment against Qadir's LLC, Ali and Rabia, in the full amount of the Constructively Fraudulent Transfers, plus pre-judgment interest, and costs of the proceedings;

D. and granting all other relief which this Court deems is just and proper in the premises.

**Count XXII: Against Chaus dba Yakub Chaus & Co., for aiding and abetting Fraudulent and Constructive Transfers**

270- For Count XXII Plaintiff reincorporates the allegations contained in the preceding paragraphs 1 to 136 and states further:

271- Chaus dba Yakub Chaus & Co., made, invented, concocted and resurrected dozens of corporations and limited liability companies for Bashir and Naseer.

272- While inventing those entities Chaus knew or would have every reason to know that the purpose of making these companies for Bashir, Naseer, Qadir, Mahin, Ali, Rabia, Jahantab, Rafiq and Aslam was not for legitimate legal or professional purposes.

273- Chaus made these entities for the sole purpose of helping Bashir, Aslam, Naseer and Rafiq to hide their assets with the active intent, knowledge and complete complicity of deceiving and defrauding the Plaintiff by streamlining the fraudulent transfers into different entities, corporations and limited liability companies and giving the scheme a legal cover.

48

274- Restatement (Second) of Torts § 876 is determinative as Chaus, Bashir and Naseer's actions were concerted and established a legal relationship between a tort feasor who acted in concert with his clients.

275- Additionally Chaus (a) committed a tortious act in concert with Bashir and Naseer and their designated proxies pursuant to a common design, or (b) knew that his clients conduct constituted a breach of duty and gave substantial assistance or encouragement to Bashir and Naseer as to their fraudulent transfers, or (c) gave substantial assistance to the debtors in accomplishing a tortious result after establishing a legal relationship with the tortfeasors.

276- That by virtue of this relationship, Chaus dba Yakub Chaus & Co., provided substantial assistance and encouragement and established a joint enterprise and a mutual agency and provided substantial assistance to Bashir and Naseer to sell their assets to their relatives, their children and their spouses in shell corporations and companies with the actual knowledge and actual intent to deprive the Plaintiff of the fruits of his judgment that was entered by a competent court of law in Cook County, Illinois.

277- Chaus's conduct as an accountant and a CPA was not restricted by failing to act or advise Bashir and Naseer not to violate the Fraudulent Transfer Act, but in reality assisted Bashir and Naseer to violate Fraudulent Transfer Act so they could dispose off their properties before court could enter a judgment that would enable the Plaintiff to execute the judgment against those properties that Chaus helped hide, conceal and disperse.

278- Liability under §§ 876 (b) and (c)2 (Re-statement of torts) "is not based on common design or agreement, but on substantial assistance." Chaus did not merely fail to act, but rather assisted Bashir and Naseer in circumventing and violating laws.

279- Chaus actively participated and helped in perpetrating each of the Fraudulent Transfers as noted above by actively aiding and abetting their transfers.

280- Chaus knew his help to Bashir and Naseer was meant with an actual intent to hinder, delay or

defraud Plaintiff.

281- Chaus knew that his providing assistance to Bashir and Naseer to sell and transfer their assets will make both Bashir and Naseer insolvent and unable to pay the debts they owed the Plaintiff.

282- Chaus knew that he was assisting the fraudulent transfers as a lawsuit against Bashir and Naseer was pending and a judgment against these individuals was imminent. Chaus not only had constructive notice of the issues in the case but had actual knowledge of the underlying issues, as Chaus was the accountant of record for Bashir and Naseer throughout the trial at the Cook County.

283- **WHEREFORE**, Plaintiff prays that this Court enter a judgment in his favor and against Chaus and Yakub Chaus & Company.

A. It is also prayed that the Court also spread the full amount of Judgments against Chaus and Yakub Chaus & Company that the Court entered in the prior litigation (17-L-07194) against Chadury and Naseer for $1,535,0000.00 and $257,000.00 respectively.

B. Grant any other relief which is just and proper in the premises.

**COUNT XX111 Against Choudhri, Rafiq & Chaus for engaging in Civil Conspiracy to commit fraud and help Bashir to defeat judgment**

Plaintiff reincorporates the allegations in the preceding paragraphs 1-136 and states further: Defendants Chaudhri, Chaus and Rafiq knowingly and voluntarily participated in a common scheme with Bashir and Naseer to commit an unlawful act to assist both debtors in delaying, hindering or defrauding the Plaintiff.

284- Defendants Choudhri, Chaus and Rafiq understood the general objectives of the debtor Bashir and Naseer's conspiratorial schemes, accepted them, and agreed implicitly to do their part to further those objectives.

285- As set forth in details above, Defendants Chaudhri, Chaus and Rafiq entered into an agreement

for the purpose of accomplishing, by concerted action, the unlawful purpose of hiding, transferring or otherwise shielding Bashir and Naseer's assets in violation of the Citation Liens that prohibited the debtors from transferring their assets, and otherwise in derogation of the rights of the Plaintiff, as part of the scheme to delay, hinder or defraud Bashir and Naseer's judgment creditors.

286- The course of conduct set forth above constitutes a civil conspiracy to commit fraud on Bashir and Naseer's judgment creditor which proximately caused harm and damage to the Plaintiff as debtor's assets were fraudulently transferred.

287- Accordingly, Defendants Choudhri, Chaus and Rafiq are jointly and severally liable to Plaintiff for the harm and damage caused by their civil conspiracy with debtor Bashir and Naseer in the fraud committed on the Plaintiff.

**WHEREFORE** Plaintiff prays that the Court enter a judgment against Choudhri, Chaus and Rafiq for the full amount of judgment that was entered against Bashir and Naseer for $1,535,910 and $257,000.00 respectively and spread them against the above named defendants.

**Count XXIV against Choudhri, Chaus and Rafiq for aiding and abetting Fraud and Fraudulent Transfers made by Bashir and Naseer to avoid judgment**

Plaintiff re-incorporates the allegations described above in the complaint and further states as under:

288- As set forth in detail above, Bashir and Naseer engaged in numerous schemes to fraudulently transfer their assets in an effort to delay, hinder or defraud his creditors, which injured the ability of the judgment creditors to collect on the amount of indebtedness owed to them by Bashir and Naseer.

289- Defendants Choudhri, Chaus and Rafiq were aware of their roles in judgment debtor Bashir and Naseer's fraudulent transfer schemes when they provided assistance to these individuals in the accomplishment of those schemes;

51

290- Defendants Choudhri, Chaus and Naseer provided knowing and substantial assistance to Bashir and Naseer in the implementation and execution of judgment debtors fraudulent transfer schemes.

291- Accordingly, Defendants knowingly induced, participated and assisted in actively defrauding Bashir and Naseer's judgment creditor Sheikh through the implementation and execution of Bashir and Naseer's fraudulent transfer schemes in order to assist debtors in their efforts to delay, hinder or defraud his creditors.

292- Defendants Choudhri, Chaus and Rafiq knew that after the assets of the debtors Bashir and Naseer are transferred, the debtors will become insolvent and their remaining assets will not be able to payoff the judgment that was entered in favor of the Plaintiff Sheikh.

293- The course of conduct set forth above constitutes aiding and abetting a fraud on the Plaintiff, which proximately caused harm and damage to Plaintiff Sheikh in the amount of debtors assets that were fraudulently transferred. Accordingly, Defendants Choudhri, Chaus and Rafiq are jointly and severally liable to Plaintiff for the harm and damage caused by their aiding and abetting Bashir and Rafiq in the fraud committed upon Sheikh by selling, shifting or transferring assets which could have been utilized by Sheikh to recoup on a judgment entered by the Court.

294- **WHEREFORE** Plaintiff prays that the Court enter a judgment against Choudhri, Chaus and Rafiq for the full amount of judgment that was entered against Bashir and Naseer for $1,535,910 and $257,000.00 respectively and spread them against the above named defendants. Any other relief that this Court deems is just and equitable.

**Count XXIV: Against Amjad Chaudry & BCA for Avoidance of Actually Fraudulent Transfer**

For Count XXIV of its verified Complaint, Sheikh incorporates the allegations contained in the preceding paragraphs 1 through 136 as if part and parcel of this Count, and further states as follows:

Amjad Chaudry received $120,000.00 from debtor Bashir and both acquired a grocery/liquor store in Wheeling. Under the arrangement worked out between Bashir and Arshad, the business will remain under the name of Amjad, but profits will be split equally between both principals.

296- This Fraudulent Transfer was made with the actual intent to hinder, delay or defraud Plaintiff.

297- These transfers made the debtors including the transferor Bashir insolvent and unable to pay the debts he owed.

298- Transfer was made when Plaintiff had filed a lawsuit against Bashir and a Court decision was expected or had been entered against the debtors and the debtors intended to put their assets out of reach to the Plaintiff.

299- The transfers were concealed and were kept a close secret by Bashir, and Arshad. All documents for the corporation were prepared by Chaus, who created a brand new corporation for such purpose.

300- Business is under Amjad's name whereas Bashir controls the business.

301- **WHEREFORE,** Plaintiff prays that this Court enter a judgment in favor of the Plaintiff and against Bashir, BCA and Amjad thus:

A. avoiding the Fraudulent Transfer of this liquor and grocery store.

B. preserving the avoided Fraudulent Transfers for the benefit of the Plaintiff;

C. awarding Plaintiff a money judgment against Arshad and Bashir.

D. granting all other relief which this Court deems is just and proper in the premises.

**Count XXV: Against Arshad & BCA for Avoidance of Constructively Fraudulent Transfers**

53

302- For Count XXV of its verified Complaint, Plaintiff incorporates the allegations contained in the preceding paragraphs 1 through 136, and further states as follows.

303- Bashir invested upwards of $120,000.00 to purchase the liquor grocery store and Arshad was instrumental in helping him set up this business. Both secured the help of Chaus in organizing the corporate set up under which both concealed the ownership of the business.

304- The Constructively Fraudulent Transferring cash by Bashir to Arshad and purchasing the liquor store was made without the transferor receiving a reasonably equivalent value in exchange while the transferor was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to its business or the transaction.

305- Each of the Constructively Fraudulent Transfer was made without the transferor receiving a reasonably equivalent value in exchange and the transferor intended to incur, or reasonably should have believed, that the transferor would incur debts beyond the transferor's ability to pay as the debts became due. Transfers were made to an old friend Amjad.

306- **WHEREFORE,** Plaintiff prays that this Court enter a judgment in his favor and against Amjad, BCA and Bashir and thus:

A. avoiding the Constructively Fraudulent Transfers of making $120,000.00 in cash to purchase the Grocery store at 326 West Liberty Street in Wheaton, Illinois.

B. preserving the avoided Constructively Fraudulent Transfers for Plaintiff's benefit;

C. awarding Plaintiff a money judgment against Arshad in the full amount of the Constructively Fraudulent Transfers, plus pre-judgment interest, and costs of the proceedings, proceedings,

D: and granting all other relief which this Court deems is just and proper in the premises.

/ S / Zafar Sheikh
Zafar Sheikh
4619 Herzog Street
Austin. TX. 78723.
(847) 414-9670
Zafarsheikh313@aol.com

## VERIFICATION

I, Zafar Sheikh, the Plaintiff in this case do hereby certify under oath and under the penalty of perjury and in accordance with the laws of the United States that I have read the attached complaint and further that the foregoing allegations, events and circumstances described herein this complaint are true and correct to the best of my knowledge and belief. (28 U.S. Code § 1746).

*/ S / Zafar Sheikh*                                                    January 20, 2024.
Zafar Sheikh

# EXHIBIT A

## Judgments Entered Against

- Bashir Chaudry for $1,535,905.00
- Bushra Naseer for $257,000.00

# IN THE CIRCUIT COURT OF THE COOK COUNTY
## LAW DIVISION

| | | |
|---|---|---|
| Zafar Sheikh | ) | |
| | ) | |
| Plaintiff | ) | 2017 L 007194 |
| | ) | |
| vs. | ) | Hon. Judge Esrig |
| | ) | |
| Bushra Naseer, Bashir | ) | |
| Chaudry, | ) | |
| | ) | |
| Defendants | ) | |

## MEMORANDUM OF JUDGMENT

On the 26th of April, 2022, a Judgment was entered in this Court in favor of Plaintiff

Zafar Sheikh and against Defendant Bashir Chaudry, whose address is:

6677 North Monticello Avenue,
Lincolnwood. Illinois. 60712.

The amount of judgment entered against Bashir Chaudry is $1, 535, 905.00

(One Million Five Hundred Thirty Five Thousand Nine Hundred and Five Dollars).

May 9, 2022

*Jerry A. Esrig*

Hon. Judge Jerry A. Esrig
Circuit Judge, Law Division.
Room 2101

Plaintiff: Zafar Sheikh
3155 West Wallen Avenue,
Chicago. IL. 60645.
Tele: (847) 414 – 9670
Email: Zafarsheikh313@aol.com

Circuit Judge
Jerry A. Esrig

May. 09, 2022

I hereby certify that the document to which this
certification is affixed is a true copy.

IRIS Y. MARTINEZ MAY ▲ 8 2022
Date

IRIS Y. MARTINEZ
Clerk of the Circuit Court
of Cook County, IL

Circuit Court - 2101

## IN THE CIRCUIT COURT OF THE COOK COUNTY
## LAW DIVISION

| | |
|---|---|
| Zafar Sheikh | ) |
| | ) |
| Plaintiff | )      2017 L 007194 |
| | ) |
| vs. | )      Hon. Judge Esrig |
| | ) |
| Bushra Naseer, Bashir | ) |
| Chaudry, | ) |
| | ) |
| Defendants | ) |

### MEMORANDUM OF JUDGMENT

On the 26th of April, 2022, a Judgment was entered in this Court in favor of Plaintiff

Zafar Sheikh and against Defendant Bushra Naseer, whose address is:

3673 West North shore Avenue,
Lincolnwood. Illinois. 60712.

The amount of judgment entered against Bushra Naseer is $257,000.00

(Two Hundred and Fifty Seven Thousand Dollars).

Circuit Judge
Jerry A. Esrig

May. 09, 2022

May 9, 2022

*Jerry A. Esrig*

Hon. Judge Jerry A. Esrig
Circuit Judge, Law Division.
Room 2101

Circuit Court - 2101

Plaintiff: Zafar Sheikh
3155 West Wallen Avenue,
Chicago. IL. 60645.
Tele: (847) 414 – 9670
Email: Zafarsheikh313@aol.com

I hereby certify that the document to which this
certification is affixed is a true copy.

IRIS Y. MARTINEZ MAY 1 8 2022
IRIS Y. MARTINEZ
Clerk of the Circuit Court
of Cook County, IL

# EXHIBIT B

## Note Signed by Bashir Chaudry For $1,200,000.00 to Purchase Gas Station

October, 2000

## MORTGAGE (ILLINOIS)

CAUTION: Consult a lawyer before using or acting under this form. Neither the publisher nor the seller of this form makes any warranty with respect thereto, including any warranty of merchantability or fitness for a particular purpose.



Doc#: 0810609104 Fee: $44.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 04/15/2008 03:41 PM Pg: 1 of 5

**Above Space for Recorder's Use Only**

THIS AGREEMENT, made March 19, 2008, between _Firstly Chicago Realty Builders Inc., of 4330 Golf Road, Skokie, Illinois 60076_
(No. and Street) (City) (State)
herein referred to as "Mortgagors," and _Secondly MCB LLC of 6655 North Monticello, Lincolnwood, Illinois, 60176_
(No. and Street) (City) (State)
herein referred to as "Mortgagee," witnesseth:

THAT WHEREAS the Mortgagors are justly indebted to the Mortgagee upon the installment note of even date herewith, in the principal sum of _ONE Million & Two Hundred thousand_ DOLLARS ($ 1,200,000.— ), payable to the order of and delivered to the Mortgagee, in and by which note the Mortgagors promise to pay the said principal sum and interest at the rate and in installments as provided in said note, with a final payment of the balance due on the _19th_ day of _March_, 2015, and all of said principal and interest are made payable at such place as the holders of the note may, from time to time, in writing appoint, and in absence of such appointment, then at the office of the Mortgagee at _4330 - Golf Road, Skokie, Illinois 60076_

NOW, THEREFORE, the Mortgagors to secure the payment of the said principal sum of money and said interest in accordance with the terms, provisions and limitations of this mortgage, and the performance of the covenants and agreements herein contained, by the Mortgagors to be performed, and also in consideration of the sum of One Dollar in hand paid, the receipt whereof is hereby acknowledged, do by these presents CONVEY AND WARRANT unto the Mortgagee, and the Mortgagee's successors and assigns, the following described Real Estate and all of their estate, right, title and interest therein, situate, lying and being in the _CiTY OF Chicago_, COUNTY OF _Cook_ IN THE STATE OF ILLINOIS, to wit:
Lots 5 (except the 16 feet thereof) Lots 6, 7, 8, 9, 10 and the South 1/2 of the vacated alley lying North & the adjoining said lots in Center Avenue addition in the Northwest 1/4 of Section 17, Township 38 North, Range 14, East of the third principal meridian in Cook county Ill.
which, with the property herein after described, is referred to herein as the "premise."

Permanent Real Estate Index Number(s): _20 - 17 - 131 - 017, 018, 019, 020, 021 & 022_

Address(es) of Real Estate: _1224 West 59th Street, Chicago, Illinois._
TOGETHER with all improvements, tenements, easements, fixtures, and appurtenances thereto belonging, and all rents, issues and profits thereof for so long and during all such times as Mortgagors may be entitled thereto (which are pledged primarily and on a parity with said real estate and not secondarily) and all apparatus, equipment or articles now or hereafter therein or thereon used to supply heat, gas, air conditioning, water, light, power, refrigeration (whether single units or centrally controlled), and ventilation, including (without restricting the foregoing), screens, window shades, storm doors and windows, floor coverings, inador beds, awnings, stoves and water heaters. All of the foregoing are declared to be a part of said real estate whether physically attached thereto or not, and it is agreed that all similar apparatus, equipment or articles hereafter placed in the premises by Mortgagors or their successors or assigns shall be considered as constituting part of the real estate.

## THE COVENANTS, CONDITIONS AND PROVISIONS REFERRED TO ON PAGE 2.

1.    Mortgagors shall (1) promptly repair, restore or rebuild any buildings or improvements now or hereafter on the premises which may become damaged or be destroyed; (2) keep said premises in good condition and repair, without waste, and free from mechanic's or other liens or claims for lien not expressly subordinated to the lien thereof; (3) pay when due any indebtedness which may be secured by a lien or charge on the premises superior to the lien hereof, and upon request exhibit satisfactory evidence of the discharge of such prior lien to the Mortgagee; (4) complete within a reasonable time any building or buildings now or at any time in process of erection upon said premises; (5) comply with all requirements of law or municipal ordinances with respect to the premises and the use thereof; (6) make no material alterations in said premises except as required by law or municipal ordinance.

2.    Mortgagors shall pay before any penalty attaches all general taxes, and shall pay special taxes, special assessments, water charges, sewer service charges, and other charges against the premises when due, and shall, upon written request, furnish to the Mortgagee duplicate receipts therefor. To prevent default hereunder Mortgagors shall pay in full under protest, in the manner provided by statute, any tax or assessment which Mortgagors may desire to contest.

3.    In the event of the enactment after this date of any law of Illinois deducting from the value of land for the purpose of taxation any lien thereon, or imposing upon the Mortgagee the payment of the whole or any part of the taxes or assessments or charges or liens herein required to be paid by Mortgagors, or changing in any way the laws relating to the taxation of mortgages or debts secured by mortgages or the mortgagee's interest in the property, or the manner of collection of taxes, so as to affect this mortgage or the debt secured hereby or the holder thereof, then and in any such event, the Mortgagors, upon demand by the Mortgagee, shall pay such taxes or assessments, or reimburse the Mortgagee therefor; provided, however, that if in the opinion of counsel for the Mortgagee (a) it might be unlawful to require Mortgagors to make such payment or (b) the making of such payment might result in the imposition of interest beyond the maximum amount permitted by law, then and in such event, the Mortgagee may elect, by notice in writing given to Mortgagors, to declare all of the indebtedness secured hereby to be and become due and payable sixty (60) days from the giving of such notice.

4.    If, by the laws of the United States of America or of any state having jurisdiction in the premises, any tax is due or becomes due in respect of the issuance of the note hereby secured, the Mortgagors covenant and agree to pay such tax in the manner required by any such law. The Mortgagors further covenant and agree to hold harmless and agree to indemnify the Mortgagee, and the Mortgagee's successors or assigns, against any liability incurred by reason of the imposition of any tax on the issuance of the note secured hereby.

5.    At such time as the Mortgagors are not in default either under the terms of the note secured hereby or under the terms of this mortgage, the Mortgagors shall have such privilege of making prepayments on the principal of said note (in addition to the required payments) as may be provided in said note.

6.    Mortgagors shall keep all buildings and improvements now or hereafter situated on said premises insured against loss or damage by fire, lightning and windstorm under policies providing for payment by the insurance companies of moneys sufficient either to pay the cost of replacing or repairing the same or to pay in full the indebtedness secured hereby, all in companies satisfactory to the Mortgagee, under insurance policies payable, in case of loss or damage, to Mortgagee, such rights to be evidenced by the standard mortgage clause to be attached to each policy, and shall deliver all policies, including additional and renewal policies, to the Mortgagee, and in case of insurance about to expire, shall deliver renewal policies not less than ten days prior to the respective dates of expiration.

7.    In case of default therein, Mortgagee may, but need not, make any payment or perform any act hereinbefore required of Mortgagors in any form and manner deemed expedient, and may, but need not, make full or partial payments of principal or interest on prior encumbrances, if any, and purchase, discharge, compromise or settle any tax lien or other prior lien or title or claim thereof, or redeem from any tax sale or forfeiture affecting said premises or contest any tax or assessment. All moneys paid for any of the purposes herein authorized and all expenses paid or incurred in connection therewith, including attorney's fees, and any other moneys advanced by Mortgagee to protect the mortgaged premises and the lien hereof, shall be so much additional indebtedness secured hereby and shall become immediately due and payable without notice and with interest thereon at the highest rate now permitted by Illinois law. Inaction of Mortgagee shall never be considered as a waiver of any right accruing to the Mortgagee on account of any default hereunder on the part of the Mortgagors.

8.    The Mortgagee making any payment hereby authorized relating to taxes or assessments, may do so according to any bill, statement or estimate procured from the appropriate public office without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.

9.    Mortgagors shall pay each item of indebtedness herein mentioned, both principal and interest, when due according to the terms hereof. At the option of the Mortgagee and without notice to Mortgagors, all unpaid indebtedness secured by this mortgage shall, notwithstanding anything in the note or in this mortgage to the contrary, become due and payable (a) immediately in the case of default in making payment of any installment of principal or interest on the note, or (b) when default shall occur and continue for three days in the performance of any other agreement of the Mortgagors herein contained.

10.    When the indebtedness hereby shall become due whether by acceleration or otherwise, Mortgagee shall have the right to foreclose the lien hereof. In any suit to foreclose the lien hereof, there shall be allowed and included as additional indebtedness in the decree for sale all expenditures and expenses which may be paid or incurred by or on behalf of Mortgagee for attorneys' fees, appraiser's fees, outlays for documentary and expert evidence, stenographers' charges, publication costs and costs (which may be estimated as to items to be expended after entry of the decree) of procuring all such abstracts of title, title searches, and examinations, title insurance policies, Torrens certificates, and similar data and assurances with respect to title as Mortgagee may deem to be reasonably necessary either to prosecute such suit or to evidence to bidders at any sale which may be had pursuant to such decree the true condition of the title to or the value of the premises. All expenditures and expenses of the nature in this paragraph mentioned shall become so much additional indebtedness secured hereby and immediately due and payable, with interest thereon at the highest rate now permitted by Illinois law, when paid or incurred by Mortgagee in connection with (a) any proceeding, including probate and bankruptcy proceedings, to which the Mortgagee shall be a party, either as plaintiff, claimant or defendant, by reason of this mortgage or any indebtedness hereby secured; or (b) preparations for the commencement of any suit for the foreclosure hereof after accrual of such right to foreclosure whether or not actually commenced; or (c) preparations for the defense of any actual or threatened suit or proceeding which might affect the premises or the security hereof.

11. The proceeds of any foreclosure sale of the premises shall be distributed and applied in the following order of priority: First, on account of all costs and expenses incident to the foreclosure proceedings, including all such items as are mentioned in the proceeding paragraph hereof; second, all other items which under the terms hereof constitute secured indebtedness additional to that evidenced by the note, with interest thereon as herein provided; third, all principal and interest remaining unpaid on the note; fourth, any overplus to Mortgagors, their heirs, legal representatives or assigns, as their rights may appear.

12. Upon or any time after the filing of a complaint to foreclose this mortgage the court in which such complaint is filed may appoint receiver of said premises. Such appointment may be made either before or after the sale, without notice, without regard to the solvency or insolvency of Mortgagors at the time of application for such receiver and without regard to the then value of the premises or whether the same shall be then occupied as a homestead or not, and the Mortgagee may be appointed as such receiver. Such receiver shall have power to collect the rents, issues and profits of said premises during the pendency of such foreclosure suit and, in case of a sale and a deficiency, during the full statutory period of redemption, whether there be redemption or not, as well as during any further times when Mortgagors, except for the intervention of such receiver, would be entitled to collect such rents, issues and profits, and all other powers which may be necessary or are usual in such cases for the protection, possession, control, management and operation of the premises during the whole of said period. The Court from time to time may authorize the receiver to apply the net income in his hands in payment in whole or in part of: (1) The indebtedness secured hereby, or by any decree foreclosing this mortgage, or any tax, special assessment or other lien which may be or become superior to the lien hereof or of such decree, provided such application is made prior to foreclosure sale; (2) the deficiency in case of a sale and deficiency.

13. No action for the enforcement of the lien or of any provision hereof shall be subject to any defense which would not be good and available to the party interposing same in an action at law upon the note hereby secured.

14. The Mortgagee shall have the right to inspect the premises at all reasonable times and access thereto shall be permitted for that purpose.

15. The Mortgagors shall periodically deposit with the Mortgagee such sums as the Mortgagee may reasonably require for payment of taxes and assessments on the premises. No such deposit shall bear any interest.

16. If the payment of said indebtedness or any part thereof be extended or varied or if any part of the security be released, any and all persons now or at any time hereafter liable thereof, or interested in said premises, shall be held to assent to such extension, variation or release, and their liability and the lien and all provisions hereof shall continue in full force, the right of recourse against all such persons being expressly reserved by the Mortgagee, notwithstanding such extension, variation or release.

17. Mortgagee shall release this mortgage and lien thereof by proper instrument upon payment and discharge of all indebtedness secured hereby and payment of a reasonable fee to Mortgagee for the execution of such release.

18. This mortgage and all provisions hereof, shall extend to and be binding upon Mortgagors and all persons claiming under or through Mortgagors, and the word "Mortgagors" when used herein shall include all such persons and all persons liable for the payment of the indebtedness or any part thereof, whether or not such persons shall have executed the note or this mortgage. The word "Mortgagee" when used herein shall include the successors and assigns of the Mortgagee named herein and the holder or holders, from time to time, of the note secured hereby.

## NOTE

FOR VALUE RECEIVED, the undersigned hereby jointly and severally promises to pay to the order of the Mortgagor the principal sum of One Million Two Hundred Thousand dollars no cents ($1,200,000.00) together with interest thereon at the rate of nine percent (9%) on the original and the unpaid balance. Said sum shall be paid in the manner described hereinunder:

One the first day of the month, and thereafter at the end of each thirty day period and the first payment being due on the First of May 2008.

All payment will first be applied to the Interest and then to the principal.

This Note can be pre-paid at any time, in whole or in part, without any penalty.

This Note shall at the option of the holder thereof be immediately due and payable upon failure to make any payment due hereunder, or for breach of any condition of any security interest, mortgage, pledge agreement or guaranty as collateral security for this Note or breach of any security agreement or mortgage, if any, on collateral granted, in whole or in part, as collateral security for this Note or upon the filing by any of the undersigned of an assignment for the benefit of the creditors, bankruptcy, or for relief under any provision of the Bankruptcy Code, or by suffering an involuntary petition in bankruptcy or receivership not vacated within thirty days.

In the event this Note is in default, and placed with an attorney for collection, then the undersigned agrees to pay all reasonable attorney fees and court costs and other costs of collection which may have to be undertaken by the holder of this Note. Payments not

made within five days of its due date shall be subject to a late charge of 2 percent of the said payment. All payments hereunder shall be made to such address as may from time to time be designated by this or any holder thereof.

THE undersigned and all other parties to this Note, whether as endorsers, guarantors or sureties waive demand, presentment and protest and all notices thereto and further agree to remain bound, notwithstanding any extension, modification, waiver, or other indulgence by any holder or upon the discharge or release of any obligor hereunder or to this Note, or upon the exchange, substitution, or release of any collateral granted as security for this Note.

Signed and sealed under the penalty of perjury this 4th day of March 2008.

Mohammed Bashir Chaudry
MCB LLC.

OFFICIAL SEAL
SU KYONG SUNG
Notary Public    State of Illinois
My Commission expires Oct 19, 2011

Su Kyong Sung.

# EXHIBIT C

**Copies of Checks for Miscellaneous**

**Advances Made to Bashir Chaudry**



Save this Copy
for your records.

**FIFTH THIRD BANK**

12929978

## CASHIER'S CHECK - Customer Receipt

March 11, 2008

Pay to the
Order of: CHAUDRY M. BASHIR***

$*******50,000.00

Amount: *FIFTY THOUSAND 00/100 US DOLLARS*

| | |
|---|---|
| Memo: | CUSTOMER PURCHASE |
| Purchased by: | ZAFAR IQBAL SHEIKH |
| Transaction #: | 52917870 |
| Cost Center: | 2447 |
| Method of Purchase: | Transfer |

**NON-NEGOTIABLE**

The purchase of a Surety Bond may be required before any Cashier's Check on this
bank will be replaced or refunded in the event it is lost, misplaced, or stolen.

VERIFY THE AUTHENTICITY OF THIS MULTI-TONE SECURITY DOCUMENT      CHECK BACKGROUND AREA CHANGES COLOR GRADUALLY FROM TOP TO BOTTOM

73-119
427

12929978

FIFTH THIRD BANK      CASHIER'S CHECK      March 11, 2008

Pay to the
Order of: CHAUDRY M. BASHIR***

$*****50,000.00

Amount: FIFTY THOUSAND 00/100 US DOLLARS

Drawn on: Fifth Third Bank, Kentucky, Inc      Transaction Number: 52917870
Lexington, KY      Cost Center:      2447

Memo:      CUSTOMER PURCHASE
Purchased by: ZAFAR IQBAL SHEIKH

The purchase of a Surety Bond may be required before any Cashier's Check on this
bank will be replaced or refunded in the event it is lost, misplaced, or stolen.

Authorized Signature

⑆129299788⑆ ⑈042101190⑈ 008264940011

THE ORIGINAL DOCUMENT HAS A WHITE REFLECTIVE WATERMARK ON THE BACK.      HOLD AT AN ANGLE TO SEE THE MARK WHEN CHECKING THE ENDORSEMENTS.

03/11/08

Save this Copy
for your records.

**FIFTH THIRD BANK**

13183842

**CASHIER'S CHECK - Customer Receipt**

April 29, 2008

Pay to the
Order of: CHAUDRY M. BASHIR***

$*******50,000.00

Amount: *FIFTY THOUSAND 00/100 US DOLLARS*

Memo:                        CUSTOMER PURCHASE
Purchased by:           CHICAGO REALTY BUILDERS INC
Transaction #:           53159819
Cost Center:             2447
Method of Purchase:  Transfer

**NON-NEGOTIABLE**

The purchase of a Surety Bond may be required before any Cashier's Check on this
bank will be replaced or refunded in the event it is lost, misplaced, or stolen.

SKOKIE, IL 60076

5-28-08
Date

Pay to the Order of: Bashir Chaudry $45,000.—

Forty Five Thousand only — Dollars

FIFTH THIRD BANK

For Loan

Zym Ghl Sheh

⑈07⎮923909⎮: 7233370027⎮⎮ 1769

Receiver By Bash. Ch.

0>/28/08

OFFICIAL CHECK

 **Charter One**

23-97
1020

692458889-7

December 06, 2008

**$50,000.00** DOLLARS

*Chaudry Bashir*

MEMO:

NON-NEGOTIABLE

PAYMENT
OF

Issued by Integrated Payment Systems Inc., Englewood, Colorado
JPMorgan Chase Bank N.A., Denver, Colorado

SAVE THIS RECORD

WE CANNOT GIVE INFORMATION OR SEARCH RECORDS UNLESS THIS COPY IS PRESENTED

HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK

**OFFICIAL CHECK**

HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK

# ❊ Charter One

692458888-9

23-97
1020

December 06, 2008

PAY _____ **\*\*$50,000.00\*\*** _____ DOLLARS

TO THE
ORDER OF **\*Chaudry Bashir\***

MEMO:

Drawer: RBS Citizens, N.A.
Charter One is a division of RBS Citizens, N.A.

Issued by Integrated Payment Systems Inc., Englewood, Colorado
JPMorgan Chase Bank, N.A., Denver, Colorado

_____
AUTHORIZED SIGNATURE                    MP

⑈222465⑈ ⑆102000979⑆ 680069245888885⑈

# EXHIBIT D

Promissory Note Signed by Bashir
Chaudry for $650,000.00 in Favor of
The Plaintiff Sheikh

## PROMISSORY NOTE

This Promissory Note is made and entered on the 27th of February 2012, and is being issued by Mohammed Bashir Chaudry of 6655 North Monticello Avenue, Lincolnwood, Illinois, hereinafter to be known as the Promisor, and is made in favor and benefit of Zafar Sheikh, currently a resident of 4555 North Central Avenue, Chicago, hereinafter to be known as the Promisee.

Both parties as stated hereinabove had some financial transactions going as far back as the year 2006, in which Bashir Chaudry has owed money to Zafar Sheikh. Both parties had been desirous to settle their outstanding balance and went over their many accounts pertaining to lots and gas station and have finished accounting. As per this final accounting the total amount owed as of this date by Bashir Chaudry to Zafar Sheikh is $650,000.00 (Six hundred and fifty thousand dollars and zero cents). The Promisor has undertaken to pay this amount by the 1st of January 2014. This final sum of $650,000. *or as soon as thereafter. 2 also includes the Note for $100,000.00 that Bashir Chaudry signed upon closing of the gas station Loan in November 2011, in favor of Zafar/Aneeqa Sheikh and that Note was recorded with the Cook County Recorder of Deeds. Hence with this accounting, that Note has been added to reach the final figure of $650,000.

2-      Both Parties acknowledge that the sum of $100,000. that the promisee gave to the Promisor in November 2011, is not a part of this Note, which is an additional sum, which the Promisee had agreed to pay back by the 1st of March 2012, and has issued checks for that amount, which will be cashed after that due date.

3-      Both Parties also acknowledge that this Note does not cover the strip center which both parties have under construction at 5838 South Racine Avenue in Chicago. That strip center is part of a separate agreement which the Parties have signed and entered into previously, and the building and leasing/sale of that strip center will be exclusively governed by that agreement. If there are any future business deals amongst both parties, this Note will not affect those transactions, as parties will make and enter into new agreements, which will be signed separately and will not bear or impact this Note in any way or form.

4-      The lot at 6155 South Ashland in Chicago has not been transferred to Bashir Chaudry or any organization controlled by him and is being reverted back to Zafar Sheikh as per this agreement.

5-      EVENTS OF DEFAULT: The Promisor will be in default upon occurrence of any one of the events, circumstances or conditions:

  A:      Failure of the Promisor on the Note or any other obligation Promisor have with the Promissee to make payments when due, or

  B:      A default or the breach by the Promisor, owner or any co-signor. endorser, surety, or guarantor under any terms of this Note, or any other loan

1



agreement, any security agreements, mortgage, deed to secure debt, deed or trust, or any other document or instrument evidencing, guaranteeing, securing, or otherwise relating to the Note or any other obligations Promissor have with the Promisee under this Note.

C:    The making or furnishing or any verbal or written representations, statements or warranties to the Promisee which are false, incorrect or incomplete in any material respect by or on behalf of the Promisor or any Co-signor, endorser, surety, or guarantor of the Note or any other obligations Promissor have with the Promissee under this Note.

D:    The death, dissolution or insolvency or the appointment of the receiver by or on behalf of the voluntary or involuntary termination, or existence by, or the commencement of any proceedings under any present or future federal or state insolvency, bankruptcy, re-organization, voluntary or involuntary, composition or debtor relief law by or against the Promissor, or any other co-signor surety or guarantor of the Note or any other obligations Promissor have made with the Promisee, or any material changes affecting the status of the Promisor,

E:    Failure to pay or provide proof of any tax, assessment, rent, insurance, premium or escrow, escrow deficiency, on or before its due date.

CONFESSION OF JUDGMENT:    Promissor hereby irrevocably authorizes and empowers an attorney at law to appear in any court of record to confess judgment against the Promissor for the unpaid amount of this Note as evidenced by an affidavit signed by the Promissee or its heirs, agents, successors and assigns, setting forth the amount/s then due, plus attorneys costs and expenses, plus costs of suits if filed, and to release all errors and waive all rights of appeal.

5-    COLLECTION OF EXPENSES:    On or after an Event of Default, Promissee may recover from Promissor all fees and expenses in collecting, enforcing and protecting liabilities and reasonable expenses in realizing on any security incurred by the Promissor, plus expenses of collecting and enforcing the Note, such expenses will also include reasonable Attorney costs and fees, incurred by the Promissee as well as paralegal fees and other costs associated with the litigation.

6-    SECURITY:    The Note is secured by the assets and the collateral held by the Promisor.

7-    <u>GENERAL PROVISIONS:</u>

a-    Time is of the essence in Promissor's performance of all duties and obligations imposed by the Note.

2



b-    The Note will be governed by the laws of the State of Illinois.

c-    The Note shall inure to the benefits of and bind the heirs, personal representative/s, Successors and assigns of the parties, provided however that the Promisor, who is taking the loan and/or owes the money, may not assign, transfer, or delegate any of the obligations under this Note though the Promisee lending this sum will be free to assign this Note/loan to any one at any time. This Note will stay a private and confidential document and the Parties have agreed not to record it with the Recorder of deeds. There are no oral or verbal agreements between the parties regarding this Note.

d-    In the event of filing of Bankruptcy the Promissor hereby agrees not to make this Note a part of any order or decree seeking protection from the Bankruptcy Court. In the event of Promisor not abiding by this clause, will be considered as trying to perpetuate fraud, by not paying the value of the properties/assets as transferred to him, or as acquired by him from the Promissee and thus unduly trying to enrich himself.

e-    All Notices under this Note will be in writing. Any Notice given by the Promissee to the Promissor hereunder will be effective upon the personal delivery or after the mailing by the regular, certified or registered mail, postage pre-paid at the address shown herein this Note.

g-    The term Promissor as implied in this Note refers to Chaudry Bashir and the term Promisee as implied in this Note refers to Zafar Sheikh.

h-    All headings are for the purpose of convenience only and any errors or omissions will not affect or dilute the Note in any way or form.


Chaudry M. Bashir
Promissor
6655 North Monticello
Lincolnwood. IL. 60176.

Zafar Sheikh
Promisee
4555 North Central, #5
Chicago. IL. 60630.


I, a Notary Public in and for the State of Illinois do hereby certify that the individuals named hereinabove did appear before me and signed this instrument of their own free will.

)
) ss
)

Notary Public

"OFFICIAL SEAL"
Shailesh J Shah
Notary Public, State of Illinois
My Commission Expires 03-16-2014

3

A G R E E M E N T

This Agreement is signed between Bashir Chaudry of 6677 North Monticello Avenue, Lincolnwood, Illinois, hereinafter to be known as Chaudry, and Zafar Sheikh of 4555 North Central Avenue, Chicago, Illinois, hereinafter to be known as Sheikh. Both Parties have agreementsthat formalize the note payable by Chaudry to Sheikh and it is hereby reiterated and agreed as follows:

*see back 2/*

1- That under those prior agreements the Second Party owes the First Party a sum of $825,000. This amount will be paid by Chaudry to Sheikh along with the statutory interest as soon as the financial condition of Chaudry and the businesses owned by him improves, including but not limited to the Central Market's profitability and the gas station owned by him at Pulaski Avenue. This sum as mentioned herein is owed by Chaudry to Sheikh since 2008 and has no bearing or consequence either or because of the entrance or non-entrance of the agreements between Chaudry and Sheikh that concern the Central Market in Indiana. The contracts and promissory note/s signed by Chaudry are stand-alone agreements and are not dependent nor contingent upon any agreement, nor they will be affected or distracted by any dispute as to the compliance or non-compliance of any other agreement. Bashir Chaudry was also advanced by Sheikh a sum of $100,000 for the inventory of the gas station located at 1224 west 59th Street, in the City of Chicago, which remains unpaid. The current Lessee of that Gas Station has notified Bashir Chaudry that out of that sum, he will be paying $42,000 to Bashir Chaudry very soon. That amount of $42,000 will be passed on and paid immediately to zafar sheikh upon its receipt by Bashir Chaudry. Chaudry has also agreed to pay $37,000 to Sheikh, that Sheikh dispensed and spent for the visas of Javed and Shahid Chaudry to legalize and earn residency for them in Sweden.


_____                    _____
Bashir Chaudry                             Zafar Sheikh

I, a Notary Public for and in the State of Illinois, do hereby certify that the above named individuals did appear before me on the _____31_____ of December 2015, and I checked their state issued drivers licenses to verify their true identity, and they put their hands below at their own free will in my presence.


_____
Notary Public.

| OFFICIAL SEAL |
| ROSEANN OCAMPO |
| Notary Public - State of Illinois |
| My Commission Expires Sep 24, 2017 |

(1) $ 42,000 will be deducted from the amount owed by
Bashir Chandry.

(2) It is agreed that no interest will charged over the $ 650,000
sum owed by Chandry till 2014.

(3) After 2014 4% interest will be charged for each year
which will increase by 1% point for each year.

# EXHIBIT E

Advances of $200,000.00 made to Bushra Naseer and her Agreement to Pay.

# LOAN AGREEMENT

This Agreement to get a small term loan is entered into by & between Aneeqa Sheikh of 3155 West Wallen Avenue, Chicago, Illinois, hereinafter referred to as the First Party and Zafar Sheikh & Bashir Chaudry of Chicago and Lincolnwood respectively to be referred to as the Second Party.

Whereas the Central Market is in dire need of cash to run its operations and have asked for a short term loan of forty five thousand dollars to sustain their operations. Therefore the First Party is extending a short term loan. The conditions of the loan are hereunder:

1- First party will extend a loan of forty five thousand dollars.
2- The loan will be for the purchase of groceries for Central market grocery store in Lake Station, Indiana.
3- The loan will be returned to the First Party by the Second Party and will have priority over all other loans and amounts.
4- In case Central Market is sold, or leased, the loan of the First Party will be paid either from the loan proceeds or from the proceeds collected from the sale of the inventory.
5- The Central Market has also filed a claim against Selective Insurance company, and in case the store could not be sold, or leased, in that case the money received from the insurance claim will be used to pay the First Party. Attorney Ed Esho will be informed of this arrangement, and the funds will directly transferred from the insurance claim to the first party.
6- In case the business picks up, in that case the Central market will pay the money directly to the first party.

County of Cook )

)

State of Illinois )

I, a Notary Public in and for the State of Illinois, do hereby certify that the above named individual did appear before me on the _____ $\overline{31}$ _____ of December 2015, and whose identity was checked by me against the personal State issued identifications, signed this Affidavit in my presence of his own free will.

_____

Notary Public

```
OFFICIAL SEAL
ROSEANN OCAMPO
Notary Public - State of Illinois
My Commission Expires Sep 24, 2017
```

## AFFIDAVIT OF BASHIR CHAUDRY

I, Bashir Chaudry, a resident of 6677 North Monticello Avenue, Lincolnwood, Illinois, do hereby certify and state under oath to the following:

1- That Bushra Naseer is the 'record owner' of few businesses which I am running, operating and profiting and that as such Bushra Naseer has authorized me to sign for and on behalf of herself as well as the legal entities thru which the businesses including the business commonly known as Central Market in Lake Station, Indiana is run, conducted and operated.

2- That Bushra Naseer has been notified and is well aware of and fully agrees with the agreement that I have entered into with Zafar Sheikh regarding the operation and profit sharing of the Central Market and that she has no objection or reservations to any of the terms and conditions of that agreement. Apart from agreeing to all its terms and conditions and authorizing me to sign that agreement, Bushra Naseer further binds herself to its contents, undertakings and commitments.

3- That Bushra Naseer is currently out of the United States and is not expected to return to Chicago till the end of January 2016 and had she been in Chicago, could have herself signed and sealed the agreement with Zafar Sheikh.

4- That I have requested Bushra Naseer to prepare a Power of Attorney appointing me as her true and legal agent to enter into and sign all agreements and that such power of attorney will further authenticate and certify my statements contained herein. That this Power of Attorney to be prepared by Bushra Baseer will be notarized at the U.S. Consulate in Lahore and returned to me by the 15th of January 2016. Bushra Naseer's attorney could also be in possession of a Power of Attorney from Naseer, which will be handed over to zafar sheikh.

5- That I will also scan and send a copy of the contract that I have entered into with zafar sheikh to Bushra Naseer and ask her to sign it and scan it back to me, within three days, so that it is received showing her consent, before the Power of Attorney is prepared and certified by the U.S. consulate, as that task could take two weeks.

Bashir Chaudry

1

County of Cook )

                   )

State of Illinois )

I, a Notary Public in and for the State of Illinois, do hereby certify that the above named individual did appear before me on the ____31____ of December 2015, and whose identity was checked by me against the personal State issued identifications, signed this Affidavit in my presence of his own free will.


Notary Public

OFFICIAL SEAL
ROSEANN OCAMPO
Notary Public - State of Illinois
My Commission Expires Sep 24, 2017

2

# EXHIBIT F

Motion Filed By Plaintiff in 17-L-07194

To Avoid and Bar Fraudulent Transfers

By Debtor Bashir Chaudry

FILED DATE: 9/30/2022 12:40 PM   2022CH09742
FILED DATE: 5/6/2019 3:09 PM   2017L007194

FILED
5/6/2019 3:09 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2017L007194

4946154

## IN THE CIRCUIT COURT OF THE COOK COUNTY

## LAW DIVISION

Z. Sheikh )
)
Plaintiff )
)
Vs. )     2017 L 07194
)
Bushra Naseer )     Hon. Judge Jerry Esrig
Nazeer Chaudry )
Bashir Chaudry )
Jahangir Zaib )
Sadia Aslam )
Loc Gas Inc. )
Khalid Shahnaz )
)
Defendants )

## PLAINTIFF'S MOTION TO VOID AND SET ASIDE
## THE DEFENDANT'S FRAUDULENT CONVEYANCE &
## TRANSFER OF ASSETS

**NOW COMES THE PLAINTIFF** Zafar Sheikh and files this Motion to void and set aside the fraudulent transfer of Defendant Chaudry and Naseer's assets. In support whereof the Plaintiff states as follows:

1- This Plaintiff filed a lawsuit in the Law Division of Cook County on or about July 18th 2017, which is currently pending in the law division. The Complaint seeks to enforce the agreements and promissory Notes that the Defendants entered into with the Plaintiff, which commit the Defendants Chaudry and Naseer to pay the Plaintiff sums that were advanced to them or which were owed to this Plaintiff under different agreements that the parties had between each other.

1

FILED DATE: 9/30/2022 12:40 PM   2022CH08742
FILED DATE: 5/6/2019 3:09 PM   2017L007194

2- The Plaintiff after filing the lawsuit also filed a Lis Pendens at the Cook County recorder of deeds, which among other properties also identified the gas station, a business/property that is owned by Chaudry & Naseer and which is located at 415 South Pulaski Avenue, in Chicago, Illinois.

3- The value of the gas station is estimated to be about 2.3 million dollars, out of which the business is valued at around $550,000 to $600,000, whereas the balance of the value is ascribed to the real property which encompasses the gas station, land and the building.

4- Though the Defendant Chaudry and Naseer kept it a closely guarded secret, but the Plaintiff found out few months ago that the defendants have sold the business located at the said premises to an individual who is commonly known as **Safi uding Hasan**, and is known to be a close friend of defendant Bashir Chaudry. Mr. Hasan purchased the business from Chaudry and Naseer for $400,000. (plus or minus). This sale price is at a minimum 35 to 40% lower than the true market value of the business, and it would surely have brought in a minimum of $550,000 had it not been sold in a 'fire sale'.

5- The defendants purpose in selling the business at such a substantial discount to a close friend of theirs was to dissipate and dispose off their assets, and was in anticipation of the judgment that the defendants knew would be coming their way in a short order, which would have transferred the asset to the Plaintiff and hence deprived the defendants of any proceeds.

6- An Agreement that Chaudry and Naseer entered into with the Plaintiff on the 19th of May 2017, states on page 2, article 7 that upon the sale of the gas station located at 415 South Pulaski Avenue, they will pay the Plaintiff a minimum of $200,000 against the sums that they owed this Plaintiff. (Exhibit A).

7- The Defendants Chaudry and Naseer not only kept the sale of the gas station business a closely held secret, they also did not pay even a single penny to this Plaintiff upon the sale of the gas station, as agreed to between the defendants and the plaintiff.

8- It was also disclosed to the Plaintiff that the transaction was facilitated and all pertinent agreements and negotiations conducted between Defendant Chaudry and Naseer and the buyer of the gas station, Mr. Sufi were conducted thru the offices of the Defendant's attorney of record Fadi Rafati and Javed Arifullah. These attorneys also prepared all sales

2

FILED DATE: 9/30/2022 12:40 PM   2022CH09742
FILED DATE: 5/6/2019 3:09 PM   2017L007194

agreements and leases for the property and helped with the formalities that were required to facilitate and close the sales transaction.

The Illinois Statutes regarding the Fraudulent Transfer of assets state as follows:

9- **740 ILCS 160/5 states, in pertinent part:**

> *(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:*
>
> *(1) with actual intent to hinder, delay, or defraud any creditor of the debtor.*

(b) In determining actual intent under paragraph (1) of subsection (a), consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider, like a friend or a relative.

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(4) the transfer was of substantially all the debtor's assets;

(5) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(6) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation incurred;

(7) the transfer occurred shortly before or shortly after a substantial debt was incurred.

9- **740 ILCS 160/6(a) states:**

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

10- **740 ILCS 160/8 states:**

> (a) In an action for relief against a transfer or obligation under this Act, a creditor, subject to the limitations in Section 9, may obtain:

3

FILED DATE: 9/30/2022 12:40 PM   2022CH09742
FILED DATE: 3/8/2019 3:09 PM   2017L007194

(1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

(2) an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by the Code of Civil Procedure;

(3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure,

(A) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(B) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

(C) any other relief the circumstances may require. (b) If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.

11.  The transfers of assets by the Defendant Chaudri to his friend Hasan Uddin Safi at a substantial discount constitutes a pattern of fraudulent conveyances under the statutes because:

a. they were made with actual intent to hinder, delay, or defraud his creditors, namely the Plaintiff;

b. they were made to "insiders" as defined in 740 ILCS 160/2(g)(1)(A), namely his long time close friend Mr. Safi.

c. the provisions of the agreement permit Defendant Chaudry to maintain effective possession and/or control of the property transferred as merely the business is sold to Mr. Hasan safi, whereas Defendants Chaudry and Naseer still own the real estate and thus quasi control over the business,

d. the value of the consideration received by defendant Chaudry and Naseer in exchange for sale and transfer of the business and business assets was not reasonably equivalent to the value of the assets transferred; in fact, these transfers were made at a 35% to 40% discount as to the true value of business assets,

e. Defendants Chaudry and Naseer became insolvent after the sale and transfer of the business to Mr. Safi.

4

FILED DATE: 9/30/2022 12:40 PM   2022CH09742
FILED DATE: 5/6/2019 3:09 PM   2017L007194

### DEFENDANTS ATTORNEY'S PULLED THIS FRAUDULENT CONVEYANCE UNDER THE "COVER OF NEGOTIATIONS"

12- During the Course of this Lawsuit on numerous occasions the Defendants attorneys approached this Court and stated a strong desire to settle the lawsuit thru negotiations. The Court was generous and granted them time at least four times, lasting well over nine months, to negotiate a settlement with the Plaintiff. These negotiations in which this Plaintiff participated with absolute good faith, were merely a ruse under which the defendant and their attorney's were operating. While these attorney's were purportedly negotiating with the Plaintiff to settle this litigation, whereas in reality they were scouting for a buyer and behind the scenes were negotiating to sell the defendants business. In practical terms Attorney Rafati and Arifullah not only deceived this Plaintiff but also defrauded this Court. It is noteworthy that Judge Mitchell who was first assigned on this matter, had told the Defendant's attorneys that no assets were to be sold during the pendency of this litigation. After the case was reassigned to this Court, this Court too told the defendants attorneys on at least two occasions that any sale or shifting of assets will be looked at as a fraudulent conveyance by this Court. Still brushing aside the warnings of this Court, the defendants and their attorneys decided to take a deliberate decision to defy and defraud this Court.

### DEFENDANTS AND THEIR ATTORNEYS PARTICIPATED IN FRAUD AND CIVIL CONSPIRACY

13- The actions of the Defendants and their attorneys clearly demonstrate that they acted in bad faith, with an intent to defraud and concocted and participated in a civil conspiracy.

A civil conspiracy between the parties is proven where the facts of the case allege and establish that:

(1) the defendant/s entered into an agreement with one or more persons to accomplish by concerted action either an unlawful purpose or a lawful purpose by unlawful means;

(2) a tortious act was committed in furtherance of the agreement; and

5

FILED DATE: 9/30/2022 12:40 PM 2022CH09742
FILED DATE: 5/6/2019 3:09 PM 2017L007194

(3) the plaintiff suffered an injury that was caused by the defendant. *Merrilees, 2013 IL App (1st) 121897, ¶ 49; see also McClure, 188 Ill. 2d at 133.*

## DEFENDANT CHAUDRY IS ALSO SECRETLY TRYING TO SELL 59TH STREET GAS STATION TO HIS ALTER EGO ZAIB/ASLAM

This Plaintiff has also learned that Defendant Chaudry is also secretly trying to put together a deal in which he will sell the 59th Street gas station that he owns to his alter ego Zaib or his wife Sadia Aslam. The gas station is currently going thru the foreclosure process, but Chaudry with the help of his attorneys and the Zaib/Aslam attorney have approached the Hanmi bank, who extended the loan for the gas station to transfer that asset to Aslam or Zaib. The transfer of this gas station will further dissipate Chaudry's assets.

## FRAUDULENT SALE AND TRANSFER OF COLLATERAL BY DEFENDANTS / THEIR ATTORNEY HAS INJURED THE PLAINTIFF

The sale and fraudulent transfer of assets from Chaudry and Naseer to Mr. Safi has seriously hurt this Plaintiff as it has impinged upon the ability of the Defendants to pay their debt that they owe to this Plaintiff. Additionally if the transfer of the 59th Street gas station is also perpetrated by the Defendant Chaudry to Aslam/Zaib, it will distinguish any prospects of this Plaintiff ever getting paid for the amounts that it is owed by these defendants. Therefore the Plaintiff respectfully seeks the Court to grant it the following relief:

A:  Declare the sale and transfer of assets by Defendants Chaudry and Naseer to their long time friend Mr. Safi, pertaining to the sale of business at 415 South Pulaski Avenue, Chicago, to be a 'fraudulent conveyance' under the Illinois statutory code, and declare it a nullity.

B:  Order the defendants and their attorneys to submit to this Court all agreements, leases, and transfer documents that were prepared to effectuate this fraudulent transfer,

C:  Order that the Defendants Chaudry and Naseer deposit all proceeds of the asset of this gas station business, which are around $400,000 (+ or -), to be

6

FILED DATE: 9/30/2022 12:40 PM 2022CH09742
FILED DATE: 5/6/2019 3:09 PM 2017L007194

deposited with the Cook County Clerk in an escrow account, till this litigation is concluded,

D:      In case the Defendants have shifted this $400,000 abroad, which this plaintiff suspects, then order their attorneys Rafati and Javedullah to deposit this sum of $400,000 from their resources with the Cook County Clerk's escrow account, or a bond to cover this sum, as these attorneys aided and abetted the fraudulent transfer of assets,

E:      Order Chaudry and Zaib and their attorney's to cease and desist from making any offers to purchase and transfer the assets of the gas station that Chaudry owns at 1224 west 59th Street in Chicago.

F:      Hold the Defendants and their attorneys in contempt of Court for scheming and defrauding the Plaintiff and the Court, and impose rule 137 sanctions. This Court has inherent powers to impose sanctions when its orders are defied, it is taken advantage of or kept in dark or defrauded,

F:      Any other relief that this Court deems fit and proper, which will serve the cause of justice.


Zafar Sheikh/Plaintiff/pro-se
3155 West Wallen Ave.,
Chicago. IL. 60645.
Tele: (847) 414 - 9670

7

Order

(Rev. 02/24/05) CCG N002

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Zafar Sheikh

v.

LOC Gas, Inc et al

No. 2017 L 07194

### ORDER

This matter coming to be heard for status and Plaintiff's motion to void Defendant's Fraudulent Conveyance. The court being advised in the premises it is hereby ordered that Defendant Bashir Chaudy is given 14 days up until May 29, 2019 to file an answer or otherwise plead to Plaintiff's 4th Amended Complaint. and this matter is set for a briefing schedule to be entered on the next court status of 5/29/19 at 10:30 am. Plaintiff's motion for Fraudulent Conveyance is denied without prejudice

Attorney No.: 29829
Name: Zuhair Nubani
Atty. for: ASlam, LOC Gas Inc
Address: 823 Adler Ct
City/State/Zip: Schaumburg IL
Telephone: (312) 719-3746

ENTERED:

Judge John A. ____
MAY 15 2019
Circuit Court ____

Dated: _____

_____
Judge                    Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

# EXHIBIT G

## CONTRACTS TO PURCHASE 59TH

## Street Gas Station and Down Payments

Exh. B

VERIFY THE AUTHENTICITY OF THIS MULTI-TONE SECURITY DOCUMENT

CHECK BACKGROUND AREA CHANGES COLOR GRADUALLY FROM TOP TO BOTTOM

**FIFTH THIRD BANK**

**CASHIER'S CHECK**

73-119
421

32690740

Pay to the
Order of: RAFATI LAW GROUP**

Amount: FIFTY THOUSAND, 00/100 US DOLLARS

February 04, 2020

$*******50,000.00

Drawn on: Fifth Third Bank
National Association

Transaction Number: 13660586
Cost Center: 4-4-8
2488

Memo:
Purchased by: SADIA ASLAM

EARNEST MONEY FROM LOC GAS INC

The purchase of a Surety Bond may be required before any Cashier's Check on this
bank will be replaced or refunded in the event it is lost, misplaced, or stolen.

Authorized Signature

⑈"3 26 90 740⑈"  ⑈:04 2⑉0⑉⑉90:  008 26⑉9⑉00⑈"

THE ORIGINAL DOCUMENT HAS A WHITE REFLECTIVE WATERMARK ON THE BACK.   HOLD AT AN ANGLE TO SEE THE MARK WHEN CHECKING THE ENDORSEMENTS.

Ex6. A



VERIFY THE AUTHENTICITY OF THIS MULTI-TONE SECURITY DOCUMENT.

CHECK BACKGROUND AREA CHANGES COLOR GRADUALLY FROM TOP TO BOTTOM

FIFTH THIRD BANK

Pay to the
Order of: RAFATILAW GROUP

Amount: FIFTY THOUSAND 00/100 US DOLLARS

CASHIER'S CHECK

784-1.9
42

July 20, 2020

334004455

$*****50,000.00

Drawn on: Fifth Third Bank
National Association

Transaction Number: 56975548
Cost Center:
23338

Memo: EARNEST MONEY VALID ONLY WITH CONTRACT AFTER DATE
Purchased by: LOC GAS INC

The purchase of a Surety Bond may be required before any Cashier's Check on this
bank will be replaced or refunded in the event it is lost, misplaced, or stolen.

Authorized Signature

⑆334004455⑆ ⑆042101190⑆ 008264940000⑆

THE ORIGINAL DOCUMENT HAS A WHITE REFLECTIVE WATERMARK ON THE BACK.   HOLD AT AN ANGLE TO SEE THE MARK WHEN CHECKING THE ENDORSEMENTS.

## EXHIBIT A

## ESCROW AGREEMENT

RE: Real Estate Sales Contract between Mohammed Abdallah ("Seller") and LOC, Inc. ("Buyer") for 1224 W. 59th St., Chicago, Illinois 60636

Funds in the total amount of $100,000 ("Earnest Money") representing the earnest money deposit for of the above described property, are deposited with Fadi Rafati, attorney at law ("Escrowee") in the event that the Sweis Law Firm, P.C. on behalf of Abdallah delivers written notice to Escrowee that LOC or his affiliate is in default and makes demand that a specific sum of the Earnest Money for a particular property be paid to Abdallah or an affiliate of Abdallah. In that event, Escrowee shall pay the amount requested by Abdallah to it or its affiliate within 10 days of such notice unless during said 10 day period Escrowee receives from LOC or its attorney written notice stating that LOC or his affiliate is not in default and that the Earnest Money should not be released or paid to Abdallah or its affiliate. In the event LOC sends such written notice to Escrowee, then Escrowee shall continue to hold the Earnest Money subject to the terms of this Escrow Agreement. Notice will only be effective if addressed to Rafati Law Group 22 W. Washington St. 15th Floor and sent by certified mail, return receipt requested, postage pre-paid, or if hand delivered to Chicago, IL Escrowee at this address. Notice shall be deemed effective only when received by Escrowee. 60602 Notice in any other form will not be effective.

Escrowee is hereby expressly authorized to regard and to comply with and obey any and all orders, judgments or decrees entered or issued by any court with or without jurisdiction, and in case the said Escrowee obeys or complies with any such order, judgment or decree of any court it shall not be liable to any of the parties hereto or any other person, firm or corporation by reason of such compliance, notwithstanding any such order, judgment or decree be entered without jurisdiction or be subsequently reversed, modified, annulled, set aside or vacated, in case of any suit or proceeding regarding this escrow, to which said Escrowee is or may be at any time a party shall have a lien on the contents hereof for any and all costs, attorneys' and solicitors' fees, whether such attorneys or solicitors shall be regularly retained or specially employed and other expenses which it may have incurred or become liable for on account thereof, and it shall be entitled to reimburse itself therefore out of said deposit, and the undersigned jointly and severally agree to pay said Escrowee upon demand all such costs, fees and expenses so incurred.

BUYER:     LOC, Inc.

_SADIA ASLAM_ _PRESIDENT_
Print Name and Title

SELLER:    MOHAMMED ABDALLAH

Accepted: Fadi Y. Rafati, Esq., as Escrowee

By:

FADI Y. RAFATI

12

# REAL ESTATE SALES CONTRACT

This Real Estate Sales Contract ("Contract") is entered into as of this 23ʳᵈ day of JULY, 2020, by and between Mohammed Abdallah, an individual, ("Abdallah") and LOC, Inc., an Illinois corporation ("LOC").

## RECITALS

**WHEREAS,** Abdallah purchased from the foreclosing lender, Hanmi Bank, the following property:

A.    1224 W. 59ᵗʰ Street, Chicago, Illinois 60636 ("Property")

**WHEREAS,** Property is currently being used as gasoline service station and uses related thereto; and

**WHEREAS,** LOC, or an affiliate of LOC, is leasing/operating the Property

**WHEREAS,** LOC is thoroughly familiar with the Property and the operations being conducted at the Property; and

**WHEREAS,** LOC desires to purchase the Property from Abdallah or an affiliate of Abdallah, and an affiliate of Abdallah desires to sell the Property to LOC, provided Abdallah or its affiliate obtains legal title to the Property from the current legal titleholder of the above described Property;

**NOW, THEREFORE,** in consideration of the foregoing Recitals, mutual promises and covenants set forth in this Contract and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Abdallah and LOC (collectively referred herein as the "Parties") agree as follows:

1.    **Purchase Price.** Abdallah through an Illinois limited liability company to be created and formed by Abdallah ("Abdallah Affiliate") shall sell the Property to LOC and LOC shall purchase the Property from Abdallah or Abdallah Affiliate at the purchase price as set forth below:

### One Million Two Hundred Thousand Dollars ($1,200,000.00)

The purchase price less the earnest money deposit plus or minus any prorations or credits shall be paid at the time of closing.

2. **Abdallah's Right to Remove Property.** In the event Abdallah or Abdallah Affiliate does not obtain legal title to the Property for whatever reason, then Abdallah shall not be obligated to sell that particular property to LOC.

3. **LOC's Termination Right.** LOC shall be required to purchase the above described Property from Abdallah or Abdallah Affiliate except in the event that Abdallah notifies LOC that it or the Abdallah Affiliate has not been able to obtain legal title to a property. In the event that Abdallah or Abdallah Affiliate is unable to obtain legal title to a property, then LOC, upon written notice to Abdallah, may terminate its obligation to purchase that specific property. The earnest money paid by LOC regarding said property shall be fully refunded to him within five business date after Abdallah receives the notice of termination under this clause.

4. **Abdallah's Termination Right.** In the event that Abdallah or Abdallah Affiliate is unable to obtain legal title to a property, then Abdallah shall have the right to terminate its obligation to sell that property to LOC by giving LOC written notice of said termination. In the event such termination is given, the earnest money paid by LOC pertaining to said property shall be fully refunded to him.

5. **Closing.** Provided Abdallah or Abdallah Affiliate obtains legal title to the Property, the closing on that particular property shall take place pursuant to notice from LOC no later than July 31, 2021. Citywide Title Corporation or a title company of Abdallah's choosing shall arrange to close the transaction at a location in Chicago, Illinois. In the event LOC fails to close through no fault of Abdallah, then the earnest money deposit made by LOC for that particular property shall be forfeited to Abdallah not as a penalty but as liquidated damages for that particular property. The Parties agree that it would be difficult to establish actual damages for a failure to close by LOC and that the payment of the earnest money deposit would be a fair damage amount.

6. **Earnest Money.** At the time of execution of this Contract, LOC shall deposit with its counsel as escrowee the sum of $100,000 as earnest money for the Property. Proof of said deposit shall be delivered to Abdallah or his counsel. In the event LOC fails to perform in accordance with the terms of this Contract, Abdallah shall be entitled to receive the earnest money deposit. Abdallah or its affiliate shall be entitled to have buyer's counsel pay the earnest money deposit in the event LOC is in default under this Contract pursuant to the terms of the Escrow Agreement. Attached hereto as Exhibit A is a copy of the Escrow Agreement to be executed.

2

7.    **Prior Title Information.** Within fourteen days (14) after execution, Abdallah shall provide to LOC or its counsel a title commitment.

8.    **Deed/Bill of Sale.** The deed to be issued to LOC shall be a special warranty deed from Abdallah Affiliate. The bill of sale pertaining to any equipment or personal property at each of the Property shall be a quitclaim bill of sale and shall not contain any representations or warranties and shall not identify any specific personal property. Abdallah and Abdallah Affiliate do not make any representations or warranties regarding its ownership rights, secured party creditor rights, or rights to transfer or convey any personal property or equipment at the Property to LOC. Abdallah does not know what personal property and equipment at each of the Property may be transferred or conveyed to LOC by Abdallah or Abdallah Affiliate. LOC agrees to accept the quitclaim bill of sale from Abdallah Affiliate and to accept all personal property, including equipment, at each of the Property in its "AS IS - WHERE IS" condition, including any legal title disputes or secured interests of third parties. Abdallah's or Abdallah Affiliate's only obligation is to quitclaim any interest it has, if any, in the personal property to LOC. However, Abdallah shall convey to Abdallah Affiliate all interests, if any, it has currently or later acquires in the real property listed in the recitals above, personal property, inventory, equipment and fixtures as they relate to any and all of the Property. At the closing of a property, Abdallah will release any secured interest it may have to the personal property, including without limitation equipment, inventory, shelving, registers and fixtures, at the property related to the operation of the business.

9.    **"AS IS - WHERE IS".** Except as expressly set forth in this Contract, the Parties acknowledge and agree Abdallah has not made, and does not make and hereby disclaims any express or implied representations and warranties regarding or relating to the surface or subsurface environmental conditions, the surface or subsurface geo-technical conditions, susceptibility to flooding, value, layout, square footage, income, expenses, zoning, use and occupancy restrictions, operation, regulatory compliance, environmental compliance, liability under any environmental laws and laws and regulations relating to hazardous materials or underground storage tanks, and legal requirements or any other matter or thing affecting or relating to the Property. LOC acknowledges that, except as expressly set forth in this Contact, no such representations or warranties, expressed or implied, have been made, and LOC is not relying on any such expressed, implied, or considered warranty or representation. In accordance with the foregoing, LOC or his designated grantee agrees to take the Property in their "AS IS-WHERE IS" condition, with all

3

faults, and in so agreeing, LOC acknowledges and represents that it has inspected the Property and has made such investigations as he deems appropriate as to the condition affecting the Property, including without limitation, the conditions described above. In so doing, LOC represents that it has retained such experts and consultants to assist in such inspections and investigations as it has deemed appropriate. In agreeing to purchase the Property in their "AS IS-WHERE IS" condition and without any representation or warranty expressed or implied, LOC acknowledges and represents that it has factored the "AS IS-WHERE IS " condition of the Property into the purchase price that has been agreed to for each property. Furthermore, LOC acknowledges and represents that it has had adequate time to perform his due diligence investigation of the Property. The terms, representations and covenants of this section shall survive the closing. LOC has retained his own legal counsel and has consulted with them on this Contract.

10.    **Title Conditions, Existing Leases, Tenancies and Occupants.** LOC shall take legal title to the properties subject to any existing title conditions, current real estate taxes not due and payable subject to paragraph 22 below, existing leases including options to purchase, tenancies or occupants at the Property. LOC agrees to take title subject to all of the matters raised in said title commitments and rights of Fuel Line Management, LLC to supply fuel to the Property. Abdallah and Abdallah Affiliate shall have no obligation to investigate, represent or warrant the status of any existing leases, tenancies or occupants and LOC shall accept full responsibility regarding any existing leases, tenancies and occupants. There shall be no credit or offsets at closing regarding security deposits. There shall be no credit at closing regarding rents unless Abdallah can determine, in its sole discretion, the rent amount to be credited if Abdallah has actually received rent.

11.    **Indemnification.** Notwithstanding anything to the contrary in this Contract, LOC agrees to and does hereby indemnify, defend, and hold harmless Abdallah and Abdallah Affiliate, their officers, and their shareholders, and each of their successors and assigns, from and against any and all liabilities, claims, demands, suite, administrative proceedings, causes of action, costs, damages, personal injuries and property damages, losses, and expenses, both known and unknown, present and future, at law or in equity, arising out of, by virtue of, or related in any way to LOC's operation of the Property pursuant to the terms of this Contract and its Lease Agreement.

12.    **Confidentiality.** The Parties shall treat this Contract as confidential in all respects and, except as required by law or expressly authorized in writing by the Parties, will not disclose the existence or contents of this Contract to anyone other than to the Parties' respective officers,

4

directors, members, agents, employees, successors and assigns, tax authorities, attorneys, and/or accountants (each of whom each Party shall advise that the Contract is confidential and will instruct and require to keep strictly confidential without any further disclosure). Any breach of the confidentiality provisions of this Contract will be considered a material breach of the Contract and will subject the discloser of the confidences to be liable to the other Party and/or Parties to damages and remedies available in law or in equity.

13.     **Remedies.** In the event Abdallah or Abdallah Affiliate fails to perform in accordance with the terms of this Contract, the sole remedies available to LOC are to obtain a refund of his earnest money deposit that he has made pertaining to the particular property that is the subject of the breach of contract claim or seek specific performance. LOC shall have no other rights or remedies to pursue against Abdallah or Abdallah Affiliate. In the event LOC fails to perform in accordance with the terms of this Contract, then Abdallah shall be entitled to receive the earnest money deposit for the particular property that LOC fails to close on in breach of this Contract. The payment of the earnest money to Abdallah or Abdallah Affiliate represents the liquidated damage amount the parties have previously agreed upon; and the forfeiture of the earnest money is not a penalty. As set forth in paragraph 6 of this Contract, the earnest money for the Property is $100,000. In the event that LOC fails to cause an earnest money deposit for a particular property to be paid to Abdallah or Abdallah Affiliate or objects to an earnest money deposit payment to be made to Abdallah or Abdallah Affiliate, then in the event Abdallah or Abdallah Affiliate prevails in any litigation to collect the earnest money, Abdallah or Abdallah Affiliate shall be entitled to recover interest on the earnest money amount from the date payment was demanded by Abdallah or Abdallah Affiliate until it is paid at the rate of 18% per annum. In addition, Abdallah or Abdallah Affiliate shall be entitled to recover its reasonable attorney fees and costs from LOC. The word "prevails" shall mean Abdallah or Abdallah Affiliate is awarded by judgment the earnest money it is claiming is owed to Abdallah, or the parties enter into an agreed order to pay the earnest money to Abdallah or Abdallah Affiliate.

14.     **Closing Costs.** It shall be the obligation of LOC, at its sole cost, to obtain the survey for each property and pay for its own loan policy, all endorsements requested on said loan policy or owner's policy and escrow costs, except Abdallah shall pay for the owner's policy of title insurance in the amount of the purchase price and Seller's customary portions of city, county and state transfer taxes.. Each party shall pay their own attorney fees. LOC shall be responsible for any inspections,

licenses or other requirements necessary and required by any federal, State or local authority in order to close the transaction.

15. **Grantee.** In the event LOC elects to accept title to a property in the name of an entity that he forms and controls, ("designated grantee") he shall notify Abdallah at least ten business days prior to closing as to the name of the entity that is to be the grantee in the quitclaim deed and bill of sale. LOC shall furnish to Abdallah at the time of said notice, and assignment of his interest to the entity; and the legal documents showing the formation of the entity and authority of the entity to accept title. LOC shall remain liable to Abdallah and shall not be released of any liability to Abdallah under the terms of this Contract as a result of the assignment.

16. **Release.** When Abdallah Affiliate takes title or goes into legal title on one of the Property, then Abdallah shall have no further obligation to LOC under this Contract, and LOC shall look solely to the Abdallah Affiliate regarding the performance of this Contract as to that particular property.

17. **Cooperation.** The Parties shall cooperate and shall take such further actions and execute such documents that may be reasonably necessary to effectuate the purposes of this Contract.

18. **Entire Agreement.** This Contract represents the entire understanding between the Parties in relation to the matters dealt with herein and supersedes all previous covenants and representations made between the Parties in relation to the Contract, whether oral or written. All prior negotiations, promises and representations and statements of fact and/or opinion are merged into this Contract. This Contract may only be modified if such modifications are in writing and signed by a duly authorized representative of each party herein.

19. **Illinois Law.** Validity, consideration and enforceability of this Contract shall be construed under and governed by the laws of the State of Illinois.

20. **Real Estate Broker.** Neither party has retained a real estate broker and there are no broker commissions due regarding the sale of the Property.

21. **Escrow Closing.** Each transaction shall close in a deed and money escrow.

22. **Real Estate Tax Proration.** The real estate taxes shall be prorated based on 100% of the most recent ascertainable full year real estate tax bill .

23. **Title Insurance Coverage.** It shall be the obligation of Abdallah, at his sole expense, to obtain a title commitment owner's title insurance for the Property. Abdallah shall not be required to pay any costs regarding extended coverage or any other endorsements.

6

24.    **Destruction/Condemnation.** If, prior to delivery of the deed, a property shall be destroyed or materially damaged by fire or other casualty, or the property is taken by condemnation, then LOC shall not have the right to terminate this Contract (and receiving a refund of earnest money). Abdallah shall not be obligated to repair or replace damaged improvements. In the event the insurance proceeds or condemnation award exceeds the purchase price for a particular property, then Abdallah shall be entitled to terminate its obligation to sell that particular property to LOC, and Abdallah shall refund it earnest money deposit on that property to him. The provisions of the Uniform Vender and Purchase Risk Act of the State of Illinois, shall be applicable to this Contract, except as modified in this paragraph.

25.    **Tax Reporting Compliance.** Seller agrees to provide to the Internal Revenue Service the Sale of Real Estate 1099 form as required by law. This Contract and the transaction described herein may be subject to the provisions of the Foreign Investment in Real Property Tax Act of 1980 and all amendments thereto (the "Act"). Abdallah and LOC shall execute or cause to be executed all documents and take or cause to be taken all action necessary in order that LOC shall have no liability, either actual or potential, under the Act.

26.    **Attorney Fees.** In the event either party is required to enforce the provisions of this Contract against the other party, then the party that prevails in the litigation shall be entitled to receive from the other party its reasonable attorney fees, court costs and expenses that it incurred in prosecuting the litigation.

27.    **Notice.** All Notices shall be in writing and shall be served by one party or attorney to the other party or attorney. Notice to any one of a multiple person party shall be sufficient notice to all. Notice shall be given in the following manner:

(a)    By personal delivery of such Notice; or

(b)    By mailing of such Notice to the addresses recited herein by regular mail and by certified mail, return receipt requested. Except as otherwise provided herein, Notice served by certified mail shall be effective on the date of mailing; or

(c)    By sending facsimile transmission. Notice shall be effective as of the date and time of facsimile transmission, provided that the Notice transmitted shall be sent on Business Days during Business Hours. In the event fax Notice is transmitted during non-business hours, the effective date and time of Notice is the first hour of the next Business Day; or

7

(d)     By sending e-mail transmission. Notice shall be effective as of the date and time of email transmission, provided that the Notice transmitted shall be sent during Business Hours. In the event email Notice is transmitted during non-business hours, the effective date and time of Notice is the first hour of the next Business Day after transmission; or

(e)     By commercial overnight delivery (e.g., FedEx). Such Notice shall be effective on the next Business Day following deposit with the overnight delivery company.

(f)     Business Days are Monday through Friday excluding any Federal holidays. Business Hours are 9:00 A.M. to 5:00 P.M. central standard time.

29.     **Rights/Obligations.** LOC's designated grantee shall have no greater rights than LOC; and any obligations and liabilities imposed upon LOC shall be binding upon his designated grantee. LOC shall not be released of any liability under this Contract because LOC elects to designate a grantee to take legal title.

30.     **Patriot Act.** LOC and each and every "person" or "entity" affiliated with LOC that has an economic interest in LOC or that has or will have an interest in the transaction contemplated by this Contract or in any property that is the subject matter of this Contract or will participate, in any manner whatsoever in the purchase of the Property, is

(a)     not a "blocked" person listed in the Annex to Executive Orders Nos. 12947, 13099, and 13224;

(b)     in full compliance with the requirements of the PATRIOT Rules and all other requirements contained in the rules and regulations of the Office of Foreign Assets Control, Department of the Treasury (OFAC);

(c)     operated under policies, procedures, and practices, if any, that are in compliance with the PATRIOT Rules and available to Abdallah for Abdallah's review and inspection during normal business hours and upon reasonable prior notice;

(d)     not in receipt of any notice from the Secretary of State or the Attorney General of the United States or any other department, agency, or office of the United States claiming a violation or possible violation of the PATRIOT Rules;

(e)     not listed as a Specifically Designated Terrorist or as a blocked person on any lists maintained by the OFAC pursuant to the PATRIOT Rules or any other list of terrorists or terrorist organizations pursuant to any of the rules and regulations of the OFAC issued pursuant to the

8

PATRIOT Rules or on any other list of terrorists or terrorist organizations pursuant to the PATRIOT Rules;

(f)     not a person who has been determined by competent authority to be subject to any of the prohibitions contained in the PATRIOT Rules; and

(g)     not owned or controlled by or now acting under/or will in the future act for or on behalf of any person or entity named in the Annex or any other list promulgated under the PATRIOT Rules or any other person who has been determined to be subject to the prohibitions contained in the PATRIOT Rules.

LOC covenants and agrees that in the event LOC receives any notice that LOC or any of its beneficial owners or affiliates or participants become listed on the Annex or any other list promulgated under the PATRIOT Rules or indicted, arraigned, or custodially detained on charges involving money laundering or predicate crimes to money laundering, LOC shall immediately notify Abdallah and, in such event this Contract shall automatically be deemed terminated, in which event the entire earnest money deposit shall be forfeited to Abdallah as liquidated damages and the parties shall have no further rights or obligations under this Contract, except for those rights, liabilities, or obligations that survive a termination of this Contract.

31.    Closing Documents.

(a)  Abdallah or Abdallah affiliate shall deliver to the title company, as escrowee, for each closing the following documents:

(i) Special Warranty Deed subject to the exceptions noted in this Contract;

(ii) Quit Claim Bill of Sale as described in Section 8 of this Contract;

(iv) Owner's ALTA form limited solely to acts of Abdallah or Abdallah affiliate;

(v) GAP undertaking;

(vi) FIRPTA certificate; and

(vii)  such other documents as shall be reasonably requested by LOC to fulfill the intent of the parties under this Contract.

(b)  LOC shall deliver to the title company, as escrowee, for each closing the following documents:

(i)  Direction to cause the title company to pay the earnest money deposit to Abdallah or Abdallah Affiliate;

(ii) balance of purchase price for the property;

9

(iii)   State of Illinois, applicable county and local transfer tax declarations and stamps; and

(iv)   such other documents as shall be reasonably requested by Abdallah or Abdallah Affiliate to fulfill the intent of the parties under this Contract.

(c)      The parties shall execute the above documents as needed and direct the title company to deliver the documents to the other party as is usual and customary in Cook County, Illinois.

**IN WITNESS WHEREOF**, the Parties have entered into this Contract as of the date as first above written.

**MOHAMMED ABDALLAH**

BY: _____

**Its Authorized Agent**

Sadia Aslam

**LOC, an Illinois corporation**

. SADIA ASLAM, PRESIDENT

**Print Name and Title**

10

## EXHIBIT A

### ESCROW AGREEMENT

RE: Real Estate Sales Contract between Mohammed Abdallah ("Seller") and LOC, Inc. ("Buyer") for 1224 W. 59th St., Chicago, Illinois 60636

Funds in the total amount of $100,000 ("Earnest Money") representing the earnest money deposit for of the above described property, are deposited with Fadi Rafati, attorney at law ("Escrowee") in the event that the Sweis Law Firm, P.C. on behalf of Abdallah delivers written notice to Escrowee that LOC or his affiliate is in default and makes demand that a specific sum of the Earnest Money for a particular property be paid to Abdallah or an affiliate of Abdallah. In that event, Escrowee shall pay the amount requested by Abdallah to it or its affiliate within 10 days of such notice unless during said 10 day period Escrowee receives from LOC or its attorney written notice stating that LOC or his affiliate is not in default and that the Earnest Money should not be released or paid to Abdallah or its affiliate. In the event LOC sends such written notice to Escrowee, then Escrowee shall continue to hold the Earnest Money subject to the terms of this Escrow Agreement. Notice will only be effective if addressed to Rafati Law Group 22 W. Washington St. 15ᵗʰ Floor and sent by certified mail, return receipt requested, postage pre-paid, or if hand delivered to Chicago, IL Escrowee at this address. Notice shall be deemed effective only when received by Escrowee. 60602 Notice in any other form will not be effective.

Escrowee is hereby expressly authorized to regard and to comply with and obey any and all orders, judgments or decrees entered or issued by any court with or without jurisdiction, and in case the said Escrowee obeys or complies with any such order, judgment or decree of any court it shall not be liable to any of the parties hereto or any other person, firm or corporation by reason of such compliance, notwithstanding any such order, judgment or decree be entered without jurisdiction or be subsequently reversed, modified, annulled, set aside or vacated, in case of any suit or proceeding regarding this escrow, to which said Escrowee is or may be at any time a party shall have a lien on the contents hereof for any and all costs, attorneys' and solicitors' fees, whether such attorneys or solicitors shall be regularly retained or specially employed and other expenses which it may have incurred or become liable for on account thereof, and it shall be entitled to reimburse itself therefore out of said deposit, and the undersigned jointly and severally agree to pay said Escrowee upon demand all such costs, fees and expenses so incurred.

11

BUYER:     LOC, Inc.

_SADIA ASLAM     PRESIDENT_
Print Name and Title

SELLER:    MOHAMMED ABDALLAH

Accepted: Fadi Y. Rafati, Esq., as Escrowee

By:

FADI Y. RAFATI

12

# EXHIBIT H

Lis Pendens Notices Filed by the Plaintiff with Cook County Recorder's Office

FILED DATE: 5/9/2023 11:55 AM   2022CH09742
FILED DATE: 9/30/2022 12:40 PM   2022CH09742

# IN DISTRICT COURT OF THE
## COOK COUNTY
## LAW DIVISION

**Zafar Sheikh**

Vs.

**Bushra Naseer**

**Nazeer Chaudry**

**Bashir Chaudry**



Doc# 1720122013 Fee #48.00

RHSP FEE:$9.00 RPRF FEE: $1.00
KAREN A. YARBROUGH
COOK COUNTY RECORDER OF DEEDS
DATE: 07/20/2017 10:26 AM PG: 1 OF 3

## CASE NO: 17 – L – 007194

## LIS PENDENS NOTICE

i, the undersigned, do hereby certify that the above entitled cause was filed in the District Court of the Cook County, Law Division, in Chicago, Illinois. The case was filed on the 18th of July 2017, and is now pending at the Court. The properties affected by this cause are as follows:

415 South Pulaski Avenue, Chicago. Illinois.

3635 West Armitage Avenue, Chicago. Illinois.

6655 North Monticello Avenue, Lincolnwood. Illinois.

3673 West North shore Avenue, Lincolnwood. Illinois.

i



FILED DATE: 5/9/2023 11:55 AM 2022CH09742
FILED DATE: 9/30/2022 12:40 PM 2022CH09742

The legal descriptions of these properties are attached herewith as Exhibit A.

Zafar Sheikh
3155 West Wallen Avenue,
Chicago. Illinois. 60645.
Tele: (847) 414-9670

2

FILED DATE: 5/9/2023 11:55 AM   2022CH09742

# CIRCUIT COURT OF THE

# COOK COUNTY, CHANCERY DIVISION

**Zafar Sheikh**
vs.
**Sadia Aslam**
**Bashir Chaudry**
**Jahangir Zaib**
**MDDS Inc.,**
**Loc Gas Inc., dba Marathon Gas**
**Chack Inc.,**



Doc# 1920622054 Fee $86.00

RHSP FEE:$9.00 RPRF FEE: $1.00
EDWARD M. MOODY
COOK COUNTY RECORDER OF DEEDS
DATE: 07/25/2019 01:33 PM  PG:  1 OF 2

## LIS PENDENS NOTICE

### Case No. 19 – CH – 0 8 4 3 8

A NOTICE is being hereby given to all those may be concerned that a Case Captioned as **19-CH-08438** has been filed in the Circuit Court of the Cook County, Chancery Division, in Chicago, Illinois. The case was filed on the 18th of July 2019, and is now pending at the Court, and seeks to Foreclose on a Mortgage, for judgment on promissory Note, damages for illegal sale of collateral & Equitable estoppel.

The properties affected by this action are:

1224 West 59th Street, Chicago, IL
415 South Pulaski Avenue, IL.
3635 West Armitage Avenue, Chicago. IL.
6677 North Monticello Avenue, Lincolnwood. IL.
3673 W. Northshore Avenue, Lincolnwood. IL.

The legal descriptions of these properties are attached herewith as Exhibit A.

David Goodrich
Attorney at Law
111 West Washington Blvd.,
Suite 1020
Chicago. IL. 60602.
Tele:312-804-9039
Email: Dgoodrichlaw@aol.com

S ✗
P —
S 3
M ✓
SC —
E ✓
INT ✓

FILED DATE: 5/9/2023 11:55 AM    2022CH09742

# EXHIBIT    A

1-

Lot 25, 26, 27 and 28 in block 12, in Lambert Tree's sub-division of the west ½ of the Northwest ¼ of Section 14, Township 39 North, range 13, east of the third principal meridian, according to the plat thereof recorded July 23, 1865, as document number 2253192 in Cook County, Illinois.
**Commonly known as 415 South Pulaski Avenue, Chicago, Illinois. 60624.**
**PIN NUMBER:    16- 14 -112 – 037- 0000**

2-

Lots 1 & 2 in block 11 in Lincoln avenue gardens, a sub-division in the North ½ of the southwest ¼ of the fractional section 35, township 41 North, range 13, east of the third principal meridian in Cook County, Illinois.
**Commonly Known as 3673 West North shore Avenue, Lincolnwood. Illinois. 60712.**
**P I N  Numbers:    10 – 35 – 315 – 001    &    10 – 35 – 315 – 002**

3-

Lot 1 and the North ½ of Lot 2 in block 10 in Lincolnwood avenue gardens, a sub-division of part of the North ½ of the southwest ¼ of Section 35, township 41 North, range 13, east of the third principal meridian in Cook County, Illinois.
**Commonly known as: 6655 North Monticello Avenue, Lincolnwood, Illinois. 60712.**
**PIN Number:         10 – 35 – 316 – 068 - 0000**

4-

Lots 1 & 2 in block 2 in Samuel delameter's sub-division of the North 430 feet of the east half of the Northeast quarter of the Southwest quarter of Section 35, township 40 North, range 13, east of the third principal meridian, in Cook County, Illinios.
**Commonly known as 3635 West Armitage Avenue, Chicago, Illinois. 60647.**
**PIN Number:         13-35-305-047-0000**

5-

Lot 5 (Except the east 16 feet thereof), lots 6, 7, 8, 9, 10 and the south ½ of the vacated alley lying North and the adjoining said lots in the center Avenue addition in the Northwest ¼ of Section 17, Township 38 North, Range 14, East of the third principal meridian in Cook County, Illinois.
**Commonly known as: 1224 West 59th Street, Chicago.**
**PIN Numbers:  20-17-131-018,  20-17-131-019, 20-17-131-020,**
**20-17-131-021  &  20-17-131-022**

FILED DATE: 5/9/2023 11:55 AM   2022CH09742
FILED DATE: 9/30/2022 12:40 PM   2022CH09742

# IN DISTRICT COURT OF THE

## COOK COUNTY

## LAW DIVISION

**Zafar Sheikh**

vs.

**Sadia Aslam**

**Jahangir Zaib**

**Loc Gas Inc.,**



Doc# 1831317020 Fee $40.00

RHSP FEE:$9.00 RPRF FEE: $1.00
KAREN A.YARBROUGH
COOK COUNTY RECORDER OF DEEDS
DATE: 11/09/2018 11:46 AM  PG:  1 OF 2

## LIS PENDENS NOTICE

### Case No. 17 – L - 07194

I, the undersigned, do hereby certify that the above entitled cause was filed in the District Court of the Cook County, Law Division, in Chicago, Illinois. The case was filed on the 18th of July 2017, and is now pending at the Court, and seeks relief $ 650,000 . —

for 'breach of contracts and defaults on promissory note'.

The property affected by this action is:

1224 West 59th Street, Chicago. Illinois.  (gas station).

The legal descriptions of these properties are attached herewith as Exhibit A.

**Zafar Sheikh**
3155 West Wallen Avenue,
Chicago. Illinois. 60645.



1831317020 Page: 2 of 2

FILED DATE: 5/9/2023 11:55 AM   2022CH09742

FILED DATE: 9/30/2022 12:40 PM   2022CH09742

## EXHIBIT A

## LEGAL    DESCRIPTION

Lot 5 (Except the east 16 feet thereof), lots 6, 7, 8, 9, 10 and the south ½ of the vacated alley lying North and the adjoining said lots in the center Avenue addition in the Northwest ¼ of Section 17, Township 38 North, Range 14, East of the third principal meridian in Cook County, Illinois. Commonly known as: 1224 West 59th Street, Chicago.

### PIN NUMBERS:

20 – 17 – 131 – 018 – 0000
20 – 17 – 131 – 019 – 0000
20 – 17 – 131 – 020 – 0000
20 – 17 – 131 – 021 – 0000
20 – 17 – 131 – 022 – 0000

2

# EXHIBIT I

Title Company Closing Statements

To Re-Purchase 59th Street Gas

Station by Aslam



**NEAR NORTH TITLE GROUP**

Near North Title Group
222 North LaSalle Street, Suite 600
Chicago, IL 60601
Phone: (312)419-3900 Fax: (312)419-0778

**Settlement Statement**

| | |
|---|---|
| Settlement Date: | February 04, 2021 |
| Disbursement Date: | February 04, 2021 |
| Order Number: | AP2015562 |
| Buyer: | Chicago 59th Inc. |
| Seller: | First American Exchange Company, LLC, as Qualified Intermediary for 59th Property LLC |
| Lender: | Millennium Bank |
| Property: | 1224 W. 59th Street |
| | Chicago, IL 60636 |

| Seller Debit | Seller Credit | | Buyer Debit | Buyer Credit |
|---|---|---|---|---|
| | | **Total Consideration** | | |
| | 1,200,000.00 | Purchase Price | | |
| | | Principal Amount of New Loan | 1,200,000.00 | |
| | | Deposit or earnest money | | 860,000.00 |
| | | | | 100,000.00 |
| | | **Prorations/Adjustments** | | |
| 15,452.71 | | Real Estate Taxes 2020 - Second Installment | | |
| 3,292.81 | | Real Estate Taxes 2021 Annually | | 15,452.71 |
| | | 35 days @ 94.080411 per day at $34,339.35 | | 3,292.81 |
| | | 01/01/21-02/04/21 | | |
| | 1,428.57 | Rent Credit | | |
| | | | 1,428.57 | |
| | | **Loan Charges** | | |
| | | Prepaid Interest | | |
| | | Appraisal Fees | 2,986.11 | |
| | | UCC Search & Filing Fees | 2,000.00 | |
| | | Flood Cert | 535.27 | |
| | | Phase I Report Fee | 17.00 | |
| | | Phase II Report Fee | 1,000.00 | |
| | | Tax Transcript Fee | 3,000.00 | |
| | | Credit Report Fee | 27.00 | |
| | | SBA Packaging Fee | 21.46 | |
| | | Escrow Servicing Fee | 2,500.00 | |
| | | Pre-Deposit Fee | 431.50 | |
| | | Tax Escrow Reserve | | 8,000.00 |
| | | Working Capital | 9,443.34 | |
| | | Inventory Proceeds | 346.25 | |
| | | | 22,653.75 | |
| | | **Title/Escrow Charges** | | |
| 150.00 | | Commitment Update Fee | | |
| | | IL State Policy Fee | | |
| 3.00 | | IL State Policy Fee | 3.00 | |
| | | Insured Closing Letter Fee-Buyer | | |
| 50.00 | | Insured Closing Letter Fee-Seller | 25.00 | |
| | | Insured Closing Letter Fee-Lender | | |
| | | Later Date Examination | 25.00 | |
| | | Predatory Lending Certificate | 150.00 | |
| 40.00 | | Wire Transfer Fee | 100.00 | |
| 80.00 | | Water Certification | | |

Printed on 2/4/2021 01:09 PM

## Settlement Statement

| Seller Debit | Seller Credit | | Buyer Debit | Buyer Credit |
|---|---|---|---|---|
| | | **Title/Escrow Charges (continued)** | | |
| | | Commercial Closing Fee | | |
| | | Money Lender Escrow Fee | 1,500.00. | |
| | | Work Done Fee | 1,250.00 | |
| | | P.O.C.$750.00 | | |
| | | Water Bill Advances | | |
| | | Title Indemnity Fee | 149.18 | |
| 3,775.00 | | Owner's Policy Premium | 175.00 | |
| | | Coverage: $1,200,000.00 | | |
| | | Version: ALTA 2006 Owners Policy | | |
| | | Extended Coverage Endorsement | | |
| | | Loan Policy Premium | 500.00 | |
| | | Coverage: $860,000.00 | 525.00 | |
| | | Version: ALTA 2006 Loan Policy | | |
| | | ALTA Endorsement 9-06 (Restrictions, Encroachments, Minerals - Loan Policy) | 225.00 | |
| 200.00 | | Property Tax Payment Fee | | |
| | | **Recording Charges** | | |
| 3,600.00 | | Recording Fees to Cook County Recorder | 309.00 | |
| | | City of Chicago Transfer Tax to NNNT-City of Chicago Dept. of Revenue | 9,000.00 | |
| 1,200.00 | | State Transfer Tax to Cook County Recorder | | |
| 600.00 | | County Transfer Tax to Cook County Recorder | | |
| | | **Miscellaneous Charges** | | |
| 18,886.64 | | TI Holdback for Water Cert to Near North Title Group, LLC | 1,500.00 | |
| | | Real Estate Taxes 2020 - First Installment to Cook County Treasurer | | |
| 40.00 | | Covenience Fee to Cook County Treasurer | | |
| 10,000.00 | | Attorney Fees to Sweis Law Firm | | |
| 57,370.16 | 1,201,428.57 | **Subtotals** | | |
| | | Balance Due FROM Buyer | 1,261,826.43 | 986,745.52 |
| 1,144,058.41 | | Balance Due TO Seller | | 275,080.91 |
| 1,201,428.57 | 1,201,428.57 | **Totals** | | |
| | | | 1,261,826.43 | 1,261,826.43 |

*Total loan* →

# MASTER SETTLEMENT STATEMENT

Near North Title Group
222 North LaSalle Street, Suite 600
Chicago, IL 60601
Phone: (312)419-3900   Fax: (312)419-0778

**Date:** 02/04/2021    **Time:** 12:00 AM
**Close of escrow:** 02/04/2021
**Borrower:** Chicago 59th Inc.
**Seller:** 59th Property LLC
**Property location:** 1224 W. 59th Street
Chicago, IL 60636

**Escrow No.:** AP2015562
**Escrow officer:** Kim Spahr

**Seller(s):**

59th Property LLC
BY:

First American Exchange Company, LLC
BY:

**Borrower(s):**

Chicago 59th Inc.

BY:
Sadia Aslam, President

LOC Gas, Inc.

BY:
Sadia Aslam, President

Settlement Signature Page (Master)

AP2015562

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the **"Agreement"**) is made by and between **CHICAGO 59th INC .** (**"Purchaser"**), and **Mohammed Abdallah**("Seller"), and is entered into as of this **23rd day of July , 2020** (the **"Effective Date"**).

**WHEREAS,** Property is currently being used as gasoline service station and uses related thereto; and

**WHEREAS,** LOC, or an affiliate of LOC, is leasing/operating the Property

## 1. **Purchase Price**

Purchaser hereby agrees to purchase at a price of **One Million two Hundred thousand Dollars (1,200,000.00)** (the **"Purchase Price"**), on the terms set forth herein, the following described real estate which is located in Cook County, Illinois, that certain real property and all improvements thereon and commonly known as **1224 West 59th Street in Chicago, Illinois 60636** (the **"Property"**).  Purchaser's obligations hereunder are subject to a mortgage contingency.  The full balance of the Purchase Price and any customary fees payable by purchaser must be paid at Closing in good funds.

Purchaser shall deposit **$100,000** as earnest money (**"Earnest Money"**) with Rafati Law Group, P.C. to be held in trust within 1 business days of the Effective Date, to be credited towards the Purchase Price, and Purchaser agrees to pay or satisfy the balance of the Purchase Price, plus or minus prorations, at the time of closing.

## 2. **Seller Covenants**

Seller agrees to sell the real estate and property described above at the Purchase Price and on the terms set forth herein, and to convey or cause to be conveyed to Purchaser or their nominee title to the Property by a recordable Special Warranty Deed, with a proper Bill of Sale, subject only to (a) covenants, conditions and restrictions of record; (b) private, public and utility easements and roads and highways if any; (c) party wall rights and agreements, if any; (d) existing leases and tenancies, if any; (e) mortgage or trust deed specified below, if any; and (f) property taxes not yet due and payable at the time of Closing.

## 3. **Closing Obligations**

Seller shall provide title as stated in paragraph 5 below.

1

4. **Closing Date**

    a. Closing shall be on or about 365 days from the date of this agreement, or on the date, if any, to which such time is mutually agreed to by the parties in writing (the "**Closing Date**"), at the office of the Title Company, provided Purchaser has not objected to any title exceptions within five (5) business days of receiving a commitment from a nationally recognized Title Company.

    b. Seller shall deliver possession to Purchaser at the time of Closing. Seller agrees to deliver possession of the real estate in the same condition as it is at the date of the Effective Date, normal wear and tear excepted and subject to existing tenancies.

5. **Title and Survey**

    a. **Title.** Closing Costs. It shall be the obligation Chicago 59th inc, at its sole cost, to obtain the survey for each property and pay for its own loan policy, all endorsements requested on said loan policy or owner's policy and escro costs, except Abdallah shall pay for the owner's policy of title insurance in the amount of the purchase price and Seller's customary portions of city, county and state transfer taxes.. Each party shall pay their own attorney fees. Chicago 59th inc shall be responsible for any inspections,

    b. **Survey.** Purchaser shall be responsible for any survey they may require at their own expense.

6. **Brokers**

Seller and Purchaser both represent and acknowledge that there are no Real Estate Brokers involved in this transaction.

7. **Conveyance, Liens and Encumbrances**

Seller shall convey, or cause to be conveyed, title to the Buyer by special warranty or trustee's deed (or by other appropriate deed if title is in trust or an estate) subject to those items specified in Paragraph 2 above.

8. **Prorations**

. Real Estate Tax Proration. The real estate taxes shall be prorated based on 100% of the most recent ascertainable full year real estate tax bill.

2

9. **Damage by Casualty before Closing**

If the improvements on the property shall be destroyed by nature or materially damaged by fire or other casualty prior to closing, the provisions of the Uniform Vendor and Purchaser Risk Act of Illinois shall apply.

10. **General Conditions And Stipulations**

   a. Both Seller and Purchaser agree to execute all acceptable documents and provide all information necessary to enable any lender to issue a commitment for mortgage or trust deed and to complete this sale.

   b. All notices herein required shall be in writing and served upon the parties at the addresses shown on this contract or upon the attorney for such party.

   c. The parties due herein agree that time is of the essence.

   d. Seller shall pay for the State of Illinois and any applicable Cook County real estate transfer tax stamps. Any municipal transfer tax shall be paid by the Seller.

11. **Contingencies**

This agreement and this transaction are contingent upon Purchaser being able to procure financing from a conventional lender in the form of a conventional mortgage. If Purchaser is not able to procure said financing, then Purchaser shall have the right to cancel this agreement and be entitled to the return of all earnest money paid. Purchaser shall have 365 days from the date of signing this agreement to produce to Seller a firm commitment for financing.

**AS IS" CONDITION:** This Contract is for the sale and purchase of the Real Estate in its "As Is" condition as of the Date of Offer. Buyer acknowledges that no representations, warranties or guarantees with respect to the condition of the Real Estate have been made by Seller or Seller's Designated Agent other than those known defects, if any, disclosed by Seller.

**THIS SPACE INTENTIONALLY LEFT BLANK**
**SIGNATURES ON NEXT PAGE**

3

**NOW THEREFORE,** the parties hereto execute this agreement intending to be bound thereby acknowledging the consideration set herein:

Dated this 23rd day of July , 2020

PURCHASER:

Chicago 59th inc.
By: Sadia Aslam

It's President

SELLER:

Mohammed Abdallah

It's President

TENANT ;LOC GAS INC

4

BUYER:    LOC, Inc.

SADIA  ASLAM   PRESIDENT
Print Name and Title

SELLER:    MOHAMMED ABDALLAH

Accepted: Fadi Y. Rafati, Esq., as Escrowee

By: 

FADI Y. RAFATI

12

# EXHIBIT J

'Note' Purchase by AbdelKader

To Acquire 415 Pulaski Gas

Station

THESE DOCUMENTS ARE REDACTED UNDER A COOK COUNTY COURT'S PROTECTIVE ORDER AND  MAY BE FILED LATER UNDER SEAL WITH COURT'S PERMISSION

# EXHIBIT K

Mortgage to Purchase 7283-87
South Chicago Gas Station by
Bashir & Choudhri

548478 7,12. JBS

## SPECIAL WARRANTY DEED

THIS INDENTURE, made this 17th day of November, 2006, between MIDWEST CORPORATE MANAGEMENT COMPANY, a corporation created and existing under and by virtue of the laws of the State of Illinois and duly authorized to transact business in the State of Illinois, party of the first part, and South Bound Properties, LLC whose address is 6655 N. Monticello, Lincolnwood, IL 60712 party of the second part, WITNESSETH, that the party of the first part, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration in hand paid by the party of the second part,



Doc#: 0634134068 Fee: $26.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 12/07/2006 01:06 PM Pg: 1 of 2

the receipt whereof is hereby acknowledged, and pursuant to authority of the Board of Directors of said corporation, by these presents does REMISE, RELEASE, ALIEN AND CONVEY unto the party of the second part, and to its successors and assigns, FOREVER, all the following described real estate, situated in the County of Cook and State of Illinois known and described as follows, to wit:

Lots 9, 10 and 11 in Block 13 of Cornell Subdivision, being a Subdivision of the West 1/2 of the Northwest 1/4 of Section 26, Township 38 North, Range 14, East of the Third Principal Meridian, in Cook County, Illinois.

Together with all and singular the hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, and all the estate, right, title, interest, claim or demand whatsoever, of the party of the first part, either in law or equity, of, in and to the above described premises, with the hereditaments and appurtenances: TO HAVE AND TO HOLD the said premises as above described, with the appurtenances, unto the party of the second part, its successors and assigns forever.

And the party of the first part, for itself, and its successors, does covenant, promise and agree, to and with the party of the second part, its successors and assigns, that it has not done or suffered to be done, anything whereby the said premises hereby granted are, or may be, in any manner incumbered or charged, except as herein recited; and that the said premises, against all persons lawfully claiming, or to claim the same, by, through or under it, it WILL WARRANT AND DEFEND, subject to: all unpaid general taxes and special assessments and to covenants, conditions, easements and restrictions of record.

Permanent Real Estate Index Number(s): 20-26-110-025-0000
Address(es) of real estate: 7283-87 S. South Chicago Avenue, Chicago, Illinois 60619

IN WITNESS WHEREOF, said party of the first part has caused its corporate seal to be hereto affixed, and has caused its name to be signed to these presents by its President, and attested by its Secretary, the day and year first above written.

MIDWEST CORPORATE MANAGEMENT COMPANY,
a corporation,

By: _____
David R. Gray, President

Attest: _____
Daniel N. Elkin, Secretary

This instrument prepared by: Frank R. Dufkis, Esq., 120 North LaSalle Street, Suite 1350, Chicago, Illinois 60602

## Ticor Title Insurance

BOX 15

MAIL TO: SOUTHBOUND Properties
6655 (Name) MONTICELLO
LINCOLNWOOD, IL 60710 (Address)
(City, State and Zip)

OR    RECORDER'S OFFICE BOX NO. 15

SEND SUBSEQUENT TAX BILLS TO:

_____
(Name)

_____
(Address)

_____
(City, State and Zip)

STATE OF ILLINOIS )
                  )  SS:
COUNTY OF COOK    )

I, the undersigned, a Notary Public in and for the said County, in the State aforesaid, DO HEREBY CERTIFY that David R. Gray, personally known to me to be the President of MIDWEST CORPORATE MANAGEMENT COMPANY, an Illinois corporation, and Daniel N. Elkin, personally known to me to be the Secretary of said corporation, and personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged as such President and Secretary, they signed and delivered the said instrument and caused the corporate seal of said corporation to be affixed thereto, pursuant to authority, given by the Board of Directors of said corporation as their free and voluntary act, and as the free and voluntary act and deed of said corporation, for the uses and purposes therein set forth.

Given under my hand and official seal this 17th day of ___November___, 2006.

Notary Public

OFFICIAL SEAL
MARY E MANNING
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:05/09/07

STATE OF ILLINOIS
STATE TAX
DEC.-1.06
REAL ESTATE TRANSFER TAX
DEPARTMENT OF REVENUE

REAL ESTATE TRANSFER TAX
0000037181
0046300
FP 102809

COOK COUNTY
REAL ESTATE TRANSACTION TAX
COUNTY TAX
DEC.-1.06
REVENUE STAMP

REAL ESTATE TRANSFER TAX
0000037048
0023150
FP 326707

CITY OF CHICAGO
CITY TAX
DEC.-1.06
REAL ESTATE TRANSACTION TAX
DEPARTMENT OF REVENUE

REAL ESTATE TRANSFER TAX
0000002588
0347300
FP 102803

Box   SPECIAL WARRANTY DEED   Corporat   TO   ADDRESS OF PROPE   MAIL TO:

**Illinois Anti-Predatory Lending Database Program**

Certificate of Exemption

RES6#56334 BPO



Doc#: 0905731100 Fee: $62.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 02/26/2009 03:15 PM Pg: 1 of 14

**Report Mortgage Fraud**
**800-532-8785**

---

The property identified as: **PIN:** 20-26-110-025-0000

**Address:**
**Street:** 7283-87 S. Chicago Avenue
**Street line 2:**
**City:** Chicago          **State:** IL          **ZIP Code:** 60619

**Lender:** Allegiance Community Bank

**Borrower:** South Bound Properties, LLC.

**Loan / Mortgage Amount:** $250,000.00

This property is located within Cook County and is exempt from the requirements of 765 ILCS 77/70 et seq. because it is not owner-occupied.

**Certificate number:** A7497EDE-DE3B-4906-BC94-8923EB64E091          **Execution date:** 01/27/2009

RECORDATION REQUESTED BY:
Allegiance Community Bank
8001 W. 183rd Street
Tinley Park, IL 60487

WHEN RECORDED MAIL TO:
Allegiance Community Bank
8001 W. 183rd Street
Tinley Park, IL 60487

RESG #56334 PI@2

**FOR RECORDER'S USE ONLY**

This Mortgage prepared by:
JEANNE LOCKREY
Allegiance Community Bank
8001 W. 183rd Street
Tinley Park, IL 60487

## MORTGAGE

THIS MORTGAGE dated January 27, 2009, is made and executed between SOUTH BOUND PROPERTIES, LLC an Illinois Limited Liability Company (referred to below as "Grantor") and Allegiance Community Bank, whose address is 8001 W. 183rd Street, Tinley Park, IL 60487 (referred to below as "Lender").

GRANT OF MORTGAGE. For valuable consideration, Grantor mortgages, warrants, and conveys to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in COOK County, State of Illinois:

LOT 9,10 AND 11 IN BLOCK 13 OF CORNELL SUBDIVISION, BEING A SUBDIVISION OF THE WEST 1/2 OF THE NORTHWEST 1/4 OF SECTION 26, TOWNSHIP 38 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

The Real Property or its address is commonly known as 7283-87 S. SOUTH CHICAGO AVE., CHICAGO, IL 60619. The Real Property tax identification number is 20-26-110-025-0000.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS MORTGAGE. THIS MORTGAGE IS INTENDED TO AND SHALL BE VALID AND HAVE PRIORITY OVER ALL SUBSEQUENT LIENS AND ENCUMBRANCES, INCLUDING STATUTORY LIENS, EXCEPTING SOLELY TAXES AND ASSESSMENTS LEVIED ON THE REAL PROPERTY, TO THE EXTENT OF THE MAXIMUM AMOUNT SECURED HEREBY. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

Loan No: 11807145

**MORTGAGE**
**(Continued)**

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Grantor shall pay to Lender all amounts secured by this Mortgage as they become due and shall strictly perform all of Grantor's obligations under this Mortgage.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Grantor agrees that Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.** Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property

## MORTGAGE
Loan No: 11807145 | **(Continued)** | Page 3

at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Grantor is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Grantor. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Illinois law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for the Existing Indebtedness referred to in this Mortgage or those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's

Loan No: 11807145

**MORTGAGE
(Continued)**

Page 4

lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials and the cost exceeds $25,000.00. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption and boiler insurance as Lender may require. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of ten (10) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Mortgage, to the extent compliance with the terms of this Mortgage would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Mortgage for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**Grantor's Report on Insurance.** Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

## MORTGAGE
**Loan No: 11807145** (Continued) Page 5

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Mortgage or any Related Documents, including but not limited to Grantor's failure to comply with any obligation to maintain Existing Indebtedness in good standing as required below, or to discharge or pay when due any amounts Grantor is required to discharge or pay under this Mortgage or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Mortgage also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**EXISTING INDEBTEDNESS.** The following provisions concerning Existing Indebtedness are a part of this Mortgage:

**Existing Lien.** The lien of this Mortgage securing the Indebtedness may be secondary and inferior to an existing lien. Grantor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

**No Modification.** Grantor shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Mortgage by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Grantor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and

attorney-in-fact are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Grantor's obligations under the Note, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Grantor pays all the Indebtedness when due, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**REINSTATEMENT OF SECURITY INTEREST.** If payment is made by Grantor, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment (A) to Grantor's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (B) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of Lender's property, or (C) by reason of any settlement or compromise of any claim made by Lender with any claimant (including without limitation Grantor), the Indebtedness shall be considered unpaid for the purpose of enforcement of this Mortgage and this Mortgage shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Mortgage or of any note or other instrument or agreement evidencing the Indebtedness and the Property will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Lender, and Grantor shall be bound by any judgment, decree, order, settlement or compromise relating to the Indebtedness or to this Mortgage.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Mortgage:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Default on Other Payments.** Failure of Grantor within the time required by this Mortgage to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Mortgage or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Should Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or Grantor's ability to repay the Indebtedness or Grantor's ability to perform Grantor's obligations under this Mortgage or any related document.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or

**MORTGAGE**
**(Continued)**

Loan No: 11807145

Page 8

on Grantor's behalf under this Mortgage or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Mortgage or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution of Grantor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Existing Indebtedness.** The payment of any installment of principal or any interest on the Existing Indebtedness is not made within the time required by the promissory note evidencing such indebtedness, or a default occurs under the instrument securing such indebtedness and is not cured during any applicable grace period in such instrument, or any suit or other action is commenced to foreclose any existing lien on the Property.

**Breach of Other Agreement.** Any breach by Grantor under the terms of any other agreement between Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty that Grantor would be required to pay.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse

**MORTGAGE**

Loan No: 11807145                                    **(Continued)**                                    Page 9

instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Mortgagee in Possession.** Lender shall have the right to be placed as mortgagee in possession or to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The mortgagee in possession or receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Note or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Grantor hereby waives any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Mortgage, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies. Nothing under this Mortgage or otherwise shall be construed so as to limit or restrict the rights and remedies available to Lender following an Event of Default, or in any way to limit or restrict the rights and ability of Lender to proceed directly against Grantor and/or against any other co-maker, guarantor, surety or endorser and/or to proceed against any other collateral directly or indirectly securing the Indebtedness.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**Loan No: 11807145**

**MORTGAGE**
**(Continued)**

Page 10

**NOTICES.** Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any party may change its address for notices under this Mortgage by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** This Mortgage, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Governing Law. This Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions. This Mortgage has been accepted by Lender in the State of Illinois.**

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Mortgage unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Mortgage shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Mortgage. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Mortgage to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Mortgage. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Mortgage shall not affect the legality, validity or enforceability of any other provision of this Mortgage.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and

**MORTGAGE**

Loan No: 11807145 **(Continued)** **Page 11**

assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waive Jury. All parties to this Mortgage hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.**

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Illinois as to all Indebtedness secured by this Mortgage.

**MAXIMUM LIEN. At no time shall the principal amount of Indebtedness secured by the Mortgage, not including sums advanced to protect the security of the Mortgage, exceed $1,250,000.00.**

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Mortgage. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means SOUTH BOUND PROPERTIES, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Default.** The word "Default" means the Default set forth in this Mortgage in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Mortgage.

**Grantor.** The word "Grantor" means SOUTH BOUND PROPERTIES, LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other

Loan No: 11807145

**MORTGAGE**
**(Continued)**

Page 12

construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage.

**Lender.** The word "Lender" means Allegiance Community Bank, its successors and assigns.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Note.** The word "Note" means the promissory note dated January 27, 2009, in the original principal amount of $250,000.00 from Grantor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The interest rate on the Note is 7.500% based on a year of 360 days.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND GRANTOR AGREES TO ITS TERMS.

GRANTOR:

SOUTH BOUND PROPERTIES, LLC

By: _____

BASHIR M. CHAUDRY A/K/A BASHIR M. CHAUDHRY

By: _____

NUSRAT CHAUDHRI

**MORTGAGE**
Loan No: 11807145          **(Continued)**          **Page 13**

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

STATE OF _Ill_           )
           ) SS
COUNTY OF _Cook_        )

On this _27th_ day of _January_ _2009_ before me, the undersigned Notary Public, personally appeared **BASHIR M. CHAUDRY A/K/A BASHIR M. CHAUDHRY,** of **SOUTH BOUND PROPERTIES, LLC and NUSRAT CHAUDHRI,** of **SOUTH BOUND PROPERTIES, LLC,** and known to me to be members or designated agents of the limited liability company that executed the Mortgage and acknowledged the Mortgage to be the free and voluntary act and deed of the limited liability company, by authority of statute, its articles of organization or its operating agreement, for the uses and purposes therein mentioned, and on oath stated that they are authorized to execute this Mortgage and in fact executed the Mortgage on behalf of the limited liability company.

By _Kathy Pinto_         Residing at _Will County_

Notary Public in and for the State of _Ill_

My commission expires _8/20/10_

"OFFICIAL SEAL"
KATHY A. PINTO
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 08-20-2010

LASER PRO Lending, Ver. 5.43.00.003 Copr. Harland Financial Solutions, Inc. 1997, 2009.  All Rights Reserved. - IL R:\CFI\LPL\G03.FC TR-752 PR-5

593878  T.<sub></sub> IFS

RECORDATION REQUESTED BY:
  Allegiance Community Bank
  8001 W. 183rd Street
  Tinley Park, IL 60487



Doc#: 0634134089 Fee: $48.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 12/07/2006 01:07 PM Pg: 1 of 13

WHEN RECORDED MAIL TO:
  Allegiance Community Bank
  8001 W. 183rd Street
  Tinley Park, IL 60487

## Ticor Title Insurance

---

**FOR RECORDER'S USE ONLY**

---

This Mortgage prepared by:
  LUS CHAVEZ
  Allegiance Community Bank
  8001 W. 183rd Street
  Tinley Park, IL 60487

---

### MORTGAGE

**THIS MORTGAGE** dated November 30, 2006, is made and executed between SOUTH BOUND PROPERTIES, LLC, an Illinois Limited Liability Company (referred to below as "Grantor") and Allegiance Community Bank, whose address is 8001 W. 183rd Street, Tinley Park, IL 60487 (referred to below as "Lender").

**GRANT OF MORTGAGE.** For valuable consideration, Grantor mortgages, warrants, and conveys to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in COOK County, State of Illinois:

  LOT 9, 10, AND 11 IN BLOCK 13 OF CORNELL SUBDIVISION, BEING A SUBDIVISION OF THE WEST 1/2 OF THE NORTHWEST 1/4 OF SECTION 26, TOWNSHIP 38 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

The Real Property or its address is commonly known as 7283-7287 S. SOUTH CHICAGO AVE., CHICAGO, IL 60619. The Real Property tax identification number is 20-26-110-025-0000.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

**THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS MORTGAGE. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Grantor shall pay to Lender all amounts secured by this Mortgage as they become due and shall strictly perform all of Grantor's obligations under this Mortgage.

### BOX 15

13H

FILED DATE: 5/23/2023 7:48 PM  2017L007194

Loan No: 11802984          Page 2

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Grantor agrees that Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.** Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances,

FILED DATE: 5/23/2023 7:48 PM 2017L007194

FILED DATE: 5/23/2023 7:48 PM   2017L007194

## MORTGAGE
**Loan No: 11802984**          **(Continued)**          **Page 3**

and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Grantor is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Grantor. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Illinois law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials and the cost exceeds $25,000.00. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**MORTGAGE**

Loan No: 11802984         **(Continued)**            **Page 4**

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption and boiler insurance as Lender may require. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of ten (10) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Grantor's Report on Insurance.** Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Mortgage or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Mortgage or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become

FILED DATE: 5/23/2023 7:48 PM    2017L007194

**MORTGAGE**
**(Continued)**

Loan No: 11802984                                                                Page 5

---

due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Mortgage also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of

**MORTGAGE**

Loan No: 11802984                                        **(Continued)**                                        Page 6

FILED DATE: 5/23/2023 7:48 PM    2017L007194

the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Grantor's obligations under the Note, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage as first and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Grantor pays all the Indebtedness when due, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

FILED DATE: 5/23/2023 7:48 PM   2017L007194

## MORTGAGE

**(Continued)**

**REINSTATEMENT OF SECURITY INTEREST.** If payment is made by Grantor, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment (A) to Grantor's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (B) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of Lender's property, or (C) by reason of any settlement or compromise of any claim made by Lender with any claimant (including without limitation Grantor), the Indebtedness shall be considered unpaid for the purpose of enforcement of this Mortgage and this Mortgage shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Mortgage or of any note or other instrument or agreement evidencing the Indebtedness and the Property will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Lender, and Grantor shall be bound by any judgment, decree, order, settlement or compromise relating to the Indebtedness or to this Mortgage.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Mortgage:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Default on Other Payments.** Failure of Grantor within the time required by this Mortgage to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Mortgage or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Should Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or Grantor's ability to repay the Indebtedness or Grantor's ability to perform Grantor's obligations under this Mortgage or any related document.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Mortgage or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Mortgage or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution of Grantor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Grantor's existence as a going business or the death of any member, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Grantor under the terms of any other agreement between Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Grantor to Lender, whether

FILED DATE: 5/23/2023 7:48 PM    2017L007194

**MORTGAGE**

Loan No: 11802984                    **(Continued)**                                    **Page 8**

existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty which Grantor would be required to pay.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Mortgagee in Possession.** Lender shall have the right to be placed as mortgagee in possession or to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The mortgagee in possession or receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Note or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Grantor hereby waives any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of

**MORTGAGE**
**(Continued)**

Loan No: 11802984

the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Mortgage, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies. Nothing under this Mortgage or otherwise shall be construed so as to limit or restrict the rights and remedies available to Lender following an Event of Default, or in any way to limit or restrict the rights and ability of Lender to proceed directly against Grantor and/or against any other co-maker, guarantor, surety or endorser and/or to proceed against any other collateral directly or indirectly securing the Indebtedness.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.** Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any party may change its address for notices under this Mortgage by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** This Mortgage, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Governing Law.** This Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions. This Mortgage has been accepted by Lender in the State of Illinois.

FILED DATE: 5/23/2023 7:48 PM   2017L007194

**MORTGAGE**

Loan No: 11802984

**(Continued)**

Page 10

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Mortgage unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Mortgage shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Mortgage. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Mortgage to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Mortgage. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Mortgage shall not affect the legality, validity or enforceability of any other provision of this Mortgage.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waive Jury. All parties to this Mortgage hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.**

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Illinois as to all Indebtedness secured by this Mortgage.

**MAXIMUM LIEN. At no time shall the principal amount of Indebtedness secured by the Mortgage, not including sums advanced to protect the security of the Mortgage, exceed $1,369,000.00.**

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Mortgage. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means SOUTH BOUND PROPERTIES, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Default.** The word "Default" means the Default set forth in this Mortgage in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or

FILED DATE: 5/23/2023 7:48 PM    2017L007194

Loan No: 11802984

**MORTGAGE**
(Continued)

Page 11

---

other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Grantor.** The word "Grantor" means SOUTH BOUND PROPERTIES, LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage.

**Lender.** The word "Lender" means Allegiance Community Bank, its successors and assigns.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Note.** The word "Note" means the promissory note dated November 30, 2006, **in the original principal amount of $373,388.54** from Grantor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The interest rate on the Note is 8.250%. Payments on the Note are to be made in accordance with the following payment schedule: In 59 regular payments of $3,646.66 each and one irregular last payment estimated at $299,545.64. Grantor's first payment is due December 30, 2006, and all subsequent payments are due on the same day of each month after that. Grantor's final payment will be due on November 30, 2011, and will be for all principal and all accrued interest not yet paid. Payments include principal and interest. The maturity date of the Note is November 30, 2011.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust,

| Loan No: 11802984 | **MORTGAGE**<br>(Continued) | Page 12 |

security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND GRANTOR AGREES TO ITS TERMS.**

**GRANTOR:**

**SOUTH BOUND PROPERTIES, LLC**

By: _____
BASHIR M. CHAUDRY A/K/A BASHIR M CHAUDHRY

By: _____
NUSRAT CHAUDHRI

LASER PRO Lending, Ver. 5.52.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2008. All Rights Reserved. - IL X:\CFI\LPL\G03.FC TR-370 PR-5

FILED DATE: 5/23/2023 7:48 PM   2017L007194

FILED DATE: 5/23/2023 7:48 PM    2017L007194

## LIMITED LIABILITY COMPANY ACKNOWLEDGEMENT

STATE OF _Illinois_ )
                            ) SS
COUNTY OF _Cook_ )

On this day before me, the undersigned Notary Public, personally appeared **BASHIR M. CHAUDRY A/K/A BASHIR M. CHAUDHRY**, Member of **SOUTH BOUND PROPERTIES, LLC.,** an Illinois Limited Liability Company, and known to me to be a member or designated agent of the limited liability company that executed the Mortgage dated **NOVEMBER 30, 2006** and acknowledged the Agreement to be the free and voluntary act and deed of the limited liability company, by authority of statute, its articles of organization or its operating agreement, for the uses and purposes therein mentioned, and on oath stated that he/she are authorized to execute this agreement and in fact executed the Agreement on behalf of the limited liability company.

Given under my hand and official seal this _30th_ day of _November_ . 20_06_.

By: _____     Residing at _Cook County_

Notary Public in and for the State of _Illinois_

My commission expires _7-23-09_

> **OFFICIAL SEAL**
> **JAMES F SHAW**
> Notary Public - State of Illinois
> My Commission Expires Jul 23, 2009

## LIMITED LIABILITY COMPANY ACKNOWLEDGEMENT

STATE OF _Illinois_ )
                            ) SS
COUNTY OF _Cook_ )

On this day before me, the undersigned Notary Public, personally appeared **NUSRAT CHAUDHRI**, Member of **SOUTH BOUND PROPERTIES, LLC.,** an Illinois Limited Liability Company, and known to me to be a member or designated agent of the limited liability company that executed the Mortgage dated **NOVEMBER 30, 2006** and acknowledged the Agreement to be the free and voluntary act and deed of the limited liability company, by authority of statute, its articles of organization or its operating agreement, for the uses and purposes therein mentioned, and on oath stated that he/she are authorized to execute this agreement and in fact executed the Agreement on behalf of the limited liability company.

Given under my hand and official seal this _30th_ day of _November_ , 20_06_.

By: _____     Residing at _____

Notary Public in and for the State of _Illinois_

My commission expires _3/24/10_

> **OFFICIAL SEAL**
> **LUS E CHAVEZ**
> NOTARY PUBLIC - STATE OF ILLINOIS
> MY COMMISSION EXPIRES:03/24/10

# EXHIBIT L

Unverified Document Provided
By Choudhri to Purchase 7283-87
South Chicago Gas Station for
$10.00

JULY 1, 2011

**AGREEMENT TO TRANSFER UNITS**

IT WAS MUTUALLY AGREED BY THE MEMBERS THAT BASHIR M CHAUDHRY WILL TRANSFER HIS 500 UNITS IN SOUTH BOUND PROPERTIES, LLC. EFFECTIVE 01/01/2012 TO NUSRAT H. CHOUDHRI FOR $10. (TEN DOLLARS)

BY SIGNING BELOW, ALL MEMBERS AGREE TO THE ABOVE TRANSFER.

_____
BASHIR M CHAUDHRY

_____
NUSRAT CHOUDHRI

JULY 1, 2011

MINUTES OF THE MEETING OF SOUTH BOUND PROPERTIES, LLC.

MEETING WAS CALLED ON BY NUSRAT CHOUDHRI AND WAS CALLED INTO
MOTION ON JULY 1, 2011 AT 5.00PM.

DURING THE MEETING FOLLOWING ACTIVIES TOOK PLACE:

1) IT WAS DECIDED THAT THE COMPANY WILL BE RUN BY NUSRAT
   CHOUDHRI WHO WILL BE THE SOLE 100% UNIT OWNER OF SOUTH
   BOUND PROPERTIES, LLC EFFECTIVE 01/01/2012.
2) BASHIR CHAUDHRY WILL SELL ALL OF HIS 500 UNITS TO NUSRAT
   CHOUDHRI ON 01/01/2012.
3) FUTURE UNITS WILL BE GIVEN FIRST TO FRIENDS AND RELATIVES
   AND THAN TO OUTSIDE PARTIES.
4) VENDOR PRICE NEGOTIATION ON PURCHASES WAS ALSO DICUSSED.

AFTER THIS THE MEETING WAS ADJOURN.

DATED:     JULY 1, 2011


NUSRAT CHOUDHRI
MEMBER

# EXHIBIT M

Agreement to Purchase Fuel and 'Right of First Refusal' Signed by Bashir & Aslam for 7283-87 South Chicago Gas Station.



**RAFTED BY & RETURN TO:**

Lacy & Associates LLC
Attn. Michael Lacy
Two Mid America Plaza, Suite 800
Oakbrook Terrace, Illinois 60181

Doc#: 1524060101 Fee: $42.00
RHSP Fee:$9.00 RPRF Fee: $1.00
Karen A.Yarbrough
Cook County Recorder of Deeds
Date: 08/28/2015 02:11 PM Pg: 1 of 3

**AFTER RECORDING RETURN TO:**

## MEMORANDUM OF
## MOTOR FUEL SALES PETROLEUM SUPPLY AGREEMENT

This Memorandum of a Motor Fuel Sales Petroleum Supply Agreement is made this _15_TH day of __APRIL_____ 2014, between **GAS DEPOT OIL COMPANY** ("Supplier"), and SOUTH CHICAGO ONE INC AND SHAMMILA RAFIQ AND BASHIR CHAUDRY (the "Dealer").

Supplier and Dealer have entered into a Motor Fuel Sales Petroleum Supply Agreement dated APRIL 15, 2014 (the "Supply Agreement") pertaining to the supply of motor fuels to the Dealer at the real property described below by Supplier. The Supplier desire to enter into this Memorandum to give record notice of the existence of said Motor Fuel Sales Petroleum Supply Agreement and the restrictions, covenants and obligations stated therein that run with the land including but not limited to the Suppliers Right of First Refusal to Purchase the Property, said Property being located in the city of CHICAGO, County of COOK, State of Illinois, described as follows:

LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT A.

Permanent Index Numbers:   20-26-110-025-0000

COMMONLY KNOWN AS:  7287 SOUTH CHICAGO AVE, CHICAGO, IL 60619

**IN WITNESS WHEREOF**, the Supplier and Dealer have executed this Memorandum of Motor Fuel Sales Petroleum Supply Agreement as of the date first written above.

**SUPPLIER:**
GAS DEPOT OIL COMPANY

By: _____
     George Nediyakalayil, President

FILED DATE: 8/29/2023 10:23 PM    2017L007194

# Acknowledgments

State of Illinois
County of DuPage

The undersigned Notary Public in and for said county, in the State aforesaid, DO HEREBY CERTIFY that George Nediyakalayil, in his capacity as President of Gas Depot Oil Company, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed, sealed and delivered the said instrument as a free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this _27_ day of _August_ _____ 2015.

_A. Constanti_

Notary Public

> OFFICIAL SEAL
> A CONSTANTIN
> Notary Public - State of Illinois
> My Commission Expires Apr 29, 2017

**EXHIBIT A**

2 of 3

FILED DATE: 8/29/2023 10:23 PM   2017L007194

The land referred to is described as follows:

LOT 9, 10 AND 11 IN BLOCK 13 OF CORNELL SUBDIVISION, BEING A SUBDIVISION OF THE WEST ½ OF THE NORTHWEST ¼ OF SECTION 26, TOWNSHIP 38 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS

The land is known as:

7287 SOUTH CHICAGO AVE, CHICAGO, IL 60619

FILED DATE: 8/29/2023 10:23 PM   2017L007194



Doc# 1812049017 Fee $50.00

RHSP FEE:$9.00 RPRF FEE: $1.00
KAREN A. YARBROUGH
COOK COUNTY RECORDER OF DEEDS
DATE: 04/30/2018 09:26 AM  PG:  1 OF 7

ₑℝL₆₇₁₇₃₁₆ ³⁄₈₄
21007700

## SUBORDINATION AGREEMENT

**THIS AGREEMENT** is entered into on March 26, 2018 by and between Byline Bank, an Illinois State Chartered Bank ("Priority Lienholder") and Gas Depot, Inc. aka Gas Depot Oil Company ("Subordinated Lienholder").

**WHEREAS,** Priority Lienholder is the holder of a Promissory Note (the "Note") from South Bound Properties, LLC("Borrower")] secured by a Mortgage and Assignment of Rents dated March 26, 2018 on real property located at 7283-7287 S South Chicago, Chicago, Illinois 60619.

**WHEREAS,** Borrower owns a certain Gas Station and a one-story convenience store with 8 fueling stations located at 7283-7287 S South Chicago Ave., Chicago, Illinois 60619 (collectively, the "Collateral") as described on Exhibit A attached herein.

**WHEREAS,** Subordinated Lien Holder has entered into a Motor Fuel Sales Petroleum Supply Agreement with South Chicago One Inc. and Shammila Rafiq and Bashir Charudry (hereinafter referred to as the "Dealer") that relates to the supply of motor fuels to the Dealer at the real Property that is the security for the Priority Lien Holders loan which has been recorded against the property in the Cook County Recorder of Deeds on August 28, 2015 as document number 1524050101.

**WHEREAS,** as a condition of making the Priority Loan to Borrower, Priority Lienholder has required Borrower to obtain and deliver a valid, binding, enforceable and unconditional subordination of all current and future rights, powers, and privileges of Subordinated Lienholder in the Collateral to the rights, powers, and privileges of Priority Lienholder in the Collateral. Subordinated Lienholder has determined that the execution and delivery of this Agreement is in its best interest and in furtherance of its corporate purposes.

**NOW, THEREFORE,** in order to induce Priority Lienholder to extend or maintain the Priority Loan, and for other good and valuable consideration, Subordinated Lienholder hereby agrees as follows:

**1.     Subordination.** Subordinated Lienholder hereby absolutely and unconditionally subordinates all of its current and future rights, powers, and privileges in any security interest, lien or levy in the Collateral, and any obligations of Dealer or its successors and assigns to the security interest of Priority Lienholder in the Collateral.

Subordination Agreement v.3

FILED DATE: 8/29/2023 10:23 PM   2017L007194

Subordinated Lienholder further agrees that so long as Priority Lienholder has any security interest in such Collateral, Subordinated Lienholder will not exercise any rights (if any) with respect to the Collateral, including the rights of distress, repossession or foreclosure.

       **2.**    **Rights to Enter Premises.** Priority Lienholder shall have the right, from time to time, without obligation or charge, to enter upon the Premises for the purpose of inspecting, repairing, maintaining and servicing the Collateral. Furthermore, in the course of exercising its rights, Priority Lienholder shall also have the right to enter upon

Premises and take possession of any or all of the Collateral (including fixtures) in a reasonable and lawful manner, notwithstanding that the Borrower may be in default of its obligation(s) to Subordinated Lienholder. Subordinated Lienholder further agrees that in the event of Default by Borrower, and a Foreclosure or transfer of ownership of property resulting therefrom to lender or a third party, Priority Lienholders Motor Fuel Sales Petroleum Supply Agreement and any modifications, amendments or renewals thereto, shall be terminated and of no further force and effect.

       **3.**    **No Default.** Subordinated Lienholder represents to Priority Lienholder that (i) Borrower is not in default under the Note and (ii) Subordinated Lienholder has full right, power and authority to execute and perform this Agreement without the necessity of obtaining the consent of any person or entity.

       **4.**    **Successors and/or Assigns.** The provisions of this Agreement shall be binding upon (a) the Subordinated Lienholder and its successors and assigns; and (b) the Borrower and its successors and assigns including any person now or hereafter holding any interest in the Premises; and shall inure to the benefit of the Priority Lienholder and its successors and assigns, including any assignee or transferee of, or participant in, the Priority Loan.

       **5.**    **Final Agreement.** This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporary agreements, commitments and understandings between the parties with respect to the subject matter hereof. There are no unwritten agreements between the parties.

       **6.**    **Notices.** Notices required by this Agreement shall be in writing, and shall be deemed delivered upon receipt, to the following addresses:

**Priority Lienholder:** Byline Bank, an Illinois State Chartered Bank
               Attention: <u>Loan Services</u>
               <u>180 North LaSalle Suite 400</u>
               <u>Chicago, Illinois 60601</u>

**Subordinated Lienholder:**   **Gas Depot Oil Company**
                           <u>8700 N. Waukegan Rd, Suite 200</u>
                           <u>Morton Grove, IL 60053</u>

FILED DATE: 8/29/2023 10:23 PM   2017L007194

The above addresses may be changed by written notice as provided herein to the other party.

7.   **Termination.** This Agreement shall remain in full force and effect until any and all obligations or liabilities of Borrower to Priority Lienholder are paid and satisfied in full.

8.   **Waiver.** Subject to the rights and priorities granted to Priority Lienholder herein, nothing herein shall be deemed to waive or adversely affect any rights that Subordinated Lienholder may have against Borrower.

9.   **Recordation.** This Agreement may be recorded in the real estate records of county in which the Premises is located. Subordinated Lienholder shall execute such other agreements, amendments hereto or acknowledgements as reasonably required by Priority Lienholder in order to so record this Agreement.

10.  **Required Notices.** Subordinated Lienholder agrees to give notice to Priority Lienholder of any declaration of an event of default under the Gas Supply Agreement. In the event Subordinated Lienholder commences any execution upon, or foreclosure proceedings with respect to, the Premises or other action upon the collateral securing the Note, such proceedings shall be, and shall be specifically advertised as being, under and subject to the terms, conditions, lien operation and payment of the Priority Loan.

11.  **Severability.** The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision.

12.  **Further Assurances.** Until such time as the Priority Loan is fully repaid and satisfied, Subordinated Lienholder shall execute, acknowledge and deliver, upon demand, any and all further subordinations or other instruments in recordable form as the Priority Lienholder may reasonably require to effectuate the purpose and intent of this Subordination Agreement.

13.  **Governing Law.** This Agreement shall be governed by and construed in accordance with the substantive laws of the State of Illinois.

14.  **Signatures:** This Agreement may be executed [signed] in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument [document].

SIGNATURES ON PAGE FOLLOWING

3

Subordination Agreement v.3

FILED DATE: 8/29/2023 10:23 PM   2017L007194

**IN WITNESS WHEREOF,** and intending to be legally bound hereby, this Agreement is duly executed, sealed and delivered as of the date first written above.

Byline Bank, an Illinois State Chartered Bank



"OFFICIAL SEAL"
KIMBERLY A KUZMICKI
NOTARY PUBLIC, STATE OF ILLINOIS
My Commission Expires 09/23/2019

By: _Mack W. Sen_

Name: _MACK W. HANSEN_

Title: _VICE PRESIDENT_

Sworn to before me this _23_ day of _March_, 2018.

Notary Public, State of _Ill_

_Kimberly G. Kuzmicki_

Gas Depot, Inc

By: _____

Name: _GEORGE NEDIYAKALAYIL_

Title: _PRESIDENT_

Sworn to before me this _26_ day of _March_, 2018.

Notary Public, State of _IL_

_A. Constantin_

A CONSTANTIN
Official Seal
Notary Public – State of Illinois
My Commission Expires Jun 6, 2021

4                                    Subordination Agreement v.3

FILED DATE: 8/29/2023 10:23 PM 2017L007194

Agreed to and Acknowledged by:

Dealer:

**South Chicago One INC.,**

By: Shamaila Rafiq

Name: Shamaila Rafiq

> JENNIFER ZIEMBA
> Official Seal
> Notary Public – State of Illinois
> My Commission Expires Dec 8, 2021

Sworn to before me this 27 day of March, 2018.

Notary Public, State of Illinois

~~Samaila Rafiq~~ SR

Shamaila

Sworn to before me this 27 day of March, 2018.

Notary Public, State of Illiois

> JENNIFER ZIEMBA
> Official Seal
> Notary Public – State of Illinois
> My Commission Expires Dec 8. 2021

**Bashir Chaudry**

Sworn to before me this 28 day of March, 2018.

Notary Public, State of IL

> CASEY BLOOMER
> Official Seal
> Notary Public – State of Illinois
> My Commission Expires Feb 2, 2021

Borrower: **South Bound Properties LLC**

By: Nwin H-Chorswu

5

# EXHIBIT N

Choudhri Representations in Supplemental Proceedings Certifying That Bashir & Aslam Own 7283 South Chicago Gas Station

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, S

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

FILED
10/2/2023 4:23 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2017L007194
Calendar, S
24615479

Zafar Sheikh,                          )
                                       )
              Plaintiff,               )          Case No. 2017 L 07194
                                       )
v.                                     )          Hon. James E. Hanlon, Jr.
                                       )
                                       )
Bushra Naseer, et al,                  )          Cal 5
                                       )
              Defendant.               )

## REPLY IN SUPPORT OF MOTION TO QUASH THIRD PARTY CITATION TO NUSRAT CHOUDHRY

NOW COMES Nusrat and Choudhry ("Nusrat" or "Movant") by and through his attorney, Konstantine Sparagis, of the Law Offices of Konstantine Sparagis, P.C., and as its Reply in Support of Motion to Quash Third Party Citation by Zafar Sheik ("Judgment Creditor" or "Zafar") states as follows:

### INTRODUCTION

1.     This matter arises out of Judgment Creditor's attempt to collect a judgment against Bashir Chaudhry ("Bashir" or "Judgment Debtor"). Bashir is not a family member or relative of the Movant except for a similarly spelled name which is common in their community. The Judgment Creditor is abusing the supplementary proceedings by attempting wholesale fishing expeditions into the financial affairs of non-debtors which are beyond the scope of both Supreme Court Rule 277 and 735 ILCS 5/2-1402.

### UNDERLYING FACTS

2.     On or about October 11, 2022, the Judgment Creditor issued his first subpoena to Nusrat which was quashed pursuant to this Court's prior order on May 31, 2023.

FILED DATE: 10/2/2023 4:23 PM   2017L007194

3.      On or about June 12, 2023, Judgement Creditor again caused a third party citation and rider to be served on Nusrat. See **Ex. A** to Motion.

4.      On June 30, 2023, Nusrat filed his Answer to the Third Party Citation indicating that he did not hold any assets or property of the Judgment Debtor and his answers and objections to the third party citation and request for documents.  See **Ex. C** to Motion.  In an attempt to appease the Judgment Creditor's curiosity and cooperate in his investigation, Respondent produced documents related to the sale and transfer of Bashir's interest in Southbound Properties, LLC from July 1, 2011. Nusrat also provided minutes of meeting, cancelled certificates, new certificates effectuating the transaction, and the most recent Secretary of State annual report identifying Nusrat as sole Manager *of a transaction completed more than 10 years ago*.

5.      Instead of recognizing the transaction for what it was – a legitimate documented transfer of a membership interest in an LLC made more than 6 years before the Judgment Creditor even filed suit, Zafar *proceeds under a fundamental misunderstanding of basic Illinois law* regarding limited liability companies, members and their relation to assets of the company.  In Illinois it is well settled that:

> A limited liability company (LLC) is a legal entity distinct from its members. It is an independent legal entity which has legal rights and obligations, differentiating it from a joint venture. See *First Mid–Illinois Bank & Trust, N.A. v. Parker,* 403 Ill.App.3d 784, 792, 342 Ill.Dec. 922, 933 N.E.2d 1215, 1221 (2010). . . .Illinois law clearly states, however, that membership in a limited liability company does not confer any ownership interest in the property, real or personal, of the LLC. 805 ILCS 180/30–1(a) (West 2008) (member of an LLC is not a co-owner of, and has no transferable interest in, property of a limited liability company). A member of an LLC owns only its membership interest in the LLC. *Bank of America, N.A. v. Freed,* 2012 IL App (1st) 110749, ¶ 41, 368 Ill.Dec. 96, 983 N.E.2d 509.

*Peabody-Waterside Dev., LLC v. Islands of Waterside, LLC*, 2013 IL App (5th) 120490, ¶ 9, 995 N.E.2d 1021, 1024

FILED DATE: 10/2/2023 4:23 PM    2017L007194

6.   How do we know Zafar is operating under a fundamental misunderstanding? Because in his response he conflates the membership interest by tying it to the real estate repeatedly and erroneously.

7.   More egregious are his flat-out false statements made in connection with his Response. This is not a new development, but it has now gotten to the point of flouting Illinois Supreme Court Rule 137. Regardless of his *pro se* appearance – he still owes a duty to this Court and the parties to state well grounded facts that are accurate in which he fails miserably. To wit:

| False Statement | Fact as Outlined by Exhibits[1] |
|---|---|
| Para 1: Refers to parties' relationship as "partnership" | Southbound Properties, LLC is not a partnership |
| Para 3: Bashir Choudhri personally purchased a gas station from Midwest Corporate Management Company ("Midwest") in which he is sole shareholder. | - Ex. 1 is the deed and acquisition loan for the subject property. Upon information and belief Bashir has no interest in and is not the shareholder of the sole corporation involved in the transaction, Midwest. See deed executed by David Gray and Daniel Elkin.<br>- Bashir did not "personally" purchase the gas station which was purchased by Southbound Properties, LLC. |

---

[1] Eash of these assertions or facts are supported by the documents submitted as exhibits in connection with the motion by the Judgment Creditor.

FILED DATE: 10/2/2023 4:23 PM    2017L007194

| | |
|---|---|
| | - The mortgage is signed by both original members or managers of Southbound including Nusrat and Bashir. Ex. 1. |
| Para 3 – South Bound Properties, LLC is owned "solely" by Bashir. | See mortgage attached as Exhibit 1. This is clearly false. |
| Para 5 & 6: Conflates the identity of the ownership of the property located at 7283 S Chicago Ave., Chicago, IL with the operator of the gas station which was South Chicago One, Inc. | As outlined in Plaintiff's Ex. B Southbound owns the real property not the gas station operating at the location which is owned and operated by South Chicago One, Inc. Further, the Motor Fuels Supply Agreement is executed by Bashir and an individual named Shammila Rafiq. |
| Para 6: Nusrat produced unverified bogus documents claiming Bashir sold his 50% interest in the gas station and South Bound Properties for $10 which is estimated to have a $1.2 MM value. | Nusrat produced (1) an agreement to transfer units; (2) executed minute of meeting authorizing the sale; and (3) cancelled and reissued certificates of the transfer of the membership units from 2011 in South Bound Properties, LLC. There are no more or less documents necessary to make the transfer and unlike the Plaintiff misplaced assumption no "ceremonial closing" such as with he transfer of real |

3

FILED DATE: 10/2/2023 4:23 PM   2017L007194

| | |
|---|---|
| | estate through a title company. Further, there is no basis for the value of $1.2MM merely conjecture and speculation and inadmissible opinion. |
| Para 7: If Bashir (debtor) had sold his 50% interest in the gas station, there would be closing statements from title company, checks issued by the title company, inventories and the price paid. | See above and Ex A. The transfer of the membership units was solely a sale of the membership units. There was no transfer of the real estate which always belonged to the LLC and the gas station was owned by a separate company. |
| Para 8: Why did the Debtor enter into gas supply agreements in 2018. | Again, those agreements were signed by South Chicago One, Inc. a separate entity and any inquiries should be addressed to the company or the Debtor. Ex. C. |
| Para 9: Debtor enters into subordination agreement with Byline Bank. | The subordination agreement at Ex. C is executed by Gas Depot, Inc. in favor of Byline Bank. The Dealer is again identified as the station operator South Chicago One which is owned by Shammila Rafiq and the Debtor. |
| Para 10: Nusrat has never denied that Bashir is running, operating or profiting | This inquiry is better directed to the operator, South Chicago One, Inc. in which |

FILED DATE: 10/2/2023 4:23 PM   2017L007194

| | |
|---|---|
| from the gas station. | Nusrat has no personal interest. Upon information and belief, Bashir is no longer actively involved in South Chicago or an owner. However, even if the Debtor was still a shareholder of South Chicago as tenant under the lease with South Bound Properties, that would still provide no basis for Nusrat (or South Bound for that matter) to be deemed to be holding any property or assets of Bashir as the tenant is South Chicago. |
| Para 11-15: Attacks on counsel and allegations that Bashir and Nusrat are related. | These statements are internally contradictory and without any basis or merit as directed to undersigned counsel. Moreover, Bashir and Nusrat are not related either by blood or through marriage. |
| Para 17: Argument repeating many of the facially false statements outlined above. | Denied. |

8.     As is evident from the above, virtually every paragraph contains false or misleading assertions, conjecture and speculation posed as fact. The "factual" allegations made by the Judgment Creditor are demonstrably false and contradicted *by his own exhibits*. They are not facts at all – but nevertheless, assuredly intended to persuade this Court. The Plaintiff is pro

FILED DATE: 10/2/2023 4:23 PM 2017L007194

se, but no stranger (as this Court knows) to legal proceedings, and upon information and belief, a trained attorney in his native country. Regardless, this does not excuse him from either conveniently misstating facts or propositions of law – and certainly does not excuse facially false factual assertions in the context of these legal proceedings.

9.      It is the law in Illinois that "*pro se* litigants are presumed to have full knowledge of applicable court rules and procedures and must comply with the same rules and procedures as would be required of litigants represented by attorneys." *In re Est. of Pellico*, 394 Ill. App. 3d 1052, 1067, 916 N.E.2d 45, 57 (2009) citing to *Steinbrecher*, 197 Ill.2d at 528, 259 Ill.Dec. 729, 759 N.E.2d 509.

10.      Movant is unfamiliar with the remaining legal proceedings launched by the Judgment Creditor against several other third parties, but believe from appearing in this matter there are many. The Judgment Creditor is free to pursue legitimate collection efforts, but that does not include impermissibly harassing Movant through a wholesale fishing expedition into his and his businesses' personal finances which are prohibited by Supreme Court Rule 277 and 735 ILCS 5/2-1402 and the caselaw interpreting those statutes – particularly related to non-debtor third parties. Especially, when the lynchpins of those efforts are based on demonstrably false factual assertions.

11.      Make no mistake about it, the Judgment Creditor's conduct in these proceedings – and particularly as directed to Nusrat have been solely for the purpose of harassing and intimidating him and his family. We realize that this Court has not had the benefit of the past papers filed in this case, but initially, the Judgment Creditor did not issue a third party citation in this Court, but rather attempted to violate Movant's probation and his liberty by issuing a subpoena in federal court against Nusrat in connection with his collection efforts in an unrelated

FILED DATE: 10/2/2023 4:23 PM   2017L007194

proceeding. Movant's original motion to quash before Judge Heneghan which was granted outlined as follows:

> Further, this attack on Respondents [Nusrat] is primarily for the purpose of harassing them. Indeed, either concurrently or prior to turning to this Court for assistance in his collection against the Judgment Debtor, the Judgment Creditor filed a petition to intervene in Respondents federal case which the Federal Court summarily denied. Regardless, the import of the activity by Judgment Creditor (a trained attorney in Pakistan) is to attempt to violate the Respondent's (a non-debtor and non-party to these proceedings) probation to have him incarcerated. A copy of the docket entries are below:

| 02/27/2023 | 66 | MOTION to Intervene; Notice. (Exhibits) (ph, ) (Entered: 02/28/2023) |
|---|---|---|
| 03/01/2023 | 67 | MINUTE entry before the Honorable Matthew F. Kennelly as to Nusrat H. Choudhry: The Court has received a motion from a non-party in this case (Zafar Shiekh) who identifies himself as a civil judgment creditor of Bashir Choudhry. Mr. Sheikh identifies Bashir Choudhry as a business partner of defendant Nusrat Choudhry. Mr. Sheikh appears to contend that the defendant has helped Bashir Choudhry conceal assets and thus avoid paying Mr. Sheikh's judgment. He asks the Court to compel the defendant to disclose certain information for use in attempting to collect on his judgment. Mr. Sheikh characterizes this as a matter of the defendant's compliance with the terms of his supervised release. The Court disagrees. If Mr. Sheikh is right then the defendant arguably may have committed a civil wrong or a separate crime. But there is nothing in the terms of the defendant's supervised release that requires the defendant to disclose the information Mr. Sheikh is asking for here. He will need to follow the appropriate civil process in connection with the case in which he obtained the judgment. And if Mr. Sheikh believes that the defendant has committed or assistance in the commission of a crime he may report it to the appropriate law enforcement authorities. The Court denies however Mr. Shiekh's motion to intervene 66 . The Clerk is directed to mail a copy of this order to: Zafar Sheikh; 3166 West Wallen Ave.; Chicago IL 60645. Mailed notice. (kp, ) (Entered: 03/01/2023) |

See Movant's Combined Motion to Quash and Response to Rule to Show Cause dated April 19, 2023; Para. 5 attached hereto as **Exhibit 1**.

FILED DATE: 10/2/2023 4:23 PM   2017L007194

12.     These initial efforts, as outlined above, were properly and summarily rejected by the federal court and Judge Heneghan properly granted the prior motion to quash – and this Court should likewise grant Movant's motion to quash here. The Zafar has engaged in a pattern of vindictive, oppressive and harassing conduct against Nusrat buttressed by false statements, conjecture and innuendo. All of which are sufficient basis to grant the Movant's motion to quash.

13.     Indeed, even when provided documents either by Nusrat or by himself that facially thwart his legally theories, Zafar fashions them out of whole cloth in order to continue his assault. Movant voluntarily produced transaction documents which conclusively show that Bashir has had no legal ownership interest in South Bound Properties, LLC from 12 years ago in order to satisfy his inquiry – but instead, he mangles those documents into a convoluted mess in order to continue his crusade thereby wasting this Court's time and the Movant's resources without any regard for this Court's rules and regulations including under Supreme Court Rule 137.

14.     Rule 137 provides that:

The signature of an attorney *or party* constitutes a certificate by him that he has read the pleading, motion or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. * * * If a pleading, motion or other paper is signed in violation of this rule, the court * * * may impose upon the person who signed it * * * an appropriate sanction. (Emphasis added.) 134 Ill.2d R. 137.

15.     The test is "an objective standard of what was reasonable under the circumstances at the time the assertions were made." *Wittekind v. Rusk*, 253 Ill. App. 3d 577, 580, 625 N.E.2d 427, 429 (1993). Therefore, "subjective good faith is *not* sufficient to meet the burden of Rule

8

137." *Id.* Indeed, "a *pro se* small claims litigant some leeway in presenting a claim which appears unreasonable, but when such a claimant engages in the harassment involved here, he must suffer the consequences." *Id.* at 429-30 citing to *Mentzer,* 236 Ill.App.3d at 731, 177 Ill.Dec. at 42, 602 N.E.2d at 937. Regardless, we digress.

16.　　As outlined in the Motion and the Movant's filed response to the requests, and the third party citation answers the requests are patently objectionable. See Mot. to Quash; Paras. 6 & 7 and Ex. C. The Movant has fully complied with their third party citation response obligations under Illinois Supreme Court Rule 277 and 735 ILCS 5/2-1402. The Judgment Creditor's dissatisfaction with the response is not relevant to the Movant's response obligations under Illinois Supreme Court Rule 277 and 735 ILCS 5/2-1402. The requests should be quashed and denied.

## ARGUMENT

### I.　Zafar's Response Provides No Basis to Deny the Motion to Quash

17.　　The Judgment Creditor's argument in opposition to the motion to quash is found at Paragraphs 16-20. Other than a formulaic recitation to the statute, he makes no further citation to any law or precedent to support his position even though "argument and citation to relevant authority are required" by Illinois courts. *Davis v. Fields*, 2019 IL App (4th) 190362-U, ¶ 22.

18.　　Moving to the substance of the response, there, the Judgment Creditor repeats in some fashion or another the same false facts as outlined above in support of his misguided efforts. But the real doozy here which crystalizes the depth of his indifference or misunderstanding is found in Paragraph 18 of his response.

19.　　There (paraphrasing his argument) the Judgment Creditor asserts that the Movant mistakenly believes that by producing indisputable evidence that Bashir has not been a member

FILED DATE: 10/2/2023 4:23 PM　2017L007194

of South Bound Properties, LLC since 2011 satisfies the inquiry. But that is exactly the point –
the transaction occurred in 2011 and Nusrat does not hold any property of the judgment debtor –
and has not for 12 years. Facially, there are no assets in his hands upon which to execute. As
argued further below, that production satisfied the inquiry into what property or assets are held
by Nusrat for Bashir as of the citation.

## II. The Purpose is to Discover Assets or Property in the Hands of Third Parties

20.    As stated in the motion and outlined in Section 2-1402 of the Illinois Code of
Civil Procedure supplementary proceedings allow discovery of assets of the judgment debtor and
apply those assets to an underlying judgment. *Stonecrafters, Inc. v. Wholesale Life Ins.
Brokerage, Inc.*, 393 Ill. App. 3d 951, 958 (2d Dist. 2009); *Pyshos v. Heart-Land Dev. Co.*, 258
Ill. App. 3d 618, 622-23 (1st Dist. 1994). Section 2-1402 applies only to "property of the
judgment debtor in the hands of a third party or property of the judgment debtor, if the citation is
directed to him." *Bank of Aspen, v Fox Cartage, Inc.*, 141 Ill. App. 3d 369, 373 (2d Dist. 1984).
Here, the Respondents have answered they hold no such property of the Judgment Debtor as set
forth in the Exhibits.

21.    "[N]othing in the code authorizes the entry of a judgment at a supplementary
proceeding against a third party who does not possess assets of the judgment debtor." *Pyshos*,
258 Ill. App. 3d at 623. The only relevant inquiry regarding a third party citation is whether the
third party is holding assets of the judgment debtor. *BMO Harris Bank N.A. v. Joe Contarino,
Inc.*, 2017 IL App (2d) 160371, ¶ 32. The burden is on the petitioner to show that the citation
respondent possesses assets belonging to the judgment creditor. *Schak v. Blom*, 334 Ill. App. 3d
129, 133 (1st Dist. 2002). Similarly, "[b]efore a judgment creditor may proceed against a third
party who is not the judgment debtor, the record must contain some evidence that the third party

10

FILED DATE: 10/2/2023 4:23 PM   2017L007194

possesses assets of the judgment debtor." *In re Marriage of Takata & Hafley*, 383 Ill. App. 3d 782, 790 (3d Dist. 2008). The court has no jurisdiction otherwise. *Id*. A court cannot compel the turnover of assets held by a third party when the judgment debtor has no right to recover those assets. *Mid-Am. Elevator Co.*, 287 Ill. App. 3d at 587.

22.      Here, the Judgment Creditor has provided no evidence that the Respondent is in possession of any assets of the Judgment Debtor other than the Judgment Creditor's self-serving, speculative, vague and misguided conclusions which are contradicted by his own exhibits.  He requests documents from Respondent from parties other than the respondent and related to persons or entities other than the Judgment Debtor and over an unspecified period seemingly going back 20 years or more.  The requests are facially improper and should be quashed.

### III. Fishing Expeditions Against Third Parties Not Allowed Under the Statute

23.      Illinois courts have noted that in connection with supplemental proceedings, a general "fishing expedition" for assets may be had only on the initial citation. *Fed. Loan Corp. v. Harris*, 17 Ill. App. 3d 49, 50–51, 308 N.E.2d 125, 127 (1974).  Given the above cited cases and the protection afforded to third party non-judgment debtors, Movant posits that the fishing expedition is likewise limited to the debtor and inapplicable against third parties.

24.      In *Fischer*, a divorced spouse who had won a child support judgment against her former spouse commenced a third party citation to the judgment debtor's parents for the purpose of locating him. *Fischer v. Kellenberger*, 73 Ill. App. 3d 550, 551, 392 N.E.2d 733, 734 (1979). The parents moved to quash because the inquiry had nothing to do with the question addressed by Section 1402 – namely the discovery of assets currently in the hands of third parties.  The trial court granted the motion to quash and was affirmed on appeal with the appellate court holding that "the statute requires the purpose of the proceeding to be to discover assets or income of the

debtor and to compel the application of discovered assets or income to the satisfaction of the judgment." *Id.* at 552. Here, Movant has satisfied the inquiry by providing indisputable documentation that Bashir is no longer a member of South Bound and that ends the inquiry.

25.     A case more analogous to the case at bar is a federal decision interpreting and applying the Illinois supplementary proceedings and citations statutes. In *Lorillard* the judgment creditor issued third party citations to non-debtor, First Chicago Bank and Trust, searching for assets regarding non-judgment debtor companies, S&D and Gas Mart. *Lorillard Tobacco Co. v. Montrose Wholesale Candies & Sundries, Inc.*, No. 03 C 4844, 2008 WL 1909114, at *1 (N.D. Ill. Apr. 30, 2008). S&D and Gas Mart filed motions to quash and dismiss the citations which were granted. Lorillard responded that it could discover their assets because it believed the non-debtors were holding assets in the form of comingled cash of the judgment debtors. Similar to the judgment creditor here, Lorillard posed their investigation as follows:

> Lorillard says that both inquiries are appropriate because it can discover assets of not only the judgment debtors that might be in the hands of third parties, but assets of those third parties that might be in the hands of fourth parties, so long as it believes those assets are traceable to the judgment debtor. Here, it is Lorillard's theory that S & D Pantry, Inc. and Harwood Heights Gas Mart are holding assets of the defendants and that those assets have been commingled in S & D's and Harwood Heights' respective bank accounts. The argument seems to take Ill.Sup.Ct. R. 277(a) a step too far.

Id. at *2.

26.     Relying on the oft cited principle that citations filed on the third party [must seek] to discover assets of the judgment debtor, not to discover the assets of the cited [third] party. *Id.* This is precisely the problem confronted here as outlined in the Movant's Motion and as outlined in Movant's Exhibit C. Indeed, and unmistakably the Judgment Creditor seeks all kinds of information involving third parties and fourth parties from Nusrat and going back over 25 years and must be quashed.

12

FILED DATE: 10/2/2023 4:23 PM   2017L007194

FILED DATE: 10/2/2023 4:23 PM   2017L007194

## CONCLUSION

WHEREFORE, Nusrat Choudhry respectfully requests an order from this Court quashing the Third Party Citation and document rider and requests directed to them and granting such further relief this Court deems equitable and just.

Respectfully submitted,
**Nusrat Choudhry**

By:/s/ Konstantine Sparagis
One of Defendants Attorneys

Konstantine T. Sparagis (6256702)
Law Offices of Konstantine Sparagis, P.C.
900 W. Jackson Blvd., Suite 4E
Chicago, IL 60607
(312) 753-6956
gus@konstantinelaw.com
Cook County Atty #: 43048

13

# EXHIBIT P

Documents Filed with Illinois
Secretary of State Showing Qadirs
LLC is Owned by Bashir's Minor
Children Ali & Rabia.

| Form **LLC-50.1** | Illinois<br>Limited Liability Company Act<br>**Annual Report** | FILE # 10684315<br>Due prior to: 07/01/2023 |
|---|---|---|

| **Secretary of State**<br>Department of Business Services<br>Limited Liability Division<br>501 S. Second St., Rm. 351<br>Springfield, IL 62756<br>217-524-8008<br>www.ilsos.gov | **Filing Fee:** 75.00<br>**Series Fee, if required:**<br>**Penalty:** 0.00<br>**Total:** 75.00 | **FILED**<br><br>June 9, 2023<br><br>**Alexi Giannoulias**<br>**Secretary of State** |
|---|---|---|

1. Limited Liability Company Name: QADIR'S LLC

   Registered Agent: HASSAN ALI QADIR

   6655 N MONTICELLO AVE

   LINCOLNWOOD, IL 60712-3713

2. State or Country of Organization: IL          Date Organized in or Admitted to Illinois: 07/22/2021

3. Address of Principal Place of Business:
   6655 N MONTICELLO AVE          LINCOLNWOOD, IL 60712

4. Name and business address of all managers and any member having the authority of manager:
   CHAUDHRY, RABIA B
   6655 N MONTICELLO AVE          LINCOLNWOOD, IL 60712
   HASSAN ALI QADIR
   7001 N KEELER AVENUE          LINCOLNWOOD, IL 60712

5. Entity managers affirm their current existence.

6. Changes to the registered agent and/or registered office must be submitted on Form LLC-1.36/1.37.

7. I affirm, under penalties of perjury, having authority to sign thereto, that this Annual Report is to the best of my knowledge and belief, true, correct and complete.

Dated: June 9 , 2023
          Month/Day          Year

HASSAN ALI QADIR
          Name

MANAGER
          Title

If applicant is a company or other entity, state Name of Company

This document was generated electronically at www.ilsos.gov. Based on version LLC 23.11

| Form **LLC-5.5** | **Illinois**<br>**Limited Liability Company Act**<br>**Articles of Organization** | **FILE # 10684315** |
|---|---|---|
| **Secretary of State Jesse White**<br>Department of Business Services<br>Limited Liability Division<br>www.cyberdriveillinois.com | Filing Fee:    $150<br><br>Approved By:   **MME** | **FILED**<br>**JUL 22 2021**<br>**Jesse White**<br>**Secretary of State** |

1.  Limited Liability Company Name: QADIR'S LLC

2.  Address of Principal Place of Business where records of the company will be kept:
    6655 N MONTICELLO AVE

    LINCOLNWOOD, IL 60712

3.  The Limited Liability Company has one or more members on the filing date.

4.  Registered Agent's Name and Registered Office Address:

    RABIA B CHAUDHRY
    6655 N MONTICELLO AVE
    LINCOLNWOOD, IL 60712-3713

5.  Purpose for which the Limited Liability Company is organized:
    "The transaction of any or all lawful business for which Limited Liability Companies may be organized under this Act."

6.  The LLC is to have perpetual existence.

7.  Name and business addresses of all the managers and any member having the authority of manager:

    CHAUDHRY, RABIA B
    6655 N MONTICELLO AVE
    LINCOLNWOOD, IL 60712

8.  **Name and Address of Organizer**
    I affirm, under penalties of perjury, having authority to sign hereto, that these Articles of Organization are to the best of my knowledge and belief, true, correct and complete.

    Dated: JULY 22, 2021             SHERAZ DARR
                                          1000 SKOKIE BLVD, STE 565
                                          WILMETTE, IL 60091

This document was generated electronically at www.cyberdriveillinois.com

| Form **LLC-50.1** | Illinois<br>Limited Liability Company Act | FILE # 10684315 |
|---|---|---|
| | **Annual Report** | Due prior to: 07/01/2022 |

**Secretary of State**
Department of Business Services
Limited Liability Division
501 S. Second St., Rm. 351
Springfield, IL 62756
217-524-8008
www.ilsos.gov

| Filing Fee: | 75.00 |
|---|---|
| Series Fee, if required: | |
| Penalty: | 100.00 |
| Total: | 175.00 |

**Filed Electronically**

September 19, 2022

**Jesse White
Secretary of State**

1. Limited Liability Company Name: QADIR'S LLC

   Registered Agent: HASSAN ALI QADIR

   6655 N MONTICELLO AVE

   LINCOLNWOOD, IL 60712-3713

2. State or Country of Organization: IL          Date Organized in or Admitted to Illinois: 07/22/2021

3. Address of Principal Place of Business:
   6655 N MONTICELLO AVE          LINCOLNWOOD, IL 60712

4. Name and business address of all managers and any member having the authority of manager:
   CHAUDHRY, RABIA B
   6655 N MONTICELLO AVE          LINCOLNWOOD, IL 60712
   HASSAN ALI QADIR
   7001 N KEELER AVENUE          LINCOLNWOOD, IL 60712

5. Entity managers affirm their current existence.

6. Changes to the registered agent and/or registered office must be submitted on Form LLC-1.36/1.37.

7. I affirm, under penalties of perjury, having authority to sign thereto, that this Annual Report is to the best of my knowledge and belief, true, correct and complete.

|  | Dated: | September 19 | , | 2022 |
|---|---|---|---|---|
| | | Month/Day | | Year |

HASSAN ALI QADIR
_____
Name

MANAGER
_____
Title

_____
If applicant is a company or other entity, state Name of Company

This document was generated electronically at www.ilsos.gov. Based on version LLC 23.11



Office of the Secretary of State

**ilsos.gov**

# Business Entity Search

## Entity Information

| **Entity Name** | QADIR'S LLC | | |
|---|---|---|---|
| **Principal Address** | 6655 N MONTICELLO AVE LINCOLNWOOD,IL 607120000 | | |
| **File Number** | 10684315 | **Status** | ACTIVE on 06-09-2023 |
| **Entity Type** | LLC | **Type of LLC** | Domestic |
| **Org. Date/Admission Date** | 07-22-2021 | **Jurisdiction** | IL |
| **Duration** | PERPETUAL | | |
| **Annual Report Filing Date** | 06-09-2023 | **Annual Report Year** | 2023 |
| **Agent Information** | HASSAN ALI QADIR 6655 N MONTICELLO AVE LINCOLNWOOD, IL 60712-3713 | **Agent Change Date** | 10-08-2021 |

## Services and More Information

Choose a tab below to view services available to this business and more information about this business.

Purchase Master Entity Certificate of Good Standing

# EXHIBIT Q

Deed For the House at 7001 N. Keeler
Fraudulently Purchased by Bashir in
Qadir's LLC's Name  Owned by his
Minor Children Ali & Rabia

# UNOFFICIAL COPY

FILED DATE: 1/5/2024 3:25 PM   2017L007194

## WARRANTY DEED

Doc#. 2123942242 Fee: $98.00
Karen A. Yarbrough
Cook County Clerk
Date: 08/27/2021 03:35 PM Pg: 1 of 4

Dec ID 20210701617915
ST/CO Stamp 2-122-222-352 ST Tax $470.00 CO Tax $235.00

Commitment Number: OC21027230

THE GRANTOR(S) **Carlos Camacho, married to Marta A. Jimenez**, of the Village of Lincolnwood, County of Cook, State of Illinois, for and in consideration of Ten and 00/100 Dollars ($10.00), and other good and valuable consideration in hand paid, CONVEY(S) and WARRANT(S) to, **Qadir's LLC**, of the City of Lincolnwood, State of Illinois, all of the interest in the following described Real Estate situated in the County of Cook, in the State of Illinois, to wit:

**Legal Description:** *Legal Description is attached as Exhibit "A".*

SUBJECT TO: General taxes and assessments for the year 2020 2nd Installment and subsequent years which are not yet due and payable; Covenants, conditions and restrictions of record; and Private, public and utility easements and roads and highways.

Hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.

Permanent Real Estate Index Number: 10-34-211-017-0000 and 10-34-211-018-0000

Address of Real Estate: 7001 North Keeler Avenue, Lincolnwood, Illinois 60712

Dated this day 27 of July 2021

Carlos Camacho

Marta A. Jimenez

FIDELITY NATIONAL TITLE
OC21027230

Warranty Deed

# UNOFFICIAL COPY

FILED DATE: 1/5/2024 3:25 PM  2017L007194

STATE OF ILLINOIS, COUNTY OF ___Cook___ SS

I, the undersigned, a Notary Public in and for said County, in the State aforesaid, CERTIFY THAT **Carlos Camacho, married to Marta A. Jimenez** (personally known to me to be the same person(s) whose name(s) is subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that they signed, sealed and delivered the said instrument as their free and voluntary act, for the uses and purposes therein set forth, including the release and waiver of the right of homestead.

Given under my hand and official seal this $2\ 7$ day of July 2021.

OFFICIAL SEAL
HOLLY ZICHA
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES JUN 04, 2023

_____
Notary Public

*Prepared by:*
Constantine G. Tzamouranis
Law Office of Constantine G. Tzamouranis, P.C.
9631 West 153rd Street, Suite 35
Orland Park, Illinois 60462

*Mail to:*
Sheraz Darr
1000 Skokie Boulevard Studio 565
Wilmette, Illinois 60091
  GRANTEES ADDRESS
*Name and Address of Taxpayer:*
Qadir's LLC
7001 North Keeler Avenue,
Lincolnwood, Illinois 60712

Warranty Deed

# UNOFFICIAL COPY

FILED DATE: 1/5/2024 3:25 PM   2017L007194



| | | |
|---|---|---|
| COUNTY: | | 235.00 |
| ILLINOIS: | | 470.00 |
| TOTAL: | | 705.00 |

10-34-211-017-0000 | 20200101617915 | 2-122-222-352

# UNOFFICIAL COPY

FILED DATE: 1/5/2024 3:25 PM   2017L007194

## EXHIBIT A

**Order No.:**   OC21027230

**For APN/Parcel ID(s):**   **10-34-211-017-0000 and 10-34-211-018-0000**
**For Tax Map ID(s):**       **10-34-211-017-0000 and 10-34-211-018-0000**

LOTS 19 AND 20 IN BLOCK 4 IN WARTELL'S SUBDIVISION OF THE SOUTH 20 ACRES OF THE
NORTHEAST 1/4 OF THE NORTHEAST 1/4 OF SECTION 34, TOWNSHIP 41 NORTH, RANGE 13,
EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

# EXHIBIT O

Bashir's Daughter Mahin's Letter to
Judge Kennelly About Close relations
& Friendship between Bashir &
Choudhri

Judge Matthew F. Kennelly
United States District Court
Northern District of Illinois
219 S Dearborn Street
Chicago, IL 60604

Honorable Judge Kennelly,

I am writing this letter on behalf of Nusrat Choudhry whom I refer to as Uncle Nusrat.

I have known Uncle Nusrat for my entire life. My father and he are very close friends and therefore our families are fairly close. I grew up seeing Uncle Nusrat as a second father. He was always there from graduations to birthday parties to sadder life events. He was the first person who was there when my grandfather passed. He didn't leave our house for days. When he did leave he made sure to drop off breakfast and dinner every night for a week.

He encouraged me to pursue accounting and break glass ceilings for Pakistani women everywhere. He pushes his daughters to become independent and stand on their own. I could tell you hundreds of stories about Uncle Nusrat but it would not do him justice.

Uncle Nusrat has sacrificed his happiness and joys for his kids and others. He makes sure others are fed before he is. He is a selfless human being who has been a prominent member of the American Pakistani community for years. In our community he has helped people get back on their feet, he has lent his support to charities and assisted members in finding jobs.

I believe Uncle Nusrat is human and mistakes happen but to punish this man and keep him from seeing all the good he has done. I humbly ask you for lenient sentencing based on the man he is today.

Sincerely,

Mahin Chaudry

# EXHIBIT R

Bashir's Mortgage of $339,000.00
To Purchase the Liquor Store
Property at 3635 W. Armitage.
(Page 2 shows the amount).

0010785562

7210/0364 07 001 Page 1 of   9
**2001-08-24  14:51:49**
Cook County Recorder        37.00

**RECORDATION REQUESTED BY:**

    **U.S. Bank National Association**
    **9918 Hibert Street, 2nd Floor**
    **San Diego, CA  92131**

**WHEN RECORDED MAIL TO:**

    **U.S. Bank National Association**
    **9918 Hibert Street, 2nd Floor**
    **San Diego, CA  92131**
    Closing Audit Department



Loan No. 6517312741

**FOR RECORDER'S USE ONLY**

**This Mortgage prepared by:**    **U.S. Bank National Association**
                                      **9918 Hibert Street, Second Floor**
                                      **San Diego, CA 92131**

## MORTGAGE

**THIS MORTGAGE IS DATED AUGUST 9, 2001,** between Bashir M. Chaudry, whose address is 3635 West Armitage Avenue, Chicago, IL  60647 (referred to below as "Grantor"); and U.S. Bank National Association, whose address is 9918 Hibert Street, 2nd Floor, San Diego, CA  92131 (referred to below as "Lender").

**GRANT OF MORTGAGE.** For valuable consideration, Grantor mortgages, warrants, and conveys to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, **located in Cook County, State of Illinois (the "Real Property"):**

    **LOTS 1 AND 2 IN BLOCK 2 OF S. DELAMATER'S SUBDIVISION OF THE NORTH 430 FEET OF THE EAST 1/2 OF THE NORTHEAST 1/4 OF THE SOUTHWEST 1/4 OF SECTION 35, TOWNSHIP 40 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.**

**The Real Property or its address is commonly known as 3635 West Armitage Avenue, Chicago, IL.** The Real Property tax identification number is 13-35-305-047-0000.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

**DEFINITIONS.** The following words shall have the following meanings when used in this Mortgage. Terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Uniform Commercial Code. All references to dollar amounts shall mean amounts in lawful money of the United States of America.

    **Grantor.** The word "Grantor" means **Bashir M. Chaudry.** The Grantor is the mortgagor under this Mortgage.

    **Guarantor.** The word "Guarantor" means and includes without limitation each and all of the guarantors, sureties, and accommodation parties in connection with the Indebtedness.

    **Improvements.** The word "Improvements" means and includes without limitation all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**BOX 333-CTI**

**Indebtedness.** The word "Indebtedness" means all principal and interest payable under the Note and any amounts expended or advanced by Lender to discharge obligations of Grantor or expenses incurred by Lender to enforce obligations of Grantor under this Mortgage, together with interest on such amounts as provided in this Mortgage. **At no time shall the principal amount of Indebtedness secured by the Mortgage, not including sums advanced to protect the security of the Mortgage, exceed the note amount of $339,000.00.**

**Lender.** The word "Lender" means U.S. Bank National Association, its successors and assigns. The Lender is the mortgagee under this Mortgage.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender, and includes without limitation all assignments and security interest provisions relating to the Personal Property and Rents.

**Note.** The word "Note" means the promissory note or credit agreement dated August 9, 2001, **in the original principal amount of $339,000.00** from Grantor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The interest rate on the Note is a variable interest rate based upon an index. The index currently is 6.750% per annum. The interest rate to be applied to the unpaid principal balance of this Mortgage shall be at a rate of 1.750 percentage point(s) over the Index, resulting in an initial rate of 8.500% per annum. NOTICE: Under no circumstances shall the interest rate on this Mortgage be more than the maximum rate allowed by applicable law. **NOTICE TO GRANTOR: THE NOTE CONTAINS A VARIABLE INTEREST RATE.**

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the property, interests and rights described above in the "Grant of Mortgage" section.

**Related Documents.** The words "Related Documents" mean and include without limitation all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (1) PAYMENT OF THE INDEBTEDNESS AND (2) PERFORMANCE OF ALL OBLIGATIONS OF GRANTOR UNDER THIS MORTGAGE AND THE RELATED DOCUMENTS. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Grantor shall pay to Lender all amounts secured by this Mortgage as they become due, and shall strictly perform all of Grantor's obligations under this Mortgage.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Grantor agrees that Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until in default or until Lender exercises its right to collect Rents as provided for in the Assignment of Rents form executed by Grantor in connection with the Property, Grantor may remain in possession and control of and operate and manage the Property and collect the Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Hazardous Substances.** The terms "hazardous waste," "hazardous substance," "disposal," "release," and "threatened release," as used in this Mortgage, shall have the same meanings as set forth in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99–499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or Federal laws, rules, or regulations adopted pursuant to any of the foregoing. The terms "hazardous waste" and "hazardous substance" shall also include, without limitation, petroleum and petroleum by–products or any fraction thereof and asbestos. Grantor represents and warrants to Lender that: (a) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any hazardous waste or substance by any person on, under, about or from the Property; (b) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (i) any use, generation, manufacture, storage, treatment, disposal,

08-09-2001            **MORTGAGE**            Page 3
Loan No 6517312741        **(Continued)**

release, or threatened release of any hazardous waste or substance on, under, about or from the Property by any prior owners or occupants of the Property or (ii) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (c) Except as previously disclosed to and acknowledged by Lender in writing, (i) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of, or release any hazardous waste or substance on, under, about or from the Property and (ii) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation those laws, regulations, and ordinances described above. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for hazardous waste and hazardous substances. Grantor hereby (a) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the properties. The provisions of this section of the Mortgage, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), soil, gravel or rock products without the prior written consent of Lender.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without the prior written consent of Lender. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and its agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon nor leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE – CONSENT BY LENDER.** Lender may, at its option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without the Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest therein; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of Real Property interest. If any Grantor is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of Grantor. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Illinois law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are a part of this Mortgage.

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Mortgage, except for the lien of taxes and assessments not due, and except as otherwise provided in the following paragraph.

**Right To Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if

requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage.

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value, covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption and boiler insurance as Lender may require. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of ten (10) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property at any time become located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at its election, apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor.

**Unexpired Insurance at Sale.** Any unexpired insurance shall inure to the benefit of, and pass to, the purchaser of the Property covered by this Mortgage at any trustee's sale or other sale held under the provisions of this Mortgage, or at any foreclosure sale of such Property.

**Grantor's Report on Insurance.** Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing: (a) the name of the insurer; (b) the risks insured; (c) the amount of the policy; (d) the property insured, the then current replacement value of such property, and the manner of determining that value; and (e) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**EXPENDITURES BY LENDER.** If Grantor fails to comply with any provision of this Mortgage, or if any action or proceeding is commenced that would materially affect Lender's interests in the Property, Lender on Grantor's behalf may, but shall not be required to, take any action that Lender deems appropriate. Any amount that Lender expends in so doing will bear interest at the rate provided for in the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses, at Lender's option, will (a) be payable on demand, (b) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (i) the term of any applicable insurance policy or (ii) the remaining term of the Note, or (c) be treated as a balloon payment which will be due and payable at the Note's maturity. This Mortgage also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of the default. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage.

08-09-2001
Loan No 6517312741

**MORTGAGE**
(Continued)

Page 5

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities, including without limitation all applicable environmental laws, ordinances, and regulations, unless otherwise specifically excepted in the environmental agreement executed by Grantor and Lender relating to the Property.

**CONDEMNATION.** The following provisions relating to condemnation of the Property are a part of this Mortgage.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments as may be requested by it from time to time to permit such participation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (a) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (b) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (c) a tax on this type of Mortgage chargeable against the Lender or the holder of the Note; and (d) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default (as defined below), and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (a) pays the tax before it becomes delinquent, or (b) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage.

**Security Agreement.** This instrument shall constitute a security agreement to the extent any of the Property constitutes fixtures or other personal property, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall execute financing statements and take whatever other action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall assemble the Personal Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party), from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code), are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage.

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when

requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (a) the obligations of Grantor under the Note, this Mortgage, and the Related Documents, and (b) the liens and security interests created by this Mortgage as first and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or agreed to the contrary by Lender in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Grantor pays all the Indebtedness when due, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time. If, however, payment is made by Grantor, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment (a) to Grantor's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (b) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of Lender's property, or (c) by reason of any settlement or compromise of any claim made by Lender with any claimant (including without limitation Grantor), the Indebtedness shall be considered unpaid for the purpose of enforcement of this Mortgage and this Mortgage shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Mortgage or of any note or other instrument or agreement evidencing the Indebtedness and the Property will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Lender, and Grantor shall be bound by any judgment, decree, order, settlement or compromise relating to the Indebtedness or to this Mortgage.

**DEFAULT.** Each of the following, at the option of Lender, shall constitute an event of default ("Event of Default") under this Mortgage:

**Default on Indebtedness.** Failure of Grantor to make any payment when due on the Indebtedness.

**Default on Other Payments.** Failure of Grantor within the time required by this Mortgage to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with the Property.

**Compliance Default.** Failure of Grantor to comply with any other term, obligation, covenant or condition contained in this Mortgage, the Note or in any of the Related Documents.

**Default in Favor of Third Parties.** Should Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or Grantor's ability to repay the Note or Grantor's ability to perform Grantor's obligations under this Mortgage or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by or on behalf of Grantor under this Mortgage, the Note or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished.

**Defective Collateralization.** This Mortgage or any of the Related Documents ceases to be in full force and effect (including failure of any collateral documents to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The death of Grantor or the dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Foreclosure, Forfeiture, etc.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any of the Property. However, this subsection shall not apply in the event of a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the foreclosure or forefeiture proceeding, provided that Grantor gives Lender written notice of such claim and furnishes reserves or a surety bond for the claim satisfactory to Lender.

**Breach of Other Agreement.** Any breach by Grantor under the terms of any other agreement between Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of any Event of Default and at any time thereafter, Lender, at its option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty which Grantor would be required to pay.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney–in–fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Mortgagee in Possession.** Lender shall have the right to be placed as mortgagee in possession or to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The mortgagee in possession or receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Note or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Grantor hereby waives any and all right to have the property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition.

**Waiver; Election of Remedies.** A waiver by any party of a breach of a provision of this Mortgage shall not constitute a waiver of or prejudice the party's rights otherwise to demand strict compliance with that provision or any other provision. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or take action to perform an obligation of Grantor under this Mortgage after failure of Grantor to perform shall not affect Lender's right to declare a default and exercise its remedies under this Mortgage.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and on any appeal. Whether or not any court action is involved, all reasonable expenses incurred by Lender that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest from the date of expenditure until repaid at the rate provided for in the Note. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including attorneys' fees for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals and any anticipated post–judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES TO GRANTOR AND OTHER PARTIES.** Any notice under this Mortgage, including without limitation any notice of default and any notice of sale to Grantor, shall be in writing, may be sent by telefacsimile (unless otherwise required by law), and shall be effective when actually delivered, or when deposited with a nationally recognized overnight courier, or, if mailed, shall be deemed effective when deposited in the United States mail first class, certified or registered mail, postage prepaid, directed to the addresses shown near the beginning of this Mortgage. Any party may change its address for notices under this Mortgage by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** This Mortgage, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Applicable Law.** The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations: (a) When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law. (b) Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan. Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Mortgage to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Mortgage in all other respects shall remain valid and enforceable.

**Successors and Assigns.** Subject to the limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**Time Is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Illinois as to all Indebtedness secured by this Mortgage.

**Waivers and Consents.** Lender shall not be deemed to have waived any rights under this Mortgage (or under the Related Documents) unless such waiver is in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by any party of a provision of this Mortgage shall not constitute a waiver of or prejudice the party's right otherwise to demand strict compliance with that provision or any other provision. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or any of Grantor's obligations as to any future transactions. Whenever consent by Lender is required in this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required.

**THE LOAN SECURED BY THIS LIEN WAS MADE UNDER A SMALL BUSINESS ADMINISTRATION PROGRAM.** The Loan secured by this lien was made under a United States Small Business Administration (SBA) nationwide program which uses tax dollars to assist small business owners. If the United States is seeking to enforce this document, then under SBA regulations:

a) When SBA is the holder of the Note, this document and all documents evidencing or securing this Loan will be construed in accordance with federal law.

b) Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability. No Borrower or Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrower, or defeat any claim of SBA with respect to this Loan.

Any clause in this document requiring arbitration is not enforceable when SBA is the holder of the Note secured by this instrument..

08-09-2001
Loan No 6517312741

**MORTGAGE**
(Continued)

Page 9

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND GRANTOR AGREES TO ITS TERMS.

**GRANTOR:**

X _____
Bashir M. Chaudry

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF _Illinois_ )
                                        ) ss
COUNTY OF _Cook_ )

On this day before me, the undersigned Notary Public, personally appeared **Bashir M. Chaudry**, to me known to be the individual described in and who executed the Mortgage, and acknowledged that he or she signed the Mortgage as his or her free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this _17th_ day of _August_ , 20 _01_.

By _Eulana M. Blalock-Jones_          Residing at _171 N. Clark_

Notary Public in and for the State of _Illinois_

My commission expires _5/19/04_

"OFFICIAL SEAL"
EULANA M. BLALOCK-JONES
Notary Public, State of Illinois
My Commission Expires 5/19/04

LASER PRO, Reg. U.S. Pat. & T.M. Off., Ver. 3.29a (C) Concentrex 2001 All rights reserved. [CA–G03 E3.26c F3.29 CHOUDHAR.LN S1.OVL]

10785562

# EXHIBIT S

Bashir Goes on Deliberate Default
And Had the Property "Sold" to his
Sister in Law Naseer for $206,000.00

**Illinois Anti-Predatory Lending Database Program**

**Certificate of Exemption**



Doc#: 1229226141 Fee: $94.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 10/18/2012 01:57 PM Pg: 1 of 29

# P.N.T.N.

**Report Mortgage Fraud**
**800-532-8785**

The property identified as:      PIN: 13-35-305-047-0000

**Address:**
**Street:**      3635 W. Armitage Avenue
**Street line 2:**
**City:** Chicago      **State:** IL      **ZIP Code:** 60647

**Lender:** Urban Partnership Bank

**Borrower:** Sandal, Inc.

**Loan / Mortgage Amount:** $206,250.00

This property is located within the program area and is exempt from the requirements of 765 ILCS 77/70 et seq. because it is commercial property.

**Certificate number:** 244BF63C-61EC-4BFB-A6EF-37FA3D8153F7      **Execution date:** 10/03/2012

S
P 29
S
SC
INT




Loan No. 66538

THIS DOCUMENT PREPARED BY:

H. Jeffrey McCown
McCown Law Offices
22837 S. Wirth
Frankfort, Illinois 60423

AFTER RECORDING RETURN TO:

Urban Partnership Bank
Attn: Loan Administration
Asset Custody / Loan Operations
7936 S. Cottage Grove Avenue
Chicago, Illinois 60619

PERMANENT INDEX NUMBER:

13-35-305-047-0000

PROPERTY ADDRESS:

3635 W. Armitage Avenue
Chicago, Illinois 60647

*This space reserved for Recorders use only.*

---

## MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT
## OF RENTS AND LEASES AND FIXTURE FILING

This MORTGAGE, SECURITY AGREEMENT, ASSIGNMENT OF RENTS AND LEASES AND FIXTURE FILING, dated as of October 3, 2012 (the "Mortgage"), is executed by SANDAL, INC., an Illinois limited liability company (the "Mortgagor"), having an address of 3673 W. North Shore Avenue, Lincolnwood, Illinois 60712, to and for the benefit of URBAN PARTNERSHIP BANK, an Illinois banking association, its successors and assigns (the "Lender"), having an address of 7936 S. Cottage Grove, Chicago, Illinois 60619.

### R E C I T A L S:

A.     Pursuant to the terms and conditions contained in that certain Loan Agreement of even date herewith by and between the Mortgagor and the Lender (the "Loan Agreement"), the Lender has agreed to make a loan to the Mortgagor in the principal amount of Two Hundred Six Thousand Two Hundred Fifty Dollars ($206,250.00) (the "Loan").

B.     The Loan is evidenced by that certain Mortgage Note of even date herewith in the principal amount of Two Hundred Six Thousand Two Hundred Fifty Dollars ($206,250.00), which

Mortgage Note bears interest at the rate of 6% percent per annum and has a maturity date of October 3, 2017;

(such Mortgage Note, as amended, restated or replaced from time to time, is hereinafter referred to as the "Note") (collectively, the Note, the Loan Agreement, this Mortgage and all other documents securing or otherwise relating to the Loan, as amended, restated or replaced from time to time, are referred to herein as the "Loan Documents").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Mortgagor agrees as follows:

## A G R E E M E N T S:

The Mortgagor hereby mortgages, grants, assigns, remises, releases, warrants and conveys to the Lender, its successors and assigns, and grants a security interest in, the following described property, rights and interests (referred to collectively herein as the "Premises"), all of which property, rights and interests are hereby pledged primarily and on a parity with the Real Estate (as defined below) and not secondarily:

(a) The real estate located in the County of Cook, State of Illinois and legally described on Exhibit A attached hereto and made a part hereof (the "Real Estate");

(b) All improvements of every nature whatsoever now or hereafter situated on the Real Estate, and all fixtures and personal property of every nature whatsoever now or hereafter owned by the Mortgagor and located on, or used in connection with the Real Estate or the improvements thereon, or in connection with any construction thereon, including all extensions, additions, improvements, betterments, renewals, substitutions and replacements to any of the foregoing and all of the right, title and interest of the Mortgagor in and to any such personal property or fixtures together with the benefit of any deposits or payments now or hereafter made on such personal property or fixtures by the Mortgagor or on its behalf (the "Improvements");

(c) All easements, rights of way, gores of real estate, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights and powers, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances whatsoever, in any way now or hereafter belonging, relating or appertaining to the Real Estate, and the reversions, remainders, rents, issues and profits thereof, and all the estate, right, title, interest, property, possession, claim and demand whatsoever, at law as well as in equity, of the Mortgagor of, in and to the same;

(d) All rents, revenues, issues, profits, proceeds, income, royalties, Letter of Credit Rights (as defined in the Uniform Commercial Code of the State of Illinois (the "Code") in effect from time to time), escrows, security deposits, impounds, reserves, tax refunds and other rights to monies from the Premises and/or the businesses and operations conducted by the Mortgagor thereon, to be applied against the Indebtedness (as hereinafter defined); provided, however, that the Mortgagor, so long as no Event of Default (as

2

hereinafter defined) has occurred hereunder, may collect rent as it becomes due, but not more than one (1) month in advance thereof;

(e)     All interest of the Mortgagor in all leases now or hereafter on the Premises, whether written or oral (each, a "Lease", and collectively, the "Leases"), together with all security therefor and all monies payable thereunder, subject, however, to the conditional permission hereinabove given to the Mortgagor to collect the rentals under any such Lease;

(f)     All fixtures, inventory, equipment and other articles of personal property now or hereafter owned by the Mortgagor, including, without limitation, any and all air conditioners, antennae, appliances, apparatus, awnings, basins, bathtubs, bidets, boilers, bookcases, cabinets, carpets, computer hardware and software used in the operation of the Premises, coolers, curtains, dehumidifiers, disposals, doors, drapes, dryers, ducts, dynamos, elevators, engines, equipment, escalators, exercise equipment, fans, fittings, floor coverings, furnaces, furnishings, furniture, hardware, heaters, humidifiers, incinerators, lighting, machinery, motors, ovens, pipes, plumbing, pumps, radiators, ranges, recreational facilities, refrigerators, screens, security systems, shades, shelving, sinks, sprinklers, stokers, stoves, toilets, ventilators, wall coverings, washers, windows, window coverings, wiring, and all renewals or replacements thereof or articles in substitution therefor, whether or not the same are or shall be attached to the Real Estate or the Improvements in any manner; it being mutually agreed that all of the aforesaid property owned by the Mortgagor and placed on the Real Estate or the Improvements, so far as permitted by law, shall be deemed to be fixtures, a part of the realty, and security for the Indebtedness; notwithstanding the agreement hereinabove expressed that certain articles of property form a part of the realty covered by this Mortgage and be appropriated to its use and deemed to be realty, to the extent that such agreement and declaration may not be effective and that any of said articles may constitute Goods (as defined in the Code), this instrument shall constitute a security agreement, creating a security interest in such goods, as collateral, in the Lender, as a Secured Party, and the Mortgagor, as Debtor, all in accordance with the Code;

(g)     All of the Mortgagor's interests in General Intangibles, including Payment Intangibles and Software (each as defined in the Code) now owned or hereafter acquired and related to the Premises, including, without limitation, all of the Mortgagor's right, title and interest in and to: (i) all agreements, licenses, permits and contracts to which the Mortgagor is or may become a party and which relate to the Premises; (ii) all obligations and indebtedness owed to the Mortgagor thereunder; (iii) all intellectual property related to the Premises; and (iv) all choses in action and causes of action relating to the Premises;

(h)     All of the Mortgagor's accounts now owned or hereafter created or acquired as relate to the Premises and/or the businesses and operations conducted thereon, including, without limitation, all of the following now owned or hereafter created or acquired by the Mortgagor:  (i) Accounts (as defined in the Code), contract rights book debts, notes, drafts, and other obligations or indebtedness owing to the Mortgagor arising from the sale, lease or exchange of goods or other property and/or the performance of services; (ii) the Mortgagor's rights in, to and under all purchase orders for goods, services or other property; (iii) the Mortgagor's rights to any goods, services or other property represented by any of the foregoing; (iv) monies due or to become due to the Mortgagor under all contracts for the sale,

3

lease or exchange of goods or other property and/or the performance of services including the right to payment of any interest or finance charges in respect thereto (whether or not yet earned by performance on the part of the Mortgagor); (v) Securities, Investment Property, Financial Assets and Securities Entitlements (each as defined in the Code); (vi) proceeds of any of the foregoing and all collateral security and guaranties of any kind given by any person or entity with respect to any of the foregoing; and (vii) all warranties, guarantees, permits and licenses in favor of the Mortgagor with respect to the Premises; and

(i) All proceeds of the foregoing, including, without limitation, all judgments, awards of damages and settlements hereafter made resulting from condemnation proceeds or the taking of the Premises or any portion thereof under the power of eminent domain, any proceeds of any policies of insurance, maintained with respect to the Premises or proceeds of any sale, option or contract to sell the Premises or any portion thereof.

TO HAVE AND TO HOLD the Premises, unto the Lender, its successors and assigns, forever, for the purposes and upon the uses herein set forth together with all right to possession of the Premises after the occurrence of any Event of Default; the Mortgagor hereby RELEASING AND WAIVING all rights under and by virtue of the homestead exemption laws of the State of Illinois.

FOR THE PURPOSE OF SECURING: (i) the payment of the Loan and all interest, late charges, prepayment premium, if any, exit fee, if any, interest rate swap or hedge expenses (if any), reimbursement obligations, fees and expenses for letters of credit issued by the Lender for the benefit of the Mortgagor, if any, and other indebtedness evidenced by or owing under the Note, any of the other Loan Documents, and any application for letters of credit and master letter of credit agreement, together with any extensions, modifications, renewals or refinancings of any of the foregoing; (ii) the obligations and liabilities of the Mortgagor to the Lender under and pursuant to any interest rate, currency or commodity swap agreement, cap agreement or collar agreement, executed by and between the Mortgagor and the Lender from time to time (collectively, "Interest Rate Agreements"), (iii) the performance and observance of the covenants, conditions, agreements, representations, warranties and other liabilities and obligations of the Mortgagor or any other obligor to or benefiting the Lender which are evidenced or secured by or otherwise provided in the Note, this Mortgage or any of the other Loan Documents; and (iv) the reimbursement to the Lender of any and all sums incurred, expended or advanced by the Lender pursuant to any term or provision of or constituting additional indebtedness under or secured by this Mortgage, any of the other Loan Documents or any Interest Rate Agreements or any application for letters of credit and master letter of credit agreement, with interest thereon as provided herein or therein (collectively, the "Indebtedness").

IT IS FURTHER UNDERSTOOD AND AGREED THAT:

1. Title. The Mortgagor represents, warrants and covenants that (a) the Mortgagor is the holder of the fee simple title to the Premises, free and clear of all liens and encumbrances, except those liens and encumbrances in favor of the Lender and as otherwise described on Exhibit B attached hereto and made a part hereof (the "Permitted Exceptions"); and (b) the Mortgagor has legal power and authority to mortgage and convey the Premises, free from any lien, security interest, encumbrance or other right, title or interest of any other person or entity other than in favor of the Lender, and has the legal power and authority to direct the Mortgagor to mortgage and convey the Premises.

2.　Maintenance, Repair, Restoration, Prior Liens, Parking. The Mortgagor covenants that, so long as any portion of the Indebtedness remains unpaid, the Mortgagor will:

(a)　promptly repair, restore or rebuild any Improvements now or hereafter on the Premises which may become damaged or be destroyed to a condition substantially similar to the condition immediately prior to such damage or destruction, whether or not proceeds of insurance are available or sufficient for the purpose;

(b)　keep the Premises in good condition and repair, without waste, and free from mechanics', materialmen's or like liens or claims or other liens or claims for lien (subject to the Mortgagor's right to contest liens as permitted by the terms of Section 27 hereof);

(c)　pay when due the Indebtedness in accordance with the terms of the Note and the other Loan Documents and duly perform and observe all of the terms, covenants and conditions to be observed and performed by the Mortgagor under the Note, this Mortgage and the other Loan Documents;

(d)　pay when due any indebtedness which may be secured by a permitted lien or charge on the Premises on a parity with, superior to or inferior to the lien hereof, and upon request exhibit satisfactory evidence of the discharge of such lien to the Lender (subject to the Mortgagor's right to contest liens as permitted by the terms of Section 27 hereof);

(e)　complete within a reasonable time any Improvements now or at any time in the process of erection upon the Premises;

(f)　comply with all requirements of law, municipal ordinances or restrictions and covenants of record with respect to the Premises and the use thereof;

(g)　obtain and maintain in full force and effect, and abide by and satisfy the material terms and conditions of, all material permits, licenses, registrations and other authorizations with or granted by any governmental authorities that may be required from time to time with respect to the performance of its obligations under this Mortgage;

(h)　make no material alterations in the Premises or demolish any portion of the Premises without the Lender's prior written consent, except as required by law or municipal ordinance;

(i)　suffer or permit no change in the use or general nature of the occupancy of the Premises, without the Lender's prior written consent;

(j)　pay when due all operating costs of the Premises;

(k)　not initiate or acquiesce in any zoning reclassification with respect to the Premises, without the Lender's prior written consent;

5

(l)     provide and thereafter maintain adequate parking areas within the Premises as may be required by law, ordinance or regulation (whichever may be greater), together with any sidewalks, aisles, streets, driveways and sidewalk cuts and sufficient paved areas for ingress, egress and right-of-way to and from the adjacent public thoroughfares necessary or desirable for the use thereof; and

(m)     shall comply, and shall cause the Premises at all times to be operated in compliance, with all applicable federal, state, local and municipal environmental, health and safety laws, statutes, ordinances, rules and regulations, including, without limitation, Mortgagor shall (i) ensure, and cause each of its subsidiaries to ensure, that no person who owns twenty percent (20%) or more of the equity interests in the Mortgagor, or otherwise controls the Mortgagor or any of its subsidiaries is or shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (ii) not use or permit the use of the proceeds of the Loan to violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto, and (iii) comply, and cause each of its subsidiaries to comply, with all applicable Bank Secrecy Act ("BSA") laws and regulations, as amended.

3.     Payment of Taxes and Assessments.  The Mortgagor will pay when due and before any penalty attaches, all general and special taxes, assessments, water charges, sewer charges, and other fees, taxes, charges and assessments of every kind and nature whatsoever (all herein generally called "Taxes"), whether or not assessed against the Mortgagor, if applicable to the Premises or any interest therein, or the Indebtedness, or any obligation or agreement secured hereby, subject to the Mortgagor's right to contest the same, as provided by the terms hereof; and the Mortgagor will, upon written request, furnish to the Lender duplicate receipts therefor within ten (10) days after the Lender's request.

4.     Tax Deposits.  Mortgagor shall deposit with the Lender, on a monthly basis until the Indebtedness is fully paid, a sum equal to one-twelfth (1/12th) of the annual Taxes on the Premises, as estimated by Lender from time to time and including a two (2) month reserve for Taxes at all times. Such deposits are to be held without any allowance of interest and are to be used for the payment of Taxes next due and payable when they become due. So long as no Event of Default shall exist, the Lender shall, at its option, either pay such Taxes when due and payable upon receipt of appropriate bills therefor from Mortgagor or release sufficient funds to the Mortgagor for the payment thereof.  Mortgagor hereby authorizes the Lender to automatically deduct from the Mortgagor's checking account at the Lender's office the amount of such tax escrow payments due hereunder.  If the funds are insufficient to cover any payment, Lender shall not be obligated to advance funds to cover the payments. If the funds so deposited are insufficient to pay any such Taxes for any year (or installments thereof, as applicable) when the same shall become due and payable, Mortgagor shall, within ten (10) days after receipt of written demand therefor, deposit additional funds as may be necessary to pay such Taxes in full. If the funds so deposited exceed the amount required to pay such Taxes for any year, the excess shall be applied toward subsequent deposits.  Such deposits need not be kept separate and apart from any other funds of the Lender. Lender is authorized to pay any bill, statement or estimate of Taxes procured from the appropriate public office without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.  Upon an Event of Default,

6

the Lender may, at its option, apply any monies at the time on deposit to cure an Event of Default or to pay any of the Indebtedness in such order and manner as the Lender may elect. If such deposits are used to cure an Event of Default or pay any of such indebtedness, the Mortgagor shall immediately, upon demand by the Lender, deposit with the Lender an amount equal to the amount expended by the Lender from the deposits. When the indebtedness owed by Mortgagor to Lender has been fully paid, any remaining deposits shall be returned to the Mortgagor. Such deposits are hereby pledged as additional security for the indebtedness and shall not be subject to the direction or control of the Mortgagor. Lender shall not be liable for any failure to apply to the payment of Taxes any amount so deposited unless the Mortgagor, prior to an Event of Default, shall have requested the Lender in writing to make application of such funds to the payment of such amounts, accompanied by the bills for such Taxes. The Lender shall not be liable for any act or omission taken in good faith or pursuant to the instruction of any party.

5.    Lender's Interest In and Use of Deposits. Upon an Event of Default, the Lender may, at its option, apply any monies at the time on deposit pursuant to Section 4 hereof to cure an Event of Default or to pay any of the Indebtedness in such order and manner as the Lender may elect. If such deposits are used to cure an Event of Default or pay any of the Indebtedness, the Mortgagor shall immediately, upon demand by the Lender, deposit with the Lender an amount equal to the amount expended by the Mortgagor from the deposits. When the Indebtedness has been fully paid, any remaining deposits shall be returned to the Mortgagor. Such deposits are hereby pledged as additional security for the Indebtedness and shall not be subject to the direction or control of the Mortgagor. The Lender shall not be liable for any failure to apply to the payment of Taxes any amount so deposited unless the Mortgagor, prior to an Event of Default, shall have requested the Lender in writing to make application of such funds to the payment of such amounts, accompanied by the bills for such Taxes. The Lender shall not be liable for any act or omission taken in good faith or pursuant to the instruction of any party.

6.    Insurance. (a) The Mortgagor shall at all times keep all buildings, improvements, fixtures and articles of personal property now or hereafter situated on the Premises insured against loss or damage by fire and such other hazards as may reasonably be required by the Lender, in accordance with the terms, coverages and provisions described on Exhibit C attached hereto and made a part hereof, and such other insurance as the Lender may from time to time reasonably require. Unless the Mortgagor provides the Lender evidence of the insurance coverages required hereunder, the Lender may purchase insurance at the Mortgagor's expense to cover the Lender's interest in the Premises. The insurance may, but need not, protect the Mortgagor's interest. The coverages that the Lender purchases may not pay any claim that the Mortgagor makes or any claim that is made against the Mortgagor in connection with the Premises. The Mortgagor may later cancel any insurance purchased by the Lender, but only after providing the Lender with evidence that the Mortgagor has obtained insurance as required by this Mortgage. If the Lender purchases insurance for the Premises, the Mortgagor will be responsible for the costs of such insurance, including, without limitation, interest and any other charges which the Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to the Indebtedness. The cost of the insurance may be more than the cost of insurance the Mortgagor may be able to obtain on its own.

(b)     The Mortgagor shall not take out separate insurance concurrent in form or contributing in the event of loss with that required to be maintained hereunder unless the Lender is included thereon as the loss payee or an additional insured as applicable. under a standard mortgage clause acceptable to the Lender and such separate insurance is otherwise acceptable to the Lender.

(c)     In case of loss or damage by fire or other casualty, Lender is authorized (i) to settle and adjust any claim under insurance policies which insure against such risks, or (ii) to allow Mortgagor to agree with the insurance company or companies on the amount to be paid in regard to such loss. In either case, Lender is authorized, to collect and issue a receipt for any such insurance money. At the option of Lender, such insurance proceeds shall be applied either to reduce the Indebtedness or to reimburse Mortgagor for the cost of rebuilding and restoration. Irrespective of whether such insurance proceeds are used to reimburse Mortgagor for the cost of such rebuilding or restoration or not, and irrespective of whether such insurance proceeds are or are not adequate for such purpose, the buildings and improvements shall be so restored or rebuilt so as to be of at least equal value and substantially the same character as prior to such damage or destruction. Lender, at its option, shall have the right to approve plans and specifications before commencement of any rebuilding or restoration work. In any case where the insurance proceeds are used for rebuilding and restoration, such proceeds shall be disbursed in the manner and under the conditions that the Lender may require and upon Lender being furnished with satisfactory evidence of the estimated cost of completion thereof and with architect's certificates, waivers of lien, contractor's and subcontractors' sworn statements and other evidence of cost and payments so that Lender can verify that the amounts disbursed from time to time are represented by completed and in place work and that such work is free and clear of mechanics' lien claims. If the estimated cost of completion exceeds the amount of the insurance proceeds available, Mortgagor immediately shall, on written demand of Lender, deposit with Lender in cash the amount of such estimated excess cost. No payment made prior to the final completion of the work shall exceed ninety percent (90%) of the value of the work performed from time to time, and at all times the undisbursed balance of such proceeds remaining in the hands of the disbursing party shall be at least sufficient to pay for the cost of completion of the work free and clear of liens. Any surplus which may remain out of such insurance proceeds after payment of such cost of building or restoration shall, at the option of the Lender, be applied on account of the Indebtedness or be paid to any party entitled thereto without interest.

7.     Condemnation.  If all or any part of the Premises are damaged, taken or acquired. either temporarily or permanently, in any condemnation proceeding, or by exercise of the right of eminent domain, the amount of any award or other payment for such taking or damages made in consideration thereof, to the extent of the full amount of the remaining unpaid Indebtedness, is hereby assigned to the Lender, who is empowered to collect and receive the same and to give proper receipts therefor in the name of the Mortgagor and the same shall be paid forthwith to the Lender. Such award or monies shall be applied on account of the Indebtedness, irrespective of whether such Indebtedness is then due and payable and, at any time from and after the taking the Lender may declare the whole of the balance of the Indebtedness to be due and payable. Notwithstanding the provisions of this section to the contrary, if any condemnation or taking of less than the entire Premises occurs and provided that no Event of Default and no event or circumstance which with the passage of time, the giving of notice or both would constitute an Event of Default then exists, and if such partial condemnation, in the reasonable discretion of the Lender, has no material adverse effect on the operation or value of the Premises, then the award or payment for such taking or consideration for damages resulting therefrom may be collected and received by the Mortgagor, and the Lender

hereby agrees that in such event it shall not declare the Indebtedness to be due and payable, if it is not otherwise then due and payable.

8.    Stamp Tax. If, by the laws of the United States of America, or of any state or political subdivision having jurisdiction over the Mortgagor, any tax is due or becomes due in respect of the execution and delivery of this Mortgage, the Note or any of the other Loan Documents, the Mortgagor shall pay such tax in the manner required by any such law. The Mortgagor further agrees to reimburse the Lender for any sums which the Lender may expend by reason of the imposition of any such tax. Notwithstanding the foregoing, the Mortgagor shall not be required to pay any income or franchise taxes of the Lender.

9.    Lease Assignment. The Mortgagor acknowledges that, concurrently herewith, the Mortgagor has executed and delivered to the Lender, as additional security for the repayment of the Loan, an Assignment of Rents and Leases (the "Assignment") pursuant to which the Mortgagor has assigned to the Lender interests in the leases of the Premises and the rents and income from the Premises. All of the provisions of the Assignment are hereby incorporated herein as if fully set forth at length in the text of this Mortgage. The Mortgagor agrees to abide by all of the provisions of the Assignment.

10.    Effect of Extensions of Time and Other Changes. If the payment of the Indebtedness or any part thereof is extended or varied, if any part of any security for the payment of the Indebtedness is released, if the rate of interest charged under the Note is changed or if the time for payment thereof is extended or varied, all persons now or at any time hereafter liable therefor, or interested in the Premises or having an interest in the Mortgagor, shall be held to assent to such extension, variation, release or change and their liability and the lien and all of the provisions hereof shall continue in full force, any right of recourse against all such persons being expressly reserved by the Lender, notwithstanding such extension, variation, release or change.

11.    Effect of Changes in Laws Regarding Taxation. If any law is enacted after the date hereof requiring (a) the deduction of any lien on the Premises from the value thereof for the purpose of taxation or (b) the imposition upon the Lender of the payment of the whole or any part of the Taxes, charges or liens herein required to be paid by the Mortgagor, or (c) a change in the method of taxation of mortgages or debts secured by mortgages or the Lender's interest in the Premises, or the manner of collection of taxes, so as to affect this Mortgage or the Indebtedness or the holders thereof, then the Mortgagor, upon demand by the Lender, shall pay such Taxes or charges, or reimburse the Lender therefor; provided, however, that the Mortgagor shall not be deemed to be required to pay any income or franchise taxes of the Lender. Notwithstanding the foregoing, if in the opinion of counsel for the Lender it is or may be unlawful to require the Mortgagor to make such payment or the making of such payment might result in the imposition of interest beyond the maximum amount permitted by law, then the Lender may declare all of the Indebtedness to be immediately due and payable.

12.    Lender's Performance of Defaulted Acts and Expenses Incurred by Lender. If an Event of Default has occurred, the Lender may, but need not, make any payment or perform any act herein required of the Mortgagor in any form and manner deemed expedient by the Lender, and may, but need not, make full or partial payments of principal or interest on prior encumbrances, if any, and purchase, discharge, compromise or settle any tax lien or other prior lien or title or claim thereof, or

redeem from any tax sale or forfeiture affecting the Premises or consent to any tax or assessment or cure any default of the Mortgagor in any lease of the Premises. All monies paid for any of the purposes herein authorized and all expenses paid or incurred in connection therewith, including reasonable attorneys' fees, and any other monies advanced by the Lender in regard to any tax referred to in Section 8 above or to protect the Premises or the lien hereof, shall be so much additional Indebtedness, and shall become immediately due and payable by the Mortgagor to the Lender, upon demand, and with interest thereon accruing from the date of such demand until paid at the rate of eleven percent per annum (the "Default Rate"). In addition to the foregoing, any costs, expenses and fees, including reasonable attorneys' fees, incurred by the Lender in connection with (a) sustaining the lien of this Mortgage or its priority, (b) protecting or enforcing any of the Lender's rights hereunder, (c) recovering any Indebtedness, (d) any litigation or proceedings affecting the Note, this Mortgage, any of the other Loan Documents or the Premises, including without limitation, bankruptcy and probate proceedings, or (e) preparing for the commencement, defense or participation in any threatened litigation or proceedings affecting the Note, this Mortgage, any of the other Loan Documents or the Premises, shall be so much additional Indebtedness, and shall become immediately due and payable by the Mortgagor to the Lender, upon demand, and with interest thereon accruing from the date of such demand until paid at the Default Rate. The interest accruing under this section shall be immediately due and payable by the Mortgagor to the Lender, and shall be additional Indebtedness evidenced by the Note and secured by this Mortgage. The Lender's failure to act shall never be considered as a waiver of any right accruing to the Lender on account of any Event of Default. Should any amount paid out or advanced by the Lender hereunder, or pursuant to any agreement executed by the Mortgagor in connection with the Loan, be used directly or indirectly to pay off, discharge or satisfy, in whole or in part, any lien or encumbrance upon the Premises or any part thereof, then the Lender shall be subrogated to any and all rights, equal or superior titles, liens and equities, owned or claimed by any owner or holder of said outstanding liens, charges and indebtedness, regardless of whether said liens, charges and indebtedness are acquired by assignment or have been released of record by the holder thereof upon payment.

13.    Security Agreement. The Mortgagor and the Lender agree that this Mortgage shall constitute a Security Agreement within the meaning of the Code with respect to (a) all sums at any time on deposit for the benefit of the Mortgagor or held by the Lender (whether deposited by or on behalf of the Mortgagor or anyone else) pursuant to any of the provisions of this Mortgage or the other Loan Documents, and (b) with respect to any personal property included in the granting clauses of this Mortgage, which personal property may not be deemed to be affixed to the Premises or may not constitute a "Fixture" (within the meaning of Section 9-102(41) of the Code and which property is hereinafter referred to as "Personal Property"), and all replacements of, substitutions for, additions to, and the proceeds thereof, and the "Supporting Obligations" (as defined in the Code) (all of said Personal Property and the replacements, substitutions and additions thereto and the proceeds thereof being sometimes hereinafter collectively referred to as "Collateral"), and that a security interest in and to the Collateral is hereby granted to the Lender, and the Collateral and all of the Mortgagor's right, title and interest therein are hereby assigned to the Lender, all to secure payment of the Indebtedness. All of the provisions contained in this Mortgage pertain and apply to the Collateral as fully and to the same extent as to any other property comprising the Premises; and the following provisions of this section shall not limit the applicability of any other provision of this Mortgage but shall be in addition thereto:

10

(a)     The Mortgagor (being the Debtor as that term is used in the Code) is and will be the true and lawful owner of the Collateral, subject to no liens, charges or encumbrances other than the lien hereof, other liens and encumbrances benefiting the Lender and no other party, and liens and encumbrances, if any, expressly permitted by the other Loan Documents.

(b)     The Collateral is to be used by the Mortgagor solely for business purposes.

(c)     The Collateral will be kept at the Real Estate and, except for Obsolete Collateral (as hereinafter defined), will not be removed therefrom without the consent of the Lender (being the Secured Party as that term is used in the Code). The Collateral may be affixed to the Real Estate but will not be affixed to any other real estate.

(d)     The only persons having any interest in the Premises are the Mortgagor, the Lender and holders of interests, if any, expressly permitted hereby.

(e)     No Financing Statement (other than Financing Statements showing the Lender as the sole secured party, or with respect to liens or encumbrances, if any, expressly permitted hereby) covering any of the Collateral or any proceeds thereof is on file in any public office except pursuant hereto; and the Mortgagor, at its own cost and expense, upon demand, will furnish to the Lender such further information and will execute and deliver to the Lender such financing statements and other documents in form satisfactory to the Lender and will do all such acts as the Lender may request at any time or from time to time or as may be necessary or appropriate to establish and maintain a perfected security interest in the Collateral as security for the Indebtedness, subject to no other liens or encumbrances, other than liens or encumbrances benefiting the Lender and no other party, and liens and encumbrances (if any) expressly permitted hereby; and the Mortgagor will pay the cost of filing or recording such financing statements or other documents, and this instrument, in all public offices wherever filing or recording is deemed by the Lender to be desirable. The Mortgagor hereby irrevocably authorizes the Lender at any time, and from time to time, to file in any jurisdiction any initial financing statements and amendments thereto, without the signature of the Mortgagor that (i) indicate the Collateral (A) is comprised of all assets of the Mortgagor or words of similar effect, regardless of whether any particular asset comprising a part of the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of the jurisdiction wherein such financing statement or amendment is filed, or (B) as being of an equal or lesser scope or within greater detail as the grant of the security interest set forth herein, and (ii) contain any other information required by Section 5 of Article 9 of the Uniform Commercial Code of the jurisdiction wherein such financing statement or amendment is filed regarding the sufficiency or filing office acceptance of any financing statement or amendment, including (A) whether the Mortgagor is an organization, the type of organization and any organizational identification number issued to the Mortgagor, and (B) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of the real property to which the Collateral relates. The Mortgagor agrees to furnish any such information to the Lender promptly upon request. The Mortgagor further ratifies and affirms its authorization for any financing statements and/or amendments thereto, executed and filed by the Lender in any jurisdiction prior to the date of this Mortgage. In addition, the Mortgagor shall make

11

appropriate entries on its books and records disclosing the Lender's security interests in the Collateral.

(f)     Upon an Event of Default hereunder, the Lender shall have the remedies of a secured party under the Code, including, without limitation, the right to take immediate and exclusive possession of the Collateral, or any part thereof, and for that purpose, so far as the Mortgagor can give authority therefor, with or without judicial process, may enter (if this can be done without breach of the peace) upon any place which the Collateral or any part thereof may be situated and remove the same therefrom (provided that if the Collateral is affixed to real estate, such removal shall be subject to the conditions stated in the Code); and the Lender shall be entitled to hold, maintain, preserve and prepare the Collateral for sale, until disposed of, or may propose to retain the Collateral subject to the Mortgagor's right of redemption in satisfaction of the Mortgagor's obligations, as provided in the Code. The Lender may render the Collateral unusable without removal and may dispose of the Collateral on the Premises. The Lender may require the Mortgagor to assemble the Collateral and make it available to the Lender for its possession at a place to be designated by the Lender which is reasonably convenient to both parties. The Lender will give the Mortgagor at least ten (10) days notice of the time and place of any public sale of the Collateral or of the time after which any private sale or any other intended disposition thereof is made. The requirements of reasonable notice shall be met if such notice is mailed, by certified United States mail or equivalent, postage prepaid, to the address of the Mortgagor hereinafter set forth at least ten (10) days before the time of the sale or disposition. The Lender may buy at any public sale. The Lender may buy at private sale if the Collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations. Any such sale may be held in conjunction with any foreclosure sale of the Premises. If the Lender so elects, the Premises and the Collateral may be sold as one lot. The net proceeds realized upon any such disposition, after deduction for the expenses of retaking, holding, preparing for sale, selling and the reasonable attorneys' fees and legal expenses incurred by the Lender, shall be applied against the Indebtedness in such order or manner as the Lender shall select. The Lender will account to the Mortgagor for any surplus realized on such disposition.

(g)     The terms and provisions contained in this section, unless the context otherwise requires, shall have the meanings and be construed as provided in the Code.

(h)     This Mortgage is intended to be a financing statement within the purview of Section 9-502(b) of the Code with respect to the Collateral and the goods described herein, which goods are or may become fixtures relating to the Premises. The addresses of the Mortgagor (Debtor) and the Lender (Secured Party) are hereinbelow set forth. This Mortgage is to be filed for recording with the Recorder of Deeds of the county or counties where the Premises are located. The Mortgagor is the record owner of the Premises.

(i)     To the extent permitted by applicable law, the security interest created hereby is specifically intended to cover all Leases between the Mortgagor or its agents, as lessor, and various tenants named therein, as lessee, including all extended terms and all extensions and renewals of the terms thereof, as well as any amendments to or replacement of said Leases, together with all of the right, title and interest of the Mortgagor, as lessor thereunder.

12

(j)     The Mortgagor hereby agrees that: (i) where Collateral is in possession of a third party, the Mortgagor will join with the Lender in notifying the third party of the Lender's interest and obtaining an acknowledgment from the third party that it is holding the Collateral for the benefit of the Lender; (ii) the Mortgagor will cooperate with the Lender in obtaining control with respect to Collateral consisting of:  deposit accounts, investment property, letter of credit rights and electronic chattel paper; and (iii) until the Indebtedness is paid in full, the Mortgagor will not change the state where it is located or change its name or form of organization without giving the Lender at least thirty (30) days prior written notice in each instance.

14.     Restrictions on Transfer.

(a)     The Mortgagor, without the prior written consent of the Lender, shall not effect, suffer or permit any conveyance, sale, assignment, transfer, lien, pledge, mortgage, security interest or other encumbrance or alienation (or any agreement to do any of the foregoing) of Premises or any part thereof or interest therein, whether any such conveyance, sale, assignment, transfer, lien, pledge, mortgage, security interest, encumbrance or alienation is effected directly, indirectly (including the nominee agreement), voluntarily or involuntarily, by operation of law or otherwise (each, a "Prohibited Transfer"); provided, however, that the foregoing provisions of this section shall not apply (i) to liens securing the Indebtedness, (ii) to the lien of current taxes and assessments not in default, (iii) to any transfers of the Premises, or part thereof, or interest therein, or any beneficial interests, or shares of stock or partnership or joint venture interests, as the case may be, by or on behalf of an owner thereof who is deceased or declared judicially incompetent, to such owner's heirs, legatees, devisees, executors, administrators, estate or personal representatives, (iv) to leases permitted by the terms of the Loan Documents, if any, or (v) sales or other dispositions of Collateral ("Obsolete Collateral") no longer useful in connection with the operation of the Premises, provided that prior to the sale or other disposition thereof, such Obsolete Collateral has been replaced by Collateral of at least equal value and utility which is subject to the lien hereof with the same priority as with respect to the Obsolete Collateral.

(b)     In determining whether or not to make the Loan, the Lender evaluated the background and experience of the Mortgagor in owning and operating property such as the Premises, found it acceptable and relied and continues to rely upon same as the means of maintaining the value of the Premises which is the Lender's security for the Note. The Mortgagor is well experienced in borrowing money and owning and operating property such as the Premises, were ably represented by a licensed attorney at law in the negotiation and documentation of the Loan and bargained at arm's length and without duress of any kind for all of the terms and conditions of the Loan, including this provision. The Mortgagor recognizes that the Lender is entitled to keep its loan portfolio at current interest rates by either making new loans at such rates or collecting assumption fees and/or increasing the interest rate on a loan, the security for which is purchased by a party other than the original Mortgagor. The Mortgagor further recognizes that any secondary junior financing placed upon the Premises (i) may divert funds which would otherwise be used to pay the Note; (ii) could result in acceleration and foreclosure by any such junior encumbrancer which would force the Lender to take measures and incur expenses to protect its security; (iii) would detract from the value of the Premises should the Lender come into possession thereof with the intention of selling same; and (iv) would impair the Lender's right to accept a deed in lieu of foreclosure, as a foreclosure by

13

the Lender would be necessary to clear the title to the Premises. In accordance with the foregoing and for the purposes of (a) protecting the Lender's security, both of repayment and of value of the Premises; (b) giving the Lender the full benefit of its bargain and contract with the Mortgagor; (c) allowing the Lender to raise the interest rate and collect assumption fees; and (d) keeping the Premises free of subordinate financing liens, the Mortgagor agrees that if this section is deemed a restraint on alienation, that it is a reasonable one.

15.    Events of Default; Acceleration. Each of the following shall constitute an "Event of Default" for purposes of this Mortgage:

(a)    The Mortgagor or any guarantor of the Note (each, an "Obligor") fails to pay when due (i) any installment of principal or interest payable pursuant to the terms of the Note, or (ii) any other amount payable to Lender under the Note, this Mortgage or any of the other Loan Documents;

(b)    Any Obligor fails to perform or cause to be performed any other obligation or observe any other condition, covenant, term, agreement or provision required to be performed or observed under the Note, this Mortgage or any of the other Loan Documents;

(c)    the existence of any inaccuracy or untruth in any material respect in any representation or warranty contained in this Mortgage or any of the other Loan Documents or of any statement or certification as to facts delivered to the Lender by any Obligor;

(d)    Any Obligor files a voluntary petition in bankruptcy or is adjudicated a bankrupt or insolvent or files any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal, state, or other statute or law, or seeks or consents to or acquiesces in the appointment of any trustee, receiver or similar officer of any Obligor or of all or any substantial part of the property of any Obligor, the Premises or all or a substantial part of the assets of any Obligor are attached, seized, subjected to a writ or distress warrant or are levied upon;

(e)    the commencement of any involuntary petition in bankruptcy against any Obligor, or the institution against any Obligor of any reorganization, arrangement, composition, readjustment, dissolution, liquidation or similar proceedings under any present or future federal, state or other statute or law, or the appointment of a receiver, trustee or similar officer for all or any substantial part of the property of any Obligor;

(f)    the dissolution, termination or merger of the Mortgagor or the occurrence of the death or declaration of legal incompetency of any Obligor;

(g)    the occurrence of a Mortgagor Prohibited Transfer (as defined above);

(h)    the occurrence of an Event of Default under the Note, the Loan Agreement or any of the other Loan Documents; or

(i)    the occurrence of any default or event of default under any document or agreement now existing or hereafter entered into between Lender and any Obligor.

If the Mortgagor is comprised of more than one person or entity, the term "Mortgagor" for purposes of this provision shall mean any one of such persons or entities.

If an Event of Default occurs, the Lender may, at its option, declare the whole of the Indebtedness to be immediately due and payable without further notice to the Mortgagor, with interest thereon accruing from the date of such Event of Default until paid at the Default Rate.

16.    Foreclosure; Expense of Litigation.  (a)  When all or any part of the Indebtedness shall become due, whether by acceleration or otherwise, the Lender shall have the right to foreclose the lien hereof for such Indebtedness or part thereof and/or exercise any right, power or remedy provided in this Mortgage or any of the other Loan Documents in accordance with the Illinois Mortgage Foreclosure Act (Chapter 735, Sections 5/15-1101 et seq., Illinois Compiled Statutes) (as may be amended from time to time, the "Act"). In the event of a foreclosure sale, the Lender is hereby authorized, without the consent of the Mortgagor, to assign any and all insurance policies to the purchaser at such sale or to take such other steps as the Lender may deem advisable to cause the interest of such purchaser to be protected by any of such insurance policies

(b)    In any suit to foreclose the lien hereof, there shall be allowed and included as additional indebtedness in the decree for sale all expenditures and expenses which may be paid or incurred by or on behalf of the Lender for reasonable attorneys' fees, appraisers' fees, outlays for documentary and expert evidence, stenographers' charges, publication costs, and costs (which may be estimated as to items to be expended after entry of the decree) of procuring all such abstracts of title, title searches and examinations, title insurance policies, and similar data and assurances with respect to the title as the Lender may deem reasonably necessary either to prosecute such suit or to evidence to bidders at any sale which may be had pursuant to such decree the true condition of the title to or the value of the Premises. All expenditures and expenses of the nature mentioned in this section and such other expenses and fees as may be incurred in the enforcement of the Mortgagor's obligations hereunder, the protection of said Premises and the maintenance of the lien of this Mortgage, including the reasonable fees of any attorney employed by the Lender in any litigation or proceeding affecting this Mortgage, the Note, or the Premises, including probate and bankruptcy proceedings, or in preparations for the commencement or defense of any proceeding or threatened suit or proceeding shall be immediately due and payable by the Mortgagor, with interest thereon until paid at the Default Rate and shall be secured by this Mortgage.

17.    Application of Proceeds of Foreclosure Sale.  The proceeds of any foreclosure sale of the Premises shall be distributed and applied in accordance with the Act and, unless otherwise specified therein, in such order as the Lender may determine in its sole and absolute discretion.

18.    Appointment of Receiver.  Upon or at any time after the filing of a complaint to foreclose this Mortgage, the court in which such complaint is filed shall, upon petition by the Lender, appoint a receiver for the Premises in accordance with the Act. Such appointment may be made either before or after sale, without notice, without regard to the solvency or insolvency of the Mortgagor at the time of application for such receiver and without regard to the value of the Premises or whether the same shall be then occupied as a homestead or not and the Lender hereunder

15

or any other holder of the Note may be appointed as such receiver. Such receiver shall have power to collect the rents, issues and profits of the Premises (i) during the pendency of such foreclosure suit, (ii) in case of a sale and a deficiency, during the full statutory period of redemption, whether there be redemption or not, and (iii) during any further times when the Mortgagor, but for the intervention of such receiver, would be entitled to collect such rents, issues and profits. Such receiver also shall have all other powers and rights that may be necessary or are usual in such cases for the protection, possession, control, management and operation of the Premises during said period, including, to the extent permitted by law, the right to lease all or any portion of the Premises for a term that extends beyond the time of such receiver's possession without obtaining prior court approval of such lease. The court from time to time may authorize the application of the net income received by the receiver in payment of (a) the Indebtedness, or by any decree foreclosing this Mortgage, or any tax, special assessment or other lien which may be or become superior to the lien hereof or of such decree, provided such application is made prior to foreclosure sale, and (b) any deficiency upon a sale and deficiency.

19.    Lender's Right of Possession in Case of Default. At any time after an Event of Default has occurred, the Mortgagor shall, upon demand of the Lender, surrender to the Lender possession of the Premises. The Lender, in its discretion, may, with process of law, enter upon and take and maintain possession of all or any part of the Premises, together with all documents, books, records, papers and accounts relating thereto, and may exclude the Mortgagor and its employees, agents or servants therefrom, and the Lender may then hold, operate, manage and control the Premises, either personally or by its agents. The Lender shall have full power to use such measures, legal or equitable, as in its discretion may be deemed proper or necessary to enforce the payment or security of the avails, rents, issues, and profits of the Premises, including actions for the recovery of rent, actions in forcible detainer and actions in distress for rent. Without limiting the generality of the foregoing, the Lender shall have full power to:

(a)    cancel or terminate any lease or sublease for any cause or on any ground which would entitle the Mortgagor to cancel the same;

(b)    elect to disaffirm any lease or sublease which is then subordinate to the lien hereof;

(c)    extend or modify any then existing leases and to enter into new leases, which extensions, modifications and leases may provide for terms to expire, or for options to lessees to extend or renew terms to expire, beyond the maturity date of the Loan and beyond the date of the issuance of a deed or deeds to a purchaser or purchasers at a foreclosure sale, it being understood and agreed that any such leases, and the options or other such provisions to be contained therein, shall be binding upon the Mortgagor and all persons whose interests in the Premises are subject to the lien hereof and upon the purchaser or purchasers at any foreclosure sale, notwithstanding any redemption from sale, discharge of the Indebtedness, satisfaction of any foreclosure judgment, or issuance of any certificate of sale or deed to any purchaser;

(d)    make any repairs, renewals, replacements, alterations, additions, betterments and improvements to the Premises as the Lender deems are necessary;

(e)     insure and reinsure the Premises and all risks incidental to the Lender's possession, operation and management thereof; and

(f)     receive all of such avails, rents, issues and profits.

20.     Application of Income Received by Lender. The Lender, in the exercise of the rights and powers hereinabove conferred upon it, shall have full power to use and apply the avails, rents, issues and profits of the Premises to the payment of or on account of the following, in such order as the Lender may determine:

(a)     to the payment of the operating expenses of the Premises, including cost of management and leasing thereof (which shall include compensation to the Lender and its agent or agents, if management be delegated to an agent or agents, and shall also include lease commissions and other compensation and expenses of seeking and procuring tenants and entering into leases), established claims for damages, if any, and premiums on insurance hereinabove authorized;

(b)     to the payment of taxes and special assessments now due or which may hereafter become due on the Premises; and

(c)     to the payment of any Indebtedness, including any deficiency which may result from any foreclosure sale.

21.     Compliance with Illinois Mortgage Foreclosure Law. If any provision in this Mortgage shall be inconsistent with any provision of the Act, provisions of the Act shall take precedence over the provisions of this Mortgage, but shall not invalidate or render unenforceable any other provision of this Mortgage that can be construed in a manner consistent with the Act. If any provision of this Mortgage shall grant to the Lender (including the Lender acting as a mortgagee-in-possession) or a receiver appointed pursuant to the provisions of this Mortgage any powers, rights or remedies prior to, upon or following the occurrence of an Event of Default which are more limited than the powers, rights or remedies that would otherwise be vested in the Lender or in such receiver under the Act in the absence of said provision, the Lender and such receiver shall be vested with the powers, rights and remedies granted in the Act to the full extent permitted by law. Without limiting the generality of the foregoing, all expenses incurred by the Lender which are of the type referred to in Section 5/15-1510 or 5/15-1512 of the Act, whether incurred before or after any decree or judgment of foreclosure, and whether or not specifically enumerated in this Mortgage, shall be added to the Indebtedness and/or by the judgment of foreclosure.

22.     Rights Cumulative. Each right, power and remedy herein conferred upon the Lender is cumulative and in addition to every other right, power or remedy, express or implied, given now or hereafter existing under any of the Loan Documents or at law or in equity, and each and every right, power and remedy herein set forth or otherwise so existing may be exercised from time to time as often and in such order as may be deemed expedient by the Lender, and the exercise or the beginning of the exercise of one right, power or remedy shall not be a waiver of the right to exercise at the same time or thereafter any other right, power or remedy, and no delay or omission of the Lender in the exercise of any right, power or remedy accruing hereunder or arising otherwise shall impair any

17

such right, power or remedy, or be construed to be a waiver of any Event of Default or acquiescence therein.

23. _Lender's Right of Inspection_. The Lender and its representatives shall have the right to inspect the Premises and the books and records with respect thereto at all reasonable times upon not less than twenty four (24) hours prior notice to the Mortgagor, and access thereto, subject to the rights of tenants in possession, shall be permitted for that purpose.

24. _Release Upon Payment and Discharge of Mortgagor's Obligations_. The Lender shall release this Mortgage and the lien hereof by proper instrument upon payment and discharge of all Indebtedness, including payment of all reasonable expenses incurred by the Lender in connection with the execution of such release.

25. _Notices_. Any notices, communications and waivers under this Mortgage shall be in writing and shall be (a) delivered in person, (b) mailed, postage prepaid, either by registered or certified mail, return receipt requested, or (c) sent by overnight express carrier, addressed in each case as follows:

| | |
|---|---|
| To the Lender: | Urban Partnership Bank |
| | 7936 S. Cottage Grove |
| | Chicago, Illinois 60619 |
| | Attention: Real Estate Department |
| | |
| With a copy to: | Urban Partnership Bank |
| | 55 East Jackson, 16th Floor |
| | Chicago, Illinois 60604 |
| | Attention: Legal Department |
| | |
| To the Mortgagor: | Sandal, Inc. |
| | 3673 W. North Shore Avenue |
| | Lincolnwood, Illinois 60712 |

or to any other address as to any of the parties hereto, as such party shall designate in a written notice to the other party hereto. All notices sent pursuant to the terms of this section shall be deemed received (i) if personally delivered, then on the date of delivery, (ii) if sent by overnight, express carrier, then on the next federal banking day immediately following the day sent, or (iii) if sent by registered or certified mail, then on the earlier of the third federal banking day following the day sent or when actually received.

26. _Waiver of Rights_. The Mortgagor hereby covenants and agrees that it will not at any time insist upon or plead, or in any manner claim or take any advantage of, any stay, exemption or extension law or any so-called "Moratorium Law" now or at any time hereafter in force providing for the valuation or appraisement of the Premises, or any part thereof, prior to any sale or sales thereof to be made pursuant to any provisions herein contained, or to decree, judgment or order of any court of competent jurisdiction; or, after such sale or sales, claim or exercise any rights under any statute now or hereafter in force to redeem the property so sold, or any part thereof, or relating to the marshalling thereof, upon foreclosure sale or other enforcement hereof; and without limiting the foregoing:

(a)     The Mortgagor hereby expressly waives any and all rights of reinstatement and redemption, if any, under any order or decree of foreclosure of this Mortgage, on its own behalf and on behalf of each and every person, it being the intent hereof that any and all such rights of reinstatement and redemption of the Mortgagor and of all other persons are and shall be deemed to be hereby waived to the full extent permitted by the provisions of Illinois Compiled Statutes 735 ILCS 5/15-1601 or other applicable law or replacement statutes;

(b)     The Mortgagor will not invoke or utilize any such law or laws or otherwise hinder, delay or impede the execution of any right, power remedy herein or otherwise granted or delegated to the Lender but will suffer and permit the execution of every such right, power and remedy as though no such law or laws had been made or enacted.

27.     Contests. Notwithstanding anything to the contrary herein contained, the Mortgagor shall have the right to contest by appropriate legal proceedings diligently prosecuted any Taxes imposed or assessed upon the Premises or which may be or become a lien thereon and any mechanics', materialmen's or other liens or claims for lien upon the Premises (each, a "Contested Liens"), and no Contested Lien shall constitute an Event of Default hereunder, if, but only if:

(a)     The Mortgagor shall forthwith give notice of any Contested Lien to the Lender at the time the same shall be asserted;

(b)     The Mortgagor shall either pay under protest or deposit with the Lender the full amount (the "Lien Amount") of such Contested Lien, together with such amount as the Lender may reasonably estimate as interest or penalties which might arise during the period of contest; provided that in lieu of such payment the Mortgagor may furnish to the Lender a bond or title indemnity in such amount and form, and issued by a bond or title insuring company, as may be satisfactory to the Lender;

(c)     The Mortgagor shall diligently prosecute the contest of any Contested Lien by appropriate legal proceedings having the effect of staying the foreclosure or forfeiture of the Premises, and shall permit the Lender to be represented in any such contest and shall pay all expenses incurred, in so doing, including fees and expenses of the Lender's counsel (all of which shall constitute so much additional Indebtedness bearing interest at the Default Rate until paid, and payable upon demand);

(d)     The Mortgagor shall pay each such Contested Lien and all Lien Amounts together with interest and penalties thereon (i) if and to the extent that any such Contested Lien shall be determined adverse to the Mortgagor, or (ii) forthwith upon demand by the Lender if, in the opinion of the Lender, and notwithstanding any such contest, the Premises shall be in jeopardy or in danger of being forfeited or foreclosed; provided that if the Mortgagor shall fail so to do, the Lender may, but shall not be required to, pay all such Contested Liens and Lien Amounts and interest and penalties thereon and such other sums as may be necessary in the judgment of the Lender to obtain the release and discharge of such liens; and any amount expended by the Lender in so doing shall be so much additional Indebtedness bearing interest at the Default Rate until paid, and payable upon demand; and provided further that the Lender may in such case use and apply monies deposited as

provided in subsection (b) above and may demand payment upon any bond or title indemnity furnished as aforesaid.

28. Expenses Relating to Note and Mortgage.

(a)     The Mortgagor will pay all expenses, charges, costs and fees relating to the Loan or necessitated by the terms of the Note, this Mortgage or any of the other Loan Documents, including without limitation, the Lender's reasonable attorneys' fees in connection with the preparation, negotiation, documentation, administration, servicing and enforcement of the Note, this Mortgage and the other Loan Documents, all filing, registration and recording fees, all other expenses incident to the execution and acknowledgment of this Mortgage (including, without limitation, title insurance expenses) and all federal, state, county and municipal taxes, and other taxes (provided the Mortgagor shall not be required to pay any income or franchise taxes of the Lender), duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Note and this Mortgage. The Mortgagor recognizes that, during the term of this Mortgage, the Lender:

(i)     May be involved in court or administrative proceedings, including, without restricting the foregoing, foreclosure, probate, bankruptcy, creditors' arrangements, insolvency, housing authority and pollution control proceedings of any kind, to which the Lender shall be a party by reason of the Loan Documents or in which the Loan Documents or the Premises are involved directly or indirectly;

(ii)     May make preparations following the occurrence of an Event of Default hereunder for the commencement of any suit for the foreclosure hereof, which may or may not be actually commenced;

(iii)     May make preparations following the occurrence of an Event of Default hereunder for, and do work in connection with, the Lender's taking possession of and managing the Premises, which event may or may not actually occur;

(iv)     May make preparations for and commence other private or public actions to remedy an Event of Default hereunder, which other actions may or may not be actually commenced;

(v)     May enter into negotiations with the Mortgagor or any of its agents, employees or attorneys in connection with the existence or curing of any Event of Default hereunder, the sale of the Premises, the assumption of liability for any of the Indebtedness or the transfer of the Premises in lieu of foreclosure; or

(vi)     May enter into negotiations with the Mortgagor or any of its agents, employees or attorneys pertaining to the Lender's approval of actions taken or proposed to be taken by the Mortgagor which approval is required by the terms of this Mortgage.

(b)     All expenses, charges, costs and fees described in this section shall be so much additional Indebtedness, shall bear interest from the date so incurred until paid at the Default Rate and shall be paid, together with said interest, by the Mortgagor forthwith upon demand.

29.     Statement of Indebtedness.   The Mortgagor, within seven days after being so requested by the Lender, shall furnish a duly acknowledged written statement setting forth the amount of the debt secured by this Mortgage, the date to which interest has been paid and stating either that no offsets or defenses exist against such debt or, if such offsets or defenses are alleged to exist, the nature thereof.

30.     Further Instruments.  Upon request of the Lender, the Mortgagor shall execute, acknowledge and deliver all such additional instruments and further assurances of title and shall do or cause to be done all such further acts and things as may reasonably be necessary fully to effectuate the intent of this Mortgage and of the other Loan Documents.

31.     Additional Indebtedness Secured.  All persons and entities with any interest in the Premises or about to acquire any such interest should be aware that this Mortgage secures more than the stated principal amount of the Note and interest thereon; this Mortgage secures any and all other amounts which may become due under the Note, any of the other Loan Documents or any other document or instrument evidencing, securing or otherwise affecting the Indebtedness, including, without limitation, any and all amounts expended by the Lender to operate, manage or maintain the Premises or to otherwise protect the Premises or the lien of this Mortgage.

32.     Indemnity.  The Mortgagor hereby covenants and agrees that no liability shall be asserted or enforced against the Lender in the exercise of the rights and powers granted to the Lender in this Mortgage, and the Mortgagor hereby expressly waives and releases any such liability, except to the extent resulting from the gross negligence or willful misconduct of the Lender.   The Mortgagor shall indemnify and save the Lender harmless from and against any and all liabilities, obligations, losses, damages, claims, costs and expenses, including reasonable attorneys' fees and court costs (collectively, "Claims"), of whatever kind or nature which may be imposed on, incurred by or asserted against the Lender at any time by any third party which relate to or arise from: (a) any suit or proceeding (including probate and bankruptcy proceedings), or the threat thereof, in or to which the Lender may or does become a party, either as plaintiff or as a defendant, by reason of this Mortgage or for the purpose of protecting the lien of this Mortgage; (b) the offer for sale or sale of all or any portion of the Premises; and (c) the ownership, leasing, use, operation or maintenance of the Premises, if such Claims relate to or arise from actions taken prior to the surrender of possession of the Premises to the Lender in accordance with the terms of this Mortgage; provided, however, that the Mortgagor shall not be obligated to indemnify or hold the Lender harmless from and against any Claims directly arising from the gross negligence or willful misconduct of the Lender.  All costs provided for herein and paid for by the Lender shall be so much additional Indebtedness and shall become immediately due and payable upon demand by the Lender and with interest thereon from the date incurred by the Lender until paid at the Default Rate.

33.     Subordination of Property Manager's Lien.  Any property management agreement for the Premises entered into hereafter with a property manager shall contain a provision whereby the property manager agrees that any and all mechanics' lien rights that the property manager or anyone claiming by, through or under the property manager may have in the Premises shall be subject and subordinate to the lien of this Mortgage and shall provide that the Lender may terminate such agreement, without penalty or cost, at any time after the occurrence of an Event of Default hereunder.  Such property management agreement or a short form thereof, at the Lender's request, shall be recorded with the Recorder of Deeds of the county where the Premises are located.  In

addition, if the property management agreement in existence as of the date hereof does not contain a subordination provision, the Mortgagor shall cause the property manager under such agreement to enter into a subordination of the management agreement with the Lender, in recordable form, whereby such property manager subordinates present and future lien rights and those of any party claiming by, through or under such property manager to the lien of this Mortgage.

34. Miscellaneous.

(a) Successors and Assigns. This Mortgage and all provisions hereof shall be binding upon and enforceable against the Mortgagor and its assigns and other successors. This Mortgage and all provisions hereof shall inure to the benefit of the Lender, its successors and assigns and any holder or holders, from time to time, of the Note.

(b) Invalidity of Provisions; Governing Law. In the event that any provision of this Mortgage is deemed to be invalid by reason of the operation of law, or by reason of the interpretation placed thereon by any administrative agency or any court, the Mortgagor and the Lender shall negotiate an equitable adjustment in the provisions of the same in order to effect, to the maximum extent permitted by law, the purpose of this Mortgage and the validity and enforceability of the remaining provisions, or portions or applications thereof, shall not be affected thereby and shall remain in full force and effect. This Mortgage is to be construed in accordance with and governed by the laws of the State of Illinois.

(c) Municipal Requirements. The Mortgagor shall not by act or omission permit any building or other improvement on premises not subject to the lien of this Mortgage to rely on the Premises or any part thereof or any interest therein to fulfill any municipal or governmental requirement, and the Mortgagor hereby assigns to the Lender any and all rights to give consent for all or any portion of the Premises or any interest therein to be so used. Similarly, no building or other improvement on the Premises shall rely on any premises not subject to the lien of this Mortgage or any interest therein to fulfill any governmental or municipal requirement. Any act or omission by the Mortgagor which would result in a violation of any of the provisions of this subsection shall be void.

(d) Rights of Tenants. The Lender shall have the right and option to commence a civil action to foreclose this Mortgage and to obtain a decree of foreclosure and sale subject to the rights of any tenant or tenants of the Premises having an interest in the Premises prior to that of the Lender. The failure to join any such tenant or tenants of the Premises as party defendant or defendants in any such civil action or the failure of any decree of foreclosure and sale to foreclose their rights shall not be asserted by the Mortgagor as a defense in any civil action instituted to collect the Indebtedness, or any part thereof or any deficiency remaining unpaid after foreclosure and sale of the Premises, any statute or rule of law at any time existing to the contrary notwithstanding.

(e) Option of Lender to Subordinate. At the option of the Lender, this Mortgage shall become subject and subordinate, in whole or in part (but not with respect to priority of entitlement to insurance proceeds or any condemnation or eminent domain award) to any and all leases of all or any part of the Premises upon the execution by the Lender of a unilateral declaration to that effect and the recording thereof in the Office of the Recorder of Deeds in and for the county wherein the Premises are situated.

22

(f)     Mortgagee-in-Possession.     Nothing herein contained shall be construed as constituting the Lender a mortgagee-in-possession in the absence of the actual taking of possession of the Premises by the Lender pursuant to this Mortgage.

(g)     Relationship of Lender and Mortgagor.  The Lender shall in no event be construed for any purpose to be a partner, joint venturer, agent or associate of the Mortgagor or of any lessee, operator, concessionaire or licensee of the Mortgagor in the conduct of their respective businesses, and, without limiting the foregoing, the Lender shall not be deemed to be such partner, joint venturer, agent or associate on account of the Lender becoming a mortgagee-in-possession or exercising any rights pursuant to this Mortgage, any of the other Loan Documents, or otherwise. The relationship of the Mortgagor and the Lender hereunder is solely that of debtor/creditor.

(h)     Time of the Essence. Time is of the essence of the payment by the Mortgagor of all amounts due and owing to the Lender under the Note and the other Loan Documents and the performance and observance by the Mortgagor of all terms, conditions, obligations and agreements contained in this Mortgage and the other Loan Documents.

(i)     No Merger. The parties hereto intend that the Mortgage and the lien hereof shall not merge in fee simple title to the Premises, and if the Lender acquires any additional or other interest in or to the Premises or the ownership thereof, then, unless a contrary intent is manifested by the Lender as evidenced by an express statement to that effect in an appropriate document duly recorded, this Mortgage and the lien hereof shall not merge in the fee simple title and this Mortgage may be foreclosed as if owned by a stranger to the fee simple title.

(j)     Maximum Indebtedness. Notwithstanding anything contained herein to the contrary, in no event shall the Indebtedness secured by this Mortgage exceed an amount equal five hundred percent of the face amount of the Note; provided, however, that Lender shall not be obligated to advance funds in excess of the face amount of the Note.

(k)     CONSENT TO JURISDICTION.  TO INDUCE THE LENDER TO ACCEPT THE NOTE, THE MORTGAGOR IRREVOCABLY AGREES THAT, SUBJECT TO THE LENDER'S SOLE AND ABSOLUTE ELECTION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THE NOTE AND THIS MORTGAGE WILL BE LITIGATED IN COURTS HAVING SITUS IN WILL COUNTY OR COOK COUNTY, ILLINOIS. THE MORTGAGOR HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY COURT LOCATED WITHIN WILL COUNTY OR COOK COUNTY, ILLINOIS, WAIVES PERSONAL SERVICE OF PROCESS UPON THE MORTGAGOR, AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL DIRECTED TO THE MORTGAGOR AT THE ADDRESS STATED HEREIN AND SERVICE SO MADE WILL BE DEEMED TO BE COMPLETED UPON ACTUAL RECEIPT.

(l)     WAIVER OF JURY TRIAL.  THE MORTGAGOR AND THE LENDER (BY ACCEPTANCE HEREOF), HAVING BEEN REPRESENTED BY COUNSEL EACH KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS MORTGAGE OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT,

23

INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS MORTGAGE OR (B) ARISING FROM ANY BANKING RELATIONSHIP EXISTING IN CONNECTION WITH THIS MORTGAGE, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. THE MORTGAGOR AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST THE LENDER OR ANY OTHER PERSON INDEMNIFIED UNDER THIS MORTGAGE ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

(m) Complete Agreement. This Mortgage, the Note and the other Loan Documents constitute the complete agreement between the parties with respect to the subject matter hereof and the Loan Documents may not be modified, altered or amended except by an agreement in writing signed by both the Mortgagor and the Lender.

IN WITNESS WHEREOF, the Mortgagor has executed and delivered this Mortgage, Security Agreement, Assignment of Rents and Leases and Fixture Filing the day and year first above written.

SANDAL, INC.

By: ⎯Bushra  Naseer⎯

Bushra Naseer, President

STATE OF ILLINOIS )
) SS
COUNTY OF _Cook_ )

The undersigned, a Notary Public in and for the said County, in the State aforesaid, does hereby certify that BUSHRA NASEER, as the President of Sandal, Inc., who is personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that as such officer, she signed and delivered the said instrument as her free and voluntary act and as the free and voluntary act of said entity, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _3RD_ day of _OCTOBER_, 201_2_.

_Karen P. Poland_

Notary Public

"OFFICIAL SEAL"
Karen P Poland
Notary Public, State of Illinois
My Commission Expires 8/5/2013

24

**TRUSTEE'S DEED** (INDIVIDUAL)

THIS INSTRUMENT WAS PREPARED BY
**DESIRE'E ANN MARKS**
**BANCO POPULAR NORTH AMERICA**
8383 WEST BELMONT AVE., RIVER GROVE, IL

0010785561

7210/0363 07 001 Page 1 of 3
2001-08-24 14:50:40
Cook County Recorder 47.00

THIS INDENTURE, made this 20TH day of AUGUST 2001 between BANCO POPULAR NORTH AMERICA, AS SUCCESSOR TRUSTEE TO PIONEER BANK AND TRUST, a corporation of New York duly organized and existing as an New York corporation under the laws of the United States of America, and duly authorized to accept and execute trusts within the State of New York, not personally but as Trustee under the provisions of a deed or deeds in trust duly recorded and

The above space for recorders use only

delivered to said Illinois Corporation in pursuance of a certain Trust Agreement, dated the 14TH day of JANUARY, 1992, and known as Trust Number 25566, party of the first part, and **MUHAMMED B. CHAUDRY, 6655 NORTH MOTICELLO, LINCOLNWOOD, ILLINOIS** party of the second part.

WITNESSETH, that said party of the first part, in consideration of the sum of Ten and No/100 Dollars, and other good and valuable considerations in hand paid, does hereby convey and quit claim unto said parties of the second part, the following described real estate, situated in COOK County, Illinois, to-wit:

**SEE RIDER ATTACHED HERETO AND MADE HEREOF**

Common Address: 3635 WEST ARMITAGE AVENUE, CHICAGO, ILLINOIS 60647

PIN: 13-35-305-047-0000

together with the tenements and appurtenances thereunto belonging.

TO HAVE AND TO HOLD the same unto said party of the second part, and to the proper use, benefit and behoof, forever, of said party of the second part.

SUBJECT TO:



STATE OF ILLINOIS
STATE TAX
AUG.23.01
REAL ESTATE TRANSFER TAX
DEPARTMENT OF REVENUE

REAL ESTATE TRANSFER TAX
0000013808
0040000
* FP 102808


COOK COUNTY
REAL ESTATE TRANSACTION TAX
COUNTY TAX
AUG.23.01
REVENUE STAMP


REAL ESTATE TRANSFER TAX
0000013833
0020000
FP 102802



CITY OF CHICAGO
CITY TAX
AUG.23.01
REAL ESTATE TRANSACTION TAX
DEPARTMENT OF REVENUE

REAL ESTATE TRANSFER TAX
0000001700
0299250
* FP 102805

DEED.DOC

**BOX 333-CTI**

This deed is executed by the party of the first part, as Trustee, as aforesaid, pursuant to and in the exercise of the power and authority granted to and vested in it by the terms of said Deed or Deeds in Trust and the provisions of said Trust Agreement above mentioned, and of every other power and authority thereunto enabling. This deed is made subject to the liens of all trust deeds and/or mortgages upon said real estate, if any, recorded or registered in said county.

IN WITNESS WHEREOF, said party of the first part has caused its corporate seal to be hereto affixed, and has caused its name to be signed to these presents by one of its Vice Presidents/Trust Officer and attested by its Assistant Secretary, the day and year first above written.

**BANCO POPULAR NORTH AMERICA,**
as Trustee, as aforesaid, and not personally,

By _____
VICE PRESIDENT/TRUST OFFICER

Attest _____
ASSISTANT SECRETARY

STATE OF ILLINOIS  } SS.
COUNTY OF COOK

I, the undersigned, a Notary Public in and for the County and State aforesaid, DO HEREBY CERTIFY, that the above named Vice President /Trust Officer and Assistant Secretary of the **BANCO POPULAR NORTH AMERICA,** An New York Corporation, Grantor, personally known to me to be the same persons whose names are subscribed to the foregoing instrument as such Vice President/Trust Officer and Assistant Secretary respectively, appeared before me this day in person and acknowledged that they signed and delivered the said instrument as their own free and voluntary act and as the free and voluntary act of said New York Corporation for the uses and purposes therein set forth; and the said Assistant Secretary then and there acknowledged that said Assistant Secretary, as custodian of the corporate seal of said New York Corporation caused the corporate seal of said New York Corporation to be affixed to said instrument as said Assistant Secretary's own free and voluntary act and as the free and voluntary act of said New York Corporation for the uses and purposes therein set forth.

Given under my hand and Notary Seal,      Date **August 20, 2001**

OFFICIAL SEAL
DESIRE'E ANN MARKS
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:09/04/04

Notary Public _____

D E L I V E R Y

NAME *MUHAMMED B. CHAUDRY*

STREET *6655 N. MONTICELLO*

CITY *LINCOLNWOOD, ILL 60712*

INSTRUCTIONS      RECORDER'S OFFICE BOX NUMBER _____

FOR INFORMATION ONLY
INSERT STREET ADDRESS OF ABOVE
DESCRIBED PROPERTY HERE

*3635 W. Armitage Ave*
*Chicago, IL 60647*

DEED.DOC

## EXHIBIT "A"

Lot 1 and 2 in Block 2 in Samuel Delameter's Subdivision of the North 430 feet of the East half of the Northeast quarter of the Southwest quarter of Section 35, Township 40 North, Range 13, East of the Third Principal Meridian in Cook County, Illinois.

Beginning at the Northeast corner of Lot 1 in Block 2, said point being the intersection of the South line of Armitage Avenue and the West line of Monticello Avenue, thence South on said West line of Monticello Avenue a distance of 130 feet to the Southeast corner of said Lot 1; thence West on the South line of Lots 1 and 2 a distance of 48 feet to the Southwest corner of said Lot 2, thence North on the West line of said Lot 2; a distance of 130 feet to the Northwest corner of Lot 2; said point being on the South line of Armitage Avenue, thence East on said South line of Armitage Avenue, a distance of 48 feet to the place of beginning, all in Samuel Delameter's Subdivision.

Permanent Tax Number          13-35-305-047-0000

Property Address              3635 West Armitage Avenue
                              Chicago, Illinois  60647

1078561

**GEORGE E. COLE®**    **No. 806-REC**
**LEGAL FORMS**    **May 1996**



Doc#: 1229226140 Fee: $40.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 10/18/2012 01:56 PM Pg: 1 of 2

### WARRANTY DEED
### Statutory (Illinois)
### (Individual to Corporation)

Caution: Consult a lawyer before using or
acting under this form. *Neither the publisher
nor the seller of this form makes any
warranty of merchantability or fitness for a
particular purpose.*

THE GRANTOR,
   Muhammed B. Chaudry, a married person

**Above Space for Recorder's use only**

of the Village _____ of Lincolnwood County of ___ Cook ___ State of __Illinois__ for and in consideration of

__Ten and no/100($10.00)__ -- DOLLARS, and other good and valuable considerations _____

_____ in hand paid, CONVEYS _____ and WARRANTS _____ to

   SANDAL, INC., an Illinois Corporation in good standing, 3673 W. NORTH SHORE AVE
                        LINCOLNWOOD, IL 60712

a corporation created and existing under and by virtue of the Laws of the State of __Illinois__ having its principal office at

the following address ___3673 W. Northshore, Lincolnwood the following described Real Estate situated in the County

of ___ Cook _____ in the State of Illinois, to wit:

Lot 1 and 2 in Block 2 in Samuel Delameter's Subdivision of the North 430 Feet of the
East ½ of the Northeast ¼ of the Southwest ¼ of Section 35, Township 40 North, Range 13,
East of the Third Principal Meridian, in Cook County, Illinois.

hereby releasing and waiving all rights under and by virtue of the Homestead Exemption Laws of the State of Illinois.

SUBJECT TO: covenants, conditions, and restrictions of record,

Document No.(s) _____ ; _____ ; and to General Taxes for ___2011___ and subsequent years.

Permanent Real Estate Index Number(s): __13-35-305-047-0000__

Address(es) of Real Estate: ___3635 W. Armitage Chicago, IL. 60647__

                          Dated this ___3rd___ day of ___Oct.___   2012

**PLEASE
PRINT OR
TYPE NAME(S)
BELOW
SIGNATURE(S)**

Muhammed B. Chaudry    (SEAL) _____ **P.N.T.N.** _____ (SEAL)

_____ (SEAL) _____ (SEAL)

                                                S Y
                                                P 2
                                                 S A
                                                 SC Y
                                                 INT

GEORGE E. COLE®
LEGAL FORMS

WARRANTY DEED
Individual to Corporation

TO

**REAL ESTATE TRANSFER** 10/04/2012

| | |
|---|---|
| CHICAGO: | $2,175.00 |
| CTA: | $870.00 |
| TOTAL: | $3,045.00 |

13-35-305-047-0000 | 20121001601145 | Q7UDJH

"OFFICIAL SEAL"
Karen P Poland
Notary Public, State of Illinois
My Commission Expires 8/5/2013

**REAL ESTATE TRANSFER** 10/04/2012

| | |
|---|---|
| COOK | $145.00 |
| ILLINOIS: | $290.00 |
| TOTAL: | $435.00 |

13-35-305-047-0000 | 20121001601145 | 1RSU2A

State of Illinois, County of _____ Cook _____ ss. I, the undersigned, a Notary Public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that Muhammed B. Ghaudry

IMPRESS
SEAL
HERE

personally known to me to be the same person _____ whose name __he__ subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that ____ he signed, sealed and delivered the said instrument as his free and voluntary act, for the uses and purposes therein set forth, including the release and waiver of the right of homestead.

Given under my hand and official seal, this _____ 3rd _____ day of _____ OCT. _____ 10 2012

Commission expires AUGUST 5 10 2013                                    NOTARY PUBLIC

This instrument was prepared by __Tom V. Mathai 4001 W. Devon Ave, Suite 208, Chicago, IL. 60646__

(Name and Address)

MAIL TO:
Sandal, Inc
(Name)
3673 W. Northshore
Lincolnwood, IL. 60712
(Address)

(City, State and Zip)

SEND SUBSEQUENT TAX BILLS TO:

Sandal, Inc.
(Name)
3673 W. Northshore
Lincolnwood, IL. 60712
(Address)

(City, State and Zip)

OR          RECORDER'S OFFICE BOX NO. _____